# 24-2803

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, Individually
and on behalf of all others similarly situated, ROBECO CAPITAL
GROWTH FUNDS SICAV–ROBECO GLOBAL CONSUMER TRENDS,

*Plaintiffs-Appellants,*

—against—

PELOTON INTERACTIVE, INC., THOMAS CORTESE, JOHN FOLEY, WILLIAM
LYNCH, JILL WOODWORTH, MARIANA GARAVAGLIA, HISAO KUSHI,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

HANNAH G. ROSS
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 554-1400

DANIEL L. BERGER
KARIN E. FISCH
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, New York 10017
(646) 722-8500

*Attorneys for Plaintiffs-Appellants*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................... iii

RULE 26.1 DISCLOSURE STATEMENT ...................................... 1

JURISDICTIONAL STATEMENT .................................................. 1

ISSUE PRESENTED FOR REVIEW ............................................... 2

INTRODUCTION ........................................................................... 2

STATEMENT OF THE CASE ......................................................... 7

I. FACTS ................................................................................ 7

    A. PELOTON'S STATEMENTS ABOUT DEMAND FOR ITS PRODUCTS WERE FACTUAL AND FALSE ................................................. 7

    B. DEFENDANTS MADE SPECIFIC STATEMENTS ABOUT PELOTON'S INVENTORY THAT WERE FALSE ........................................ 11

    C. INVESTORS LEARN THE TRUTH ......................................... 15

    D. AFTER THE CLASS PERIOD, DEFENDANTS ADMITTED THE TRUTH ABOUT INVENTORY AND DEMAND ........................... 16

II. PROCEDURAL HISTORY AND RULING BELOW ................... 17

SUMMARY OF ARGUMENT ....................................................... 18

STANDARD OF REVIEW ............................................................ 21

ARGUMENT ................................................................................ 21

I. ISSUES REACHED BY THE DISTRICT COURT ...................... 21

    A. THE SAC PLEADS MATERIALLY FALSE AND MISLEADING STATEMENTS ................................................................ 21

        1. The SAC Adequately Pleads Misstatements Regarding Demand ...................................................................... 23

i

2. The SAC Adequately Pleads Misstatements Regarding Inventory ...................................................................26

3. The District Court Improperly Discounted the Reports of the CWs..............................................................30

4. Eight Dismissed Statements Are Not Forward-Looking and Were Not Accompanied by Meaningful Cautionary Language ......................................................................35

5. Peloton's Risk Warnings Were Misleading.............................41

6. Statements 9 and 19 Are Not Puffery or Opinions ..................44

II. ISSUES NOT REACHED BY THE DISTRICT COURT ...........................48

   A. THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ............................48

1. Defendants Had Actual Knowledge That Sales Were Declining, Quotas Were Missed, and Inventory Was Building....................................................................49

2. Inventory and Demand Were Core Matters at Peloton.............52

3. Internal Documents Support Defendants' Scienter .................53

4. Defendants' Insider Trades ......................................................53

   B. THE SAC ADEQUATELY ALLEGES A SECTION 20A CLAIM...................58

   C. THE COMPLAINT ADEQUATELY ALLEGES A CONTROL PERSON LIABILITY CLAIM ......................................................................58

CONCLUSION .................................................................. 59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*,
   529 F. Supp. 3d 111 (S.D.N.Y. 2021) ................................58

*In re Am. Bus. Computers Corp. Sec. Litig.*,
   MDL No. 913, 1994 WL 848690 (S.D.N.Y. 1994) ...........................58

*In re AppHarvest Securities Litig.*,
   684 F. Supp. 3d 201 (S.D.N.Y. 2023) ..............................31

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...............................52

*Ashcroft v. Iqbal*,
   556 U.S. 678 (2009) ...........................................29

*Bishins v. CleanSpark, Inc.*,
   No. 21 CV 511 (LAP), 2023 WL 112558 (S.D.N.Y. Jan. 5, 2023) ..................39

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v.
   Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011) .............................54

*Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v.
   Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...........................42

*Caiola v Citibank, N.A., N.Y.*,
   295 F.3d 312 (2d Cir. 2002) ...........................................22

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) .......................................38

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ...........................54

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020) ...........................54

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ............................................................53

*In re Deutsche Bank AG Sec. Litig.*,
No. 09-CV-1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25,
2016) ............................................................................................................22

*Emps.' Ret. Sys. of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ........................................................*passim*

*In re Facebook, Inc., IPO Secs. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................................................39, 43

*In re Finisar Corp. Sec. Litig.*,
646 F. App'x 506 (9th Cir. 2016) ........................................................5, 27

*Frankfurt-Tr Inv. Luxemborg Ag v. United Techs. Corp*,
336 F. Supp 3d 196 (S.D.N.Y. 2018) ............................................................30

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................22

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) ............................................................39

*Garber v. Legg Mason, Inc.*,
347 F. App'x 665 (2d. Cir. 2009) ............................................................25

*George v. China Auto. Sys., Inc.*,
No. 11 CIV. 7533 KBF, 2012 WL 3205062 (S.D.N.Y. Aug. 8,
2012) ............................................................................................................55

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ........................................................45, 49

*Gormley v. Magicjack Vocaltec Ltd.*,
220 F. Supp. 3d 510 (S.D.N.Y. 2016) ............................................................38

*Hartford Courant Co. v. Pellegrino*,
380 F.3d 83 (2d Cir. 2004) ............................................................48

*In re Honest Co. Sec. Litig.*,
615 F. Supp. 3d 1149 (C.D. Cal. 2022) ............................................................24

iv

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) ............................................................21, 24

*Karimi v. Deutsche Bank Aktiengesellschaft*,
607 F. Supp. 3d 381 (S.D.N.Y. 2022) ...............................................45

*Kasilingam v. Tilray, Inc.*,
No. 20-CV-03459 (PAC), 2022 WL 4537846 (S.D.N.Y. Sept. 28,
2022) ....................................................................................................55

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..............................................................29

*Leadersel Innotech ESG v. Teladoc Health, Inc., et al.*,
No. 23-1112-CV, 2024 WL 4274362 (2d Cir. Sept. 24, 2024)..................*passim*

*In re McKesson HBOC Inc. Sec. Litig.*,
126 F. Supp 2d 1238 (N.D. Cal. 2000) ..............................................37

*Meyer v. Concordia Int'l Corp.*,
No. 16 CIV. 6467 (RMB), 2017 WL 4083603 (S.D.N.Y. July 28,
2017) ....................................................................................................57

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ...............................................................22

*Moshell v. Sasol Ltd.*,
481 F. Supp. 3d 280 (S.D.N.Y. 2020) ................................................50

*In re Mylan N.V. Sec. Litig.*,
No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28,
2018) ....................................................................................................53

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.*,
709 F.3d 109 (2d Cir. 2013) ...............................................................31

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ....................................................*passim*

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018) ................................................56

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000) .................................................28, 45, 48

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ...............................................................24

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
 300 F. Supp. 3d 551 (S.D.N.Y. 2018) ..............................................46, 47

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015)................................................................................47

*In re Oxford Health Plans, Inc.*,
 187 F.R.D. 133 (S.D.N.Y 1999)........................................................54, 58

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ......................................39

*In re Petrobras Sec. Litig.*,
 116 F. Supp. 3d 368 (S.D.N.Y. 2015) ..............................................45, 48

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
 No. 17-CV-5753, 2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019).......................44

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l, N.V.*,
 89 F. Supp. 3d 602 (S.D.N.Y. 2015) .....................................................52

*In re Pretium Res. Inc. Sec. Litig.*,
 256 F. Supp. 3d 459 (S.D.N.Y. 2017) ...................................................52

*In re Quality Sys., Inc. Sec. Litig.*,
 865 F.3d 1130 (9th Cir. 2017) .......................................................*passim*

*Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*,
 No. 23 CIV. 2138 (JPC), 2024 WL 4354809 (S.D.N.Y. Sept. 30,
 2024) .....................................................................................................46

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001) ...................................................................54

*S.E.C. v. McCaskey*,
 No. 98 CIV 6153 (SWK) (AJP), 2002 WL 850001 (S.D.N.Y. Mar.
 26, 2002) ................................................................................................58

*In re Salix Pharms., Ltd.*,
    14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y April 22,
    2016) ................................................................................................49

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    No. 22-CV-6339 (AS), 2024 WL 1898512 (S.D.N.Y. May 1, 2024) ...............24

*In re Secure Computing Corp. Sec. Litig.*,
    184 F. Supp. 2d 980 (N.D. Cal. 2001) ...............................................54

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ......................................................38, 43

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
    No. 3:09-CV-2083(RNC), 2018 WL 1587457 (D. Conn. Mar. 31,
    2018) ...........................................................................24, 28

*Simon v. Am. Power Conversion Corp.*,
    945 F. Supp. 416 (D.R.I. 1996) ......................................................28

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) .........................................................23

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010) ................................................38

*Smilovits v. First Solar, Inc.*,
    No. CV12-0555-PHX-DGC, 2019 WL 7282026 (D. Ariz. Dec. 27,
    2019) ...........................................................................56

*In Re SolarEdge Tech. Sec. Litig.*,
    No. 1:23-CV-9748-GHW, 2024 WL 4979296 (S.D.N.Y Dec. 4,
    2024) ......................................................................*passim*

*Speakes v. Taro Pharm. Indus., Ltd.*,
    No. 16-CV-08318 (ALC), 2018 WL 4572987 (S.D.N.Y. Sept. 24,
    2018) ...........................................................................52

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................58

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ...............................................................6, 48

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016) ................................................47

*In re Vivendi S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ...............................................22, 35, 38

*Wang v. Cloopen Grp. Holding Ltd.*,
  No. 21-CV-10610 (JGK), 2023 WL 2534599 (S.D.N.Y. Mar. 16,
  2023) ................................................................................................44

*In re Wells Fargo & Co. Sec. Litig.*,
  No. 1:20-CV-04494 (GHW), 2021 WL 4482102 (S.D.N.Y. Sept.
  30, 2021) ..........................................................................................47

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023)......................................*passim*

**Statutes**

Securities Exchange Act Section 10(b), 15 U.S.C. §78j(b) .....................1

Securities Exchange Act Section 20(a), 15 U.S.C. §78t(a) .....................1

Securities Exhange Act Section 20A, 15 U.S.C. §78t-1............................1

Securities Exchange Act Section 27, 15 U.S.C. §78aa ............................1

28 U.S.C. § 1291 .....................................................................................2

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1337 .....................................................................................1

Private Securities Litigation Reform Act of 1995 ...........................17, 38

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 .................................................1

Fed. R. Civ. P. 9(b) ................................................................................22

Fed. R. Civ. P. 12(b)(6)..........................................................................21

Fed. Civ. P. 54(b) ....................................................................................1

Fed. R. App. P. 26.1 .................................................................................1

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellant Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends is an open-ended investment company, with no parent corporation and no publicly held corporation holding 10% or more of its stock. Appellant City of Hialeah Employees' Retirement System is a benefit pension plan, with no parent corporation and no publicly held corporation holding 10% or more of its stock.

## JURISDICTIONAL STATEMENT

Appellants Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends and City of Hialeah Employees' Retirement System (collectively, "Plaintiffs") bring this action against Peloton Interactive ("Peloton" or the "Company"), and its Chief Executive Officer John Foley, President William Lynch, Chief Financial Officer Jill Woodworth, and Board Members Hisao Kushi, Mariana Garavaglia and Thomas Cortese (collectively with Peloton, "Defendants") under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

The District Court had jurisdiction of this action under 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The District Court entered final judgment pursuant to Federal Rule of Civil Procedure 54(b) on

September 30, 2024. SPA-1.[1] Plaintiffs filed a Notice of Appeal on October 21, 2024. JA-1009. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Whether, on *de novo* review, Plaintiffs adequately alleged material misrepresentations or omissions about the level of demand and inventory for Defendants' primary products.

## INTRODUCTION

This is a class action alleging that Peloton and its principal officers lied to investors regarding demand for its principal products and concealed an alarming buildup of inventory at a critical inflection point as COVID concerns began to wane. JA-176 ¶1. Prior to February 5, 2021 (the start of the Class Period),[2] Peloton had experienced unprecedented, enormous growth in its business of selling at-home work out equipment because of COVID. JA-206 ¶¶109-110. However, once COVID restrictions eased, and vaccines had become available, demand for Peloton's bikes and treadmills declined substantially and inventory of unsold equipment piled up in Peloton's warehouses. JA-211-19 ¶¶130-145. Naturally, investors were concerned about whether the changing circumstances of the pandemic impacted

---

[1] Citations herein to the Joint Appendix and the Special Appendix are referred to as "JA" and "SPA," respectively.

[2] The District Court misstated the Class Period at page one of its Order. SPA-1. The Class Period is defined at paragraph 9 of the Complaint. JA-179.

Peloton's business and so questioned management. *See* JA-222 ¶154; JA-223 ¶¶155-56. But rather than disclose a decline in demand and the true reasons for Peloton's excess inventory, Defendants repeatedly assured investors that they were "absolutely ***not***" seeing a "softening of demand" and that the "increase in inventory levels" noticed by investors was necessary "***to meet the current increased demand***." JA-222 ¶154; JA-228 ¶168. While misleading investors, Defendant Foley and his fellow executives took the opportunity to cash out $383 million of their personal stock. JA-259 ¶244. By January 2022, the end of the Class Period, Peloton was finally forced to tell investors the truth—that product demand had long ago deteriorated and the Company had years-worth of excess inventory. JA-254-56 ¶¶228-235. Peloton's stock price sank by over 59%, between November 5, 2021 and January 20, 2022, the two alleged corrective disclosure dates, erasing over $12.5 billion in shareholder value. JA-176 ¶2; JA-253 ¶225; JA-256 ¶235. Foley and other executives were fired. JA-257 ¶237. The Company's new CEO, Barry McCarthy, admitted that, when he arrived at Peloton right after the Class Period, "***we were drowning in inventory***," which created "***an existential threat to the business***." *Id.* at ¶240.

Plaintiffs' Complaint (the Second Amended Consolidated Class Action Complaint, "SAC" or "Complaint") sets forth with particularity facts sufficient to establish at the pleading stage that Defendants' statements regarding inventory and

demand were knowingly false and misleading. The SAC is supported by the detailed, mutually-reinforcing accounts of *thirty-one* confidential witnesses ("CWs"). JA-182 ¶24. The CWs describe how demand for Peloton's Connected Fitness products across the country had dropped by the start of the Class Period and worsened thereafter. JA-182-206 ¶¶26-108. They further detail how inventory levels continued to rise until unsold equipment piled up at Peloton's warehouses, on trucks and at ports, so that by November 2021, Peloton had *$1.27 billion* of unsold inventory—an astounding 35% jump from the prior quarter. JA-178 ¶7.

Reports from investigative journalists corroborate the CWs' accounts. *CNBC* reported that, in order to manage excess inventory, Peloton had stopped producing the Bike+ in December 2021, and planned a two-month production freeze of all other Connected Fitness products. JA-254 ¶¶229-30. This was just one month after Foley told investors that inventory levels were "healthy." JA-246 ¶205. On January 24, 2022, *Business Insider* published a January 10, 2022 presentation leaked by a Peloton employee which stated that Peloton had an excessive amount of inventory on hand, 91% of which was unsold. JA-219 ¶145; JA-256 ¶234.

The SAC alleges a compelling narrative that Defendants delayed revealing the truth about declining demand for and rising inventory levels of the Company's Connected Fitness products. This Court and others around the country have repeatedly held that a company's misrepresentations about the level of product

4

demand and inventory are material to investors and actionable under the securities laws. *See e.g.*, *Emps.' Ret. Sys. of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (excess inventory due to declining demand demonstrated falsity of statements regarding growing demand); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) (representations that company was "managing its inventory well or that any inventory problems were aberrations" were false where company was actually experiencing a rising volume of unsold inventory); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (statements denying knowledge of building inventory in excess of demand actionable where defendants previously had learned of inventory build-up); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (statements regarding company's sales pipeline actionable where CWs stated that defendants "had access to and used reports documenting in real time the decline in sales"); *In Re SolarEdge Tech. Sec. Litig.*, No. 1:23-CV-9748-GHW, 2024 WL 4979296, at *10 (S.D.N.Y Dec. 4, 2024) ("By attributing rising inventories to other factors and omitting mention of channel stuffing, Defendants' statements misled investors about the alleged reason that inventories were rising").

In dismissing the Complaint, the District Court made a series of compounding errors. First, it mischaracterized many of the challenged statements as "forward-looking," "puffery" and statements of "opinion." SPA-14-24. Second, it accepted

5

Defendants' ipse dixit assertion that their statements were true, and did so by discounting the self-corroborating accounts of CWs (*see* SPA-20-21) from a variety of geographic regions who attested to the decrease in demand and resulting inventory crisis beginning in early 2021 (*see* JA-182-206 ¶¶25-108). Third, the District Court mischaracterized the Complaint's core allegations. This action does ***not*** concern whether Peloton met its past sales guidance and Plaintiffs did not challenge any statement about guidance. Rather, this case concerns whether Peloton's statements to investors about the then-current state of demand for its fitness products and inventories were false and misleading—and the Complaint establishes that they were. Finally, the District Court erred by faulting Plaintiffs for not providing "evidence" at the pleading stage and accepting Defendants' unsupported version of the facts at issue. Rather than accept the Complaint's well-pled allegations as true (*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007)), the District Court adopted Defendants' version of the facts and altogether ignored the Complaint's detailed allegations that contradict Defendants' story. The District Court thus paid lip service to the standards requiring inferences to be drawn in Plaintiffs' favor at the pleading stage.

The Court should reverse the District Court's decision.

## STATEMENT OF THE CASE

### I.   FACTS

#### A.   PELOTON'S STATEMENTS ABOUT DEMAND FOR ITS PRODUCTS WERE FACTUAL AND FALSE

Peloton is a fitness equipment and media company, whose principal products are internet-connected stationary bicycles ("Bike" and "Bike+") and treadmills ("Tread," and together with the Bike and Bike+, "Connected Fitness" products). JA-180 ¶15; JA-206 ¶109. During the pandemic, stay at home orders kept people out of gyms, leading to an increased interest in at-home exercise options. JA-206 ¶110. Demand for Peloton's Connected Fitness products exploded, and its stock price rose as a result. JA-176 ¶1; JA-206 ¶110. However, by February 2021, COVID restrictions had eased, vaccines were available, and people began returning to gyms. JA-176 ¶1. Prior to the Class Period, nearly 80% of Peloton's revenue had come from sales of its Connected Fitness products, so sustaining demand for those products was critical to the continued success of the business. JA-206 ¶109. Peloton investors accordingly were singularly focused on whether the COVID-induced demand for Peloton products would endure post-pandemic. JA-221-22 ¶¶153-55; JA-227 ¶164; JA-236-37 ¶186.

Thus, during the Class Period, investors and analysts questioned Peloton management specifically about the state of demand for its Connected Fitness products. *See* JA-222 ¶154; JA-223 ¶156; JA-233 ¶177; JA-240 ¶191. Defendants

routinely responded that demand remained strong and was not impacted by the relaxation of COVID restrictions.  *Id.*

| Statement 1[3] | On February 4, 2021, in response to an analyst's question about "change in demand," Foley stated, "**We are not seeing a softening in demand.  That is absolutely not what's happening here. . . [W]e're seeing robust demand.**" JA-222 ¶154. |
|---|---|
| Statement 2 | During the same call, Woodworth told investors: "Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products.**" JA-223 ¶155. |
| Statement 9 | In its 10-Q filed on May 7, 2021, Peloton reported "a **$363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.**" JA-228 ¶165. |
| Statement 10 | On May 25, 2021, Woodsworth stated "**we still see a ton of demand**" in response to a JP Morgan analyst's question about demand for the Bike. JA-233 ¶177. |
| Statement 11 | On the August 26, 2021 earnings call, Woodworth told investors: "We are entering fiscal 2022 with **a normalized backlog for our Bike portfolio** and guidance reflects our **expectation of continued strong demand.**" JA-236 ¶185. |
| Statement 14 | On August 26, 2021, Foley stated that Peloton's decision to drop the price of its bikes by $400, was "absolutely offensive" and designed to "democratiz[e] the access to great fitness" thereby denying that the price cut was an attempt to offload the Company's surplus of bikes. JA-237 ¶187. |

These statements were false or, at a minimum, highly misleading.[4]  *See* JA-223-25 ¶158.  The accounts of the **thirty-one CWs** detailed in the SAC confirm that,

---

[3] The statement numbers correspond to those used by the Court in its March 30, 2023, Opinion and Order (SPA-27) and its September 30, 2024 Opinion and Order (SPA-1).

[4] Plaintiffs are not appealing the District Court's decision dismissing Statement 13.

8

contrary to Defendants' public statements, demand for Peloton's products had started to plummet as early as December 2020:

- CW21 reported that senior management circulated monthly sales reports, which showed a drastic slowdown in sales beginning in early 2021 (JA-199 ¶¶85-86; JA-213 ¶134), as further confirmed by CW18, CW20, CW22, CW28, and CW30 (JA-198 ¶84; JA-200 ¶¶87-88; JA-204 ¶¶101-02; JA-205 ¶105).

- CW2, CW10, CW21, CW22, and CW28 stated that, by as early as December 2020 and into early 2021, Peloton's "Looker" database (which was updated daily with data from Salesforce), showed that Peloton had missed sales quotas. JA-192 ¶¶60-61; JA-211-12 ¶130. CW2, CW22, and CW28 stated that quotas were then lowered, but most of the sales staff was still unable to achieve the lowered quotas. JA-211-12 ¶130; JA-214-15 ¶135).

- After Peloton imported record equipment shipments of Connected Fitness products between September 2020 and June 2021, shipments largely ceased by the end June 2021. JA-219 ¶146; JA-221 ¶151.

- According to CW3, CW11, CW14, CW15, CW16, CW19, CW23, CW24, CW25, and CW27, fewer deliveries signaled a decline in demand. JA-186 ¶37; JA-197-98 ¶81; JA-198 ¶84; JA-201 ¶90; JA-202 ¶94; JA-238-39 ¶189. As a result, Peloton laid off a significant number of warehouse employees (JA-215 ¶136) and instituted a company-wide hiring freeze (*id.*).

Defendants tracked demand daily and knew that, once COVID restrictions eased, demand for Peloton's Connected Fitness products had declined substantially. *See* JA-183-84 ¶¶28-30; JA-185 ¶¶34-35; JA-186 ¶37; JA-188 ¶¶43-46; JA-189 ¶50; JA-212-15 ¶¶131-36; JA-219 ¶145. According to CWs who worked in Peloton's sales organization during the Class Period, including CW10, the Director of Inside

9

Sales,[5] Defendants used Looker, a business intelligence tool, to compile sales reports and track demand for Peloton's products in real time. JA-192 ¶¶59, 61-63; JA-208-09 ¶290; JA-213-14 ¶134. These CWs stated that Defendants received Looker reports showing that beginning in February 2021, demand for and sales of Connected Fitness products had declined, and that Peloton management cut sales quotas several times during 2021. JA-185 ¶¶33, 35; JA-188 ¶¶45-46; JA-192-93 ¶¶60-62; JA-211-12 ¶¶130-32; JA-214-15 ¶135. CW10 stated that by the summer of 2021, only about 10 individuals out of Peloton's roughly 200-person Inside Sales Team had hit their goals. JA-17 ¶60. Sales representatives across the country likewise recalled that they struggled to meet sales quotas, despite those quotas being cut by at least half. JA-185 ¶34; JA-200 ¶88; JA-204 ¶102; JA-214-15 ¶135. The trend of declining sales combined with Peloton's inability to meet decreased sales quotas demonstrated that demand for Peloton products had dried up. JA-198 ¶¶82, 83; JA-199 ¶86; JA-200 ¶88; JA-204 ¶102. Defendants thus knew facts that directly contradicted their statements that demand was "robust," "strong," and had "increased."

---

[5] Peloton had two primary sales channels: (i) "Inside Sales," which came from interested customers who reached out to Peloton directly; and (ii) an "Outside Sales Team" or "Retail Organization" which encompassed sales made at brick-and-mortar locations. JA- 206 ¶111. Defendants argued that Plaintiffs ignored that Peloton had three sales channels. The District Court accepted this as true in order to dispense with accounts made by former Inside Sales employees. *See* SPA-20. However, the Complaint alleges that Inside Sales and Outside Sales were the Company's **primary** sales channels, not the Company's **only** sales channels.

### B. DEFENDANTS MADE SPECIFIC STATEMENTS ABOUT PELOTON'S INVENTORY THAT WERE FALSE

Hand in glove with their misrepresentations about demand, Defendants lied about the reasons for Peloton's growing inventory levels. In response to specific questions about Peloton's growing inventory, Defendants said that inventory levels had increased because current demand for Peloton Bikes had increased:

| Statement 9 | Peloton reported in its 10-Q for the third quarter ("3Q") of fiscal year ("FY") 2021, filed on May 7, 2021, that an increase in net operating assets and liabilities was "partially offset by a *$363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand*." JA-228 ¶168. |
| --- | --- |
| Statement 11 | In an August 26, 2021 earnings call, Woodworth told investors: "We are entering fiscal 2022 with *a normalized backlog for our Bike portfolio* and guidance reflects our expectation of *continued strong demand*." JA-236 ¶185. |
| Statement 14 | Foley stated on August 26, 2021 that a $400 price drop was "absolutely offensive" and designed to "democratiz[e] the access to great fitness" thus denying that Peloton was trying to offload bikes to address rising inventory levels. JA-237-38 ¶187. |
| Statement 19 | On November 4, 2021, Foley stated: "Looking ahead, we're about to enter our busiest time of the year. *Our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period*." JA-246 ¶205. |

These statements also were false or, at a minimum, highly misleading. Defendants knew or were deliberately reckless in not knowing, that (1) inventory build-up had far outpaced demand and inventory had accumulated to alarming and unprecedented levels (JA-228-32 ¶¶169-176); (2) backlog had not normalized (JA-241-42 ¶¶193-95); (3) the price reduction was not intended to "democratize" access to the Bike, but rather to offload excess inventory (JA-240-41 ¶192; JA-245 ¶199);

11

and (4) the rising inventory levels were not an intended response to current or seasonal demand (JA-246-50 ¶¶206-12). Peloton's internal reporting and databases, contained detailed information about demand for Peloton's products, equipment sales, and inventory levels. JA-187 ¶40; JA-188 ¶45; JA-194 ¶68; JA-208-211 ¶¶117-129; JA-213 ¶¶134-35). Defendants Foley and Lynch acknowledged in internal emails and at meetings that they reviewed this information in real-time. *Id.* The tracking data demonstrated that as demand for Peloton's products declined, Connected Fitness product sales plummeted, resulting in a huge buildup of excess inventory in Peloton's distribution centers across the country. JA-182-83 ¶¶26-27; JA-190-91 ¶¶52-55; JA-193 ¶¶64-66; JA-216 ¶138; JA-216-17 ¶140. CWs who worked in supply chain and operations roles across the U.S. personally observed that inventory accumulation far outpaced demand:

- CW13, an Inbound Specialist, observed excessive inventory building up at Peloton's Houston warehouse around Christmastime in 2020. JA-195 ¶71. CW13 stated that the Houston warehouse was getting eight to ten trucks' worth of exercise equipment a day at that time, and that there was not enough inventory leaving the warehouse to account for what was coming in. *Id.*

- CW11, a Warehouse Associate for Peloton's Perris, CA distribution center (one of Peloton's largest distribution facilities), stated that as early as April or May of 2021, the Perris warehouse was so overwhelmed with inbound inventory that the facility began storing containers of equipment in the yard (JA-193-94 ¶¶65-67) and that Peloton opened an additional warehouse in San Bernardino just to store excess product. JA-194 ¶66.

- CW8, who managed operations at Peloton's largest warehouse on the east coast, described a significant mismatch between inventory and demand. *See* JA-190-91 ¶52-55. CW8 stated that beginning in June of 2021, finding places to store excess inventory had become the sole focus. *Id.* By August 2021, Peloton had three months of excess inventory at shipping ports. JA-238 ¶189.

- CW1, who served as a Senior Director, Operations and Supply Chain Management, stated that Peloton's August 2021 price reduction of its Bike was an attempt to increase sales to reduce high levels of excess inventory. JA-184 ¶31.

These CW accounts, among others discussed below, demonstrate that Defendants misled the market when they falsely attributed rising inventory levels only to what was required to "***meet the current increased demand***" for Peloton's products (i.e., Statements 9, 11, 14, and 19). *See* JA-228-32 ¶¶169-176; JA-241-42 ¶¶193-95; JA-240-41 ¶192; JA-245 ¶199; JA-246-50 ¶¶206-12. In truth, inventory levels rose because of a lack of demand and concomitant lack of sales. *Id.*

CWs who worked in Peloton's distribution and supply chain management stated that Peloton's internal data showed that its inventory far exceeded demand by February 2021 (JA-183-84 ¶¶27-29; JA-198-98 ¶81; JA-201 ¶90), thereby tying up cash and increasing costs exponentially. *See* JA-211-12 ¶130; JA-215-16 ¶137. CW1, the former Senior Director of Operations and Supply Chain Program Management, stated that the buildup of excess inventory was discussed in weekly and monthly meetings, which Defendants Lynch and Woodworth personally attended. JA-183-84 ¶¶27-32; JA-217 ¶142. During those meetings, CW1 voiced

13

concerns to Defendant Lynch directly about the growing inventory build-up at Peloton's distribution centers. *Id.* CWs further confirmed that company-wide inventory data displayed on NetSuite, Manhattan Scale, Tableau, and Salesforce, showed that unsold inventory was accumulating to unmanageable levels. JA-186 ¶38, JA-189 ¶¶48, 50; JA-190-91 ¶¶53-55; JA-210-11 ¶¶124-29; JA-216-18 ¶¶140-43. CW3 added that, by May 2021, shipments of bikes from Peloton's largest warehouses across the country declined by 25% from per-COVID levels. JA-186 ¶37; JA-213 ¶132. Thus, Peloton had an enormous oversupply of Bikes that far exceeded demand (i.e., orders) (JA-253 ¶229) and because Peloton was required to disclose the amount of its inventory, investors and analysts saw the burgeoning numbers (JA-236-37 ¶186) and asked Defendants for an explanation. In response, Defendants lied.

Peloton's failure to address the inventory overflow resulted in shipping containers idling at ports of entry. *Id.* at ¶54. The cost to Peloton to store excess inventory at ports was astronomical. *See id.*; JA-191-92 ¶58; JA-217 ¶141. CW9, who worked as an Invoice Analyst and reported to Peloton's International Freight manager during the Class Period, stated that because the warehouses had no room to store excess inventory, Peloton paid hefty demurrage fees to let containers of equipment sit at international and domestic ports for months. JA-184 ¶31; JA-190-92 ¶¶52-58; JA-205-06 ¶108; ¶JA-217 ¶141. Indeed, by November 2021, Peloton

had expended millions of dollars on demurrage costs because the warehouses had no room for the excess inventory. JA-250 ¶207(ii).

These accounts directly contradict or, at a minimum, render misleading Defendants' statements regarding inventory levels. Contrary to Defendants' public statements, inventory levels were not aligned with a current increase in demand. And, by November 2021, *91%* of Peloton's inventory was unsold. JA-178 ¶7; JA-253 ¶223.

### C. INVESTORS LEARN THE TRUTH

On November 4, 2021, Peloton disclosed that 91% of its inventory was unsold and that it was reducing its earnings guidance by more than $1 billion. JA-178 ¶7; JA-252 ¶¶219-23. The next day, Peloton disclosed that its inventory had skyrocketed to $1.27 billion—a 35% increase from the previous quarter. JA-178 ¶7; JA-252 ¶223. On November 5, 2021, Peloton's stock price dropped by 35%. JA-253 ¶225. Attempting to soften this bombshell, Foley falsely assured investors that Peloton's inventories were "healthy." JA-254 ¶227. This was not true; as Foley knew, Peloton was buried in almost eighteen months' worth of inventory and had decided to halt production of its Bike and Bike+ to reduce inventory levels. JA-184 ¶32; JA-217 ¶142; JA-246-47 ¶207.

In a report dated November 5, 2021, analysts with Macquarie Research described Peloton's announcement as "Bad news," and highlighted that "*demand is*

*also not what it seemed*." JA-252 ¶222. Analysts with Credit Suisse likewise observed that "demand has slowed and the focus has turned to cost leverage, efficiency initiatives, and right sizing." *Id.* Analysts at Jeffries remarked that COVID had "pulled forward sales" for Peloton, which "***compressed years of growth, and now they're stuck with dying demand, bloated inventory, bloated cost structure***." *Id*.

Foley's November 4, 2021 statement that Peloton's inventories were "healthy" was proven false just two months later when, on January 20, 2022, a series of articles, including a *Business Insider* article, revealed that Peloton had been struggling to manage the costs of maintaining its inventory surplus, and that the mismatch between inventory and demand had long plagued the Company. JA-254-55 ¶¶228-231. Peloton announced that it would incur a net loss of $423-$481 million for the second quarter of its FY 2022 (JA-255-56 ¶232), and its stock dropped by 24% (JA-256 ¶235). In the earnings release, Foley finally acknowledged that Peloton was "***taking significant corrective actions***." JA-255-56 ¶232. Foley and his fellow top executives were fired, but only after having realized huge insider trading profits of $383 million. JA-259 ¶244.

D.    **AFTER THE CLASS PERIOD, DEFENDANTS ADMITTED THE TRUTH ABOUT INVENTORY AND DEMAND**

Peloton's post Class Period disclosures confirm the CW accounts regarding demand and inventory. *Compare* JA-216-17 ¶¶138-141 *with* JA-257-58 ¶¶236-242.

16

On February 8, 2022, during Peloton's FY 2022 second quarter earnings call, Woodworth emphasized that "rightsizing" Peloton's costs would require its "inventories to decrease sequentially in Q3 and further in Q4." JA-257 ¶236. She acknowledged that Peloton had "*slowed production*" to better match our current demand outlook. *Id.* Woodworth also stated that Peloton's "aim is to get back to a *normalized inventory balance* no later than the end of fiscal 2023, driving a more efficient use of our balance sheet going forward." *Id.* During a Goldman Sachs Conference held on September 12, 2022, McCarthy, Foley's replacement as CEO, discussed the circumstances that existed at Peloton when he became CEO on February 8, 2022, specifically, that Peloton had been "*drowning in inventory*," which "posed an existential threat to the business." JA-257-58 ¶240. In a letter to shareholders dated May 10, 2022, Peloton reported a net loss of $751.1 million for the third quarter of FY 2022, and admitted that the "*[p]rimary drivers of our underperformance were higher inventory payments, softer than anticipated demand* (both Peloton and Precor) as well as *higher detention & demurrage*, shipping and logistics, and *storage costs*." JA-258 ¶241.

## II. PROCEDURAL HISTORY AND RULING BELOW

This action was filed on June 6, 2022. JA-7, ECF 1. On May 5, 2022, Robeco was appointed Lead Plaintiff, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). JA-11-12, ECF 42. Lead Plaintiff filed an Amended

17

Complaint on June 25, 2022 (JA-14, ECF 51) and Defendants filed their first motion to dismiss on August 22, 2022 (JA-15, ECF 65). The District Court granted that motion, without oral argument. JA-18, ECF 88.

On May 6, 2023, Plaintiffs filed the SAC. JA-18, ECF 92. The SAC contained additional facts gathered from twenty-four new confidential witnesses and additional alleged misstatements. *Id.* Defendants again moved to dismiss. JA-18, ECF 93. On April 2, 2024, the District Court denied Plaintiffs' request for oral argument. JA-19, ECF 103. On September 30, 2024, the District Court issued an opinion and order (the "Order") holding again that the SAC did not plead any actionable misstatements or omissions. JA-20, ECF 108. The District Court did not address the Complaint's allegations of scienter and insider trading. Plaintiffs filed a timely Notice of Appeal. JA-20, ECF 109.

## SUMMARY OF ARGUMENT

The District Court dismissed the Action ruling none of the alleged statements were either false or misleading. This was in error.

***First***, the District Court erred in dismissing statements that demand for Peloton's products was increasing, robust, and had not softened. As detailed in the Complaint, Defendants knew that demand for Peloton's products was decreasing at the time of their misstatements. These allegations are substantiated by numerous CW accounts, internal documents, and the Company's post-Class Period

18

admissions, all of which the District Court ignored, mischaracterized or improperly discounted.

***Second***, the District Court erred in dismissing statements regarding the reasons for Peloton's inventory growth and that inventory levels were "healthy" and had been "ramped up" to meet current increased demand. The accounts of numerous CWs reveals the contrary truth: as demand waned because COVID-restrictions had eased and people returned to gyms, inventory levels continued to balloon at an inordinate pace that left Peloton supply chain personnel struggling to find space for the excess inventory. As reflected in Peloton's internal documents and confirmed by CWs, Peloton had accumulated so much inventory by the start of 2021 that it effectively halted shipments of Bikes and Treads by June 2021, and found itself saddled with 500 days of Bike and Tread inventory by the end of 2021 (ten times its usual target of 50 days). JA-219 ¶¶145-46; JA-220-21 ¶¶149-151. Peloton's inventory had tripled from $500 million in January 2021 to over $1.3 billion in October 2021, representing over a year's worth of unsold inventory. But, throughout the Class Period, in response to analysts' pointed questions about rising inventory levels, Defendants falsely and misleadingly represented that inventory levels were "healthy" and appropriate to meet demand. The District Court improperly disregarded the detailed accounts from CWs, the leaked internal documents revealing the glut of inventory with which Peloton entered 2022, and Peloton's new

19

CEO's later admissions that the Company's was "drowning in inventory" when he joined the Company in March 2022.

**Third**, the District Court erred in characterizing many of Defendants' statements as "forward-looking." The statements at issue were decidedly not forward-looking, as they were present tense representations about then-existing inventory and then-current demand. Moreover, even if any of these statements were forward-looking, none were accompanied by the necessary meaningful cautionary language.

**Fourth,** the District Court erred in dismissing Plaintiffs' claims challenging Defendants' "risk warnings" regarding the possibility of excess inventory levels. Defendants misleadingly warned of a hypothetical risk that had in fact already materialized, specifically that "**If** we fail to accurately forecast consumer demand, we **may** experience excess inventory levels." JA-250-51 ¶214. At the time Defendants warned of these purportedly hypothetical "risks," Peloton was already facing decreasing demand and excessive inventory levels.

**Fifth**, the District Court erred in finding that certain statements were inactionable "opinions" or "puffery"—i.e., corporate fluff. All of the statements that the District Court incorrectly placed into this category expressed certainty, misrepresenting specific, existing facts regarding current demand and inventory levels. They were not opinions or rosy predictions. But even if any of these

20

statements somehow could be characterized as such, they are nevertheless actionable because they omitted conflicting facts known by Defendants.

***Finally***, the District Court ignored this Court's delineation of the standards on a motion to dismiss by, among other things, drawing inferences in Defendants' favor; substituting its own benign view of the facts alleged for Plaintiffs' reasonable and well-supported factual allegations; and failing to consider Plaintiffs' allegations as a whole and in context.

## STANDARD OF REVIEW

This Court reviews the District Court's Rule 12(b)(6) dismissal *de novo*, assuming all facts alleged within the four corners of the complaint to be true and drawing all reasonable inferences in favor of the plaintiff. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021).

## ARGUMENT

## I.     ISSUES REACHED BY THE DISTRICT COURT

### A.     THE SAC PLEADS MATERIALLY FALSE AND MISLEADING STATEMENTS

When assessing falsity, courts must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor," even when non-fraudulent alternative interpretations of challenged statement are "not unreasonable." *Textron*, 14 F.4th at 147 (reversing dismissal on falsity grounds, in part, because "the District Court in effect required [plaintiffs] to show that [their]

reading was superior to the court's own benign reading of those statements—a requirement we have described as error"); see *also Leadersel Innotech ESG v. Teladoc Health, Inc., et al.*, No. 23-1112-CV, 2024 WL 4274362, at *4 (2d Cir. Sept. 24, 2024) (summary order). Courts must review the statements "taken together and in context." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014). A statement is misleading if a reasonable investor would have received a false impression of from the statement. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).

When a company does not have an obligation to speak but choses to do so, it assumes "a duty to be both accurate and complete. *Caiola v Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002. *Accord, Jinkosolar*, 761 F.3d at 250-51 ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth."); *see also In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("[S]o-called half-truths – literally true statements that create a materially misleading impression – will support claims for securities fraud.") To comply with Fed. R. Civ. P. 9(b), a plaintiff need only: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Deutsche Bank AG Sec. Litig.*, No. 09-CV-1714 (DAB), 2016 WL 4083429, at *20 (S.D.N.Y. July 25, 2016). Whether a statement is actionable should be "evaluated not only by the

'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

### 1. The SAC Adequately Pleads Misstatements Regarding Demand

Defendants stated to investors that the demand for Peloton's exercise equipment was "robust" "strong" and "organic" even after COVID-restrictions had eased. *See* JA-222 ¶154; JA-223 ¶155; JA-236 ¶185; JA-237 ¶187. Specifically, Foley said: "We are ***not*** seeing a softening in demand. That is absolutely ***not*** what's happening here. We are seeing incredibly strong organic demand even in the phase of light marketing." JA-222 ¶154. Woodworth said: "… but we're still seeing very strong organic demand across all geographies across all products." JA-223 ¶¶155. First, these (and the other demand statements, *see* JA-228 ¶168; JA-233 ¶177; JA-236-¶185; JA-238 ¶187), were not, as the District Court concluded, "forward-looking." *See* SPA-15-18. They were direct representations by Peloton's most senior executives about the then-*current* state of demand for Peloton's core products – not about what demand "will" be or was "expected" to be, but what demand was (e.g., "we ***are*** seeing"). Second, the statements were not, as the District Court concluded, "vague." SPA-23. They were unequivocal (e.g., softening of demand is "absolutely not what's happening here" (JA-222 ¶154) and "it's absolutely not a softening of demand" (*id.*). Defendants issued these statements to assuage the market's fears that COVID-level demand would not continue, when, in fact,

23

Defendants well knew that the market's fears were well-founded. JA-225 ¶159; JA-234 ¶180; JA-249 ¶208; JA-278-79 ¶¶322-24. If the SAC pleads facts showing that strong demand was not what Defendants "were seeing" or softening demand was what "was happening," the challenged statements are actionable under § 10(b). And the SAC pleads exactly such facts, with support from CWs, internal documents, news reports and admissions.

This Court has found that false and misleading statements, like those here, about the demand for a company's product are actionable. *See Textron*, 14 F.4th at 147 (statement that improved demand allowed the clearing of inventory was false where plaintiffs pled competing facts); *Blanford*, 794 F.3d at 306 (defendants' representations concerning consumer demand were actionable). *See also Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) (finding false the statement "Oracle sees robust demand,"); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, No. 22-CV-6339 (AS), 2024 WL 1898512, at *5 (S.D.N.Y. May 1, 2024) (sustaining demand statements where plaintiffs alleged facts that conflicted with the truth of such statements); *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, No. 3:09-CV-2083(RNC), 2018 WL 1587457, at *5 (D. Conn. Mar. 31, 2018) (same); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 874, 879 (N.D. Cal. 2023) (same); *In re Honest Co. Sec. Litig.*, 615 F. Supp. 3d 1149, 1156 (C.D. Cal. 2022) (same).

Nevertheless, Defendants argued that because Peloton supposedly achieved its "sales guidance" during the Class Period, the statements about demand necessarily were true. The District Court adopted Defendants' flawed argument, concluding that because Peloton achieved its sales guidance, the "challenged statements were entirely consistent with Peloton's actual financial results." JA-1002. To reach this conclusion, the Court went beyond the four corners of the SAC, which says nothing about the accuracy of Peloton's guidance. *See* JA-976 at 1. In so doing, the District Court impermissibly relied on documents Defendants provided which were not referenced in the SAC, for the "truth" of what they contained. *See Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d. Cir. 2009). More importantly, however, the SAC does not contain a single allegation challenging Peloton's sales guidance as false. Rather, the SAC challenged two categories of statements: those concerning demand for Peloton's products, and those regarding Peloton's inventory levels. JA-176 ¶1; *see generally* JA-221-251 ¶¶153-218.[6] Thus, even if Peloton met its sales guidance because of historical revenues realized as a result of COVID-generated demand, this is irrelevant to whether the challenged statements about demand and inventory were false at the time they were made. Nor does Peloton meeting its sales guidance discredit the CW accounts regarding other

---

[6] The District Court stated that none of the CWs had any involvement in the preparation of Peloton's sales guidance. SPA-22. Again, Plaintiffs have not alleged that Peloton's sales guidance was false or misleading.

internal metrics, which Defendants closely tracked. Peloton's meeting of its sales guidance did not reflect current demand but rather historical demand that Peloton was no longer experiencing at the time Defendants made the challenged statements. What is more, the District Court's dismissal of the challenged statements because Peloton met past sales guidance ignores that the Company eventually cut its guidance by $1 billion. JA-252 ¶219. *See Blanford*, 794 F.3d at 307 (gap in future sales supported "claim that inventory was misleadingly characterized").

Because the District Court fell prey to Defendants' red herring argument regarding sales guidance, it overlooked the portion of their demand statements that Plaintiffs actually allege were false. For instance, Plaintiffs challenged the bolded portion of Woodworth's August 26, 2021 statement: "We are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of ***continued strong demand***" (JA-236 ¶185), which falsely represented that demand was strong when, in fact, it was declining; not the part of the statement concerning Defendants' guidance or expectations about future demand. The District Court made this error as to each of the alleged false statements about demand. *See* statement list in Section I(A), *supra*.

### 2. The SAC Adequately Pleads Misstatements Regarding Inventory

Defendants' statements about inventory also were false and misleading. Peloton's inventory levels increased substantially during 2021, and Defendants had

to explain to investors why. Their explanations were false and misled investors. Defendants told investors that the inventory buildup was normal and reflected increasing demand, i.e., inventory produced to match sales, but exactly the opposite was true. In fact, inventory accumulated because demand had declined.

The inventory statements were neither forward-looking nor vague. In its May 2021 10-Q, Peloton said that an increase in net operating assets and liabilities was "partially offset by a $363.7 million increase in inventory levels as we ramped up supply *to meet the current increased demand*." This is not forward looking, but a representation that the Peloton had built up its inventory to respond to increased demand – misstatements of existing fact. These statements also are not vague: Defendants were asked about the inventory build-up and provided a specific reason therefor. Of course, the reality was completely different: inventory had ballooned because Peloton could no longer sell its Bikes at the same levels. *See* Section I(B), *supra*.

Similar facts have established the falsity of statements regarding the relationship between demand and inventory. *See, e.g.*, *Blanford*, 794 F.3d at 306 (statements that inventory was at "appropriate levels" were actionable where CW reported inventory buildup "to the rafters" without corresponding demand); *Finisar*, 646 F. App'x at 507 (statements denying knowledge of building inventory in excess of demand actionable where defendants previously had learned of inventory build-

up); *Terex Corp*, 2018 WL 1587457, at *5 (facts regarding inventory building up as employees "kept making stuff but not selling it," and company storing excess inventory stored in employee parking lots were sufficient to demonstrate falsity of alleged statements); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 429 (D.R.I. 1996) (statements that high demand caused increased inventories were actionable where the "true cause for rising inventory levels was a production slowdown"). Comparable facts also have demonstrated the falsity of statements that discussed the reasons for higher inventories. *See, e.g.*, *Celestica*, 455 F. App'x at 15 (representations that company was "managing its inventory well or that any inventory problems were aberrations" were false where company was actually experiencing a rising volume of unsold inventory); *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) ("[R]eassurances that inventory was under control or giving false explanations for its growth" constituted 'conscious misstatements'"); *SolarEdge*, 2024 WL 4979296, at *7-8 (upholding allegations that the defendants' statements about the reasons for rising inventories were misleading).

Again, the District Court dismissed the inventory statements because it accepted Defendants' unsupported version of the facts – specifically, that Peloton purportedly disclosed its inventory issues when it told investors that it was

purposefully increasing inventory to decrease its delivery times. SPA-22.[7]  By

falsely attributing increased inventory to **increased** demand and an effort to reduce

delivery times, Defendants misled investors about the true reason for the ballooning

inventory: declining demand.  And in fact, many of Defendants' false statements

regarding inventory (Statements 9, 11, 13, and 14 (A-228 ¶168; JA-246 ¶205; JA-

250-51 ¶214)) were made after Foley told investors, during Peloton's 3Q2021

earnings call on May 6, 2021, that Peloton's delivery times already had been

significantly reduced.   JA-706.[8]  Defendants' unsupported explanation for the

inventory buildup is "entitled to little weight at this stage of the litigation." *Blanford*,

794 F.3d at 307.

    When the truth about Peloton's inventory levels was disclosed on November

4, 2021, and January 20, 2022, the market understood for the first time what the

increasing inventories meant for Peloton's business and cash position: Peloton had

---

[7] Perhaps with a Freudian slip, the District Court strangely found that "Peloton has
sufficiently alleged that its Class Period inventory was not 'excessive….'" SPA-21.
But Peloton has not "alleged" (or proved) anything.  This slip shows that the Court
improperly accepted Defendants' contentions at the pleading stage, and ignored the
Complaint's allegations which undercut Defendants' story.  "If defendants are
permitted to present their own version of the facts at the pleading stage—and the
district court accepts those facts as uncontroverted and true—it becomes near
impossible for even the most aggrieved plaintiff to demonstrate a sufficiently
"plausible" claim for relief." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988,
999 (9th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[8] Further, CW10 stated that delivery times had declined dramatically between April
and August of 2021, from 8-10 weeks to just 1-2 days.  JA-193 ¶64.

excess inventory on its books since at least June 2021, was drowning in 500 days' worth of excess inventory, 91% of which was unsold, and had entirely halted production of its bikes.

### 3. The District Court Improperly Discounted the Reports of the CWs

In improperly deeming Defendants' statements true at the pleading stage, the District Court cherry-picked and then dispensed with the accounts of several CWs which it arbitrarily determined were "anecdotal" and did not reflect Peloton's performance as a whole. SPA-20-21.[9] This was clear error. The SAC alleged that CWs across Peloton's sales organization missed sales quotas and continued to miss quotas even when those quotas were reduced. *See, e.g.*, JA-185 ¶34 (CW2, an account executive within Peloton's Inside Sales organization, observed that, by December 2020, Peloton's sales organization had begun to miss sales goals (i.e.,

---

[9] The District Court improperly relied on *Frankfurt-Tr Inv. Luxemborg Ag v. United Techs. Corp.*, where the CWs had little insight into the company as a whole. 336 F. Supp 3d. 196, 223 (S.D.N.Y 2018). Here, however, the SAC includes accounts from **eleven** former sales representatives who worked in both of Peloton's primary sales channels (JA-185 ¶33; JA-187 ¶41; JA-188 ¶43, JA-192 ¶59; JA-198 ¶¶82-83) and **sixteen** former supply chain employees (JA-182 ¶25, JA-185-86 ¶36; JA-187 ¶¶39-40; JA-189 ¶47; JA-190 ¶52; JA-191 ¶56; JA-193 ¶65; JA-195 ¶71) who worked across the entire U.S. including in California (JA-193 ¶66; JA-197 ¶81; JA-198 ¶¶83, 84; JA-201 ¶89), Colorado (JA-192 ¶59); Utah (JA-200 ¶88), Texas (JA-187 ¶41; JA-195 ¶¶70-71; JA-203 ¶¶98, 99; JA-204 ¶103), Georgia (JA-182 ¶25); Washington (JA-198 ¶82; JA-199 ¶85; JA-201 ¶92), and New York (JA-182 ¶25; JA-204 ¶101). These CWs confirmed that Defendants had access to and utilized internal data about sales performance and inventory across the entire company. JA-210-11 ¶¶124-29.

quotas); JA-200 ¶88 (CW22 who worked in a Peloton showroom in Utah from May 2020 to June 2021 stated that the sales quota dropped from 100 bikes to just 30 bikes/month.). These, and other similar CW accounts, speak to Peloton's performance as a whole. *See In re AppHarvest Securities Litig.,* 684 F. Supp. 3d 201, 262–63 (S.D.N.Y. 2023) (internal quotation marks omitted) (at the pleading stage, "accounts of confidential witnesses support a company-wide inference where, for example, they emanate from several geographic areas; (2) span different levels of the company hierarchy; and (3) remain consistent across different time period[s].")

Indeed, this Court credited comparable CW accounts in *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.*, 709 F.3d 109, 123-24 (2d Cir. 2013). There, this Court found that the allegations of eight CWs who had worked in various regional offices across different states including California, Ohio, Florida (*id.* at 118), were sufficient from which to "draw the reasonable inference" that the alleged practices were widespread (*id.* at 123-24). And recently, in *SolarEdge*, the District Court heeded this Court's treatment of CW accounts in *Royal Bank supra*, when it held that allegations of CWs who worked in varying sales positions at SolarEdge, and who observed defendants engaging in channel stuffing, were sufficient to allege falsity notwithstanding that all of the CWs worked at different offices scattered across the continental United States. 2024 WL 4979296,

31

at *8. *See also Blanford*, 794 F.3d at 307 (crediting CW accounts of inventory buildup).

So too here, the SAC pleads mutually corroborating accounts from numerous CWs who worked across Peloton's sales channels, and who had personal knowledge of and access to Salesforce reports which reflected sales performance across the Company in real-time. JA-185 ¶¶34-35; JA-188 ¶¶44-45; JA-193 ¶¶62-63; JA-209 ¶121. The SAC also alleges the accounts of sixteen former employees who worked at Peloton's distribution facilities and in supply chain management. JA-182 ¶25; JA-185-86 ¶36; JA-187 ¶39; JA-189 ¶47; JA-190 ¶52; JA-191 ¶56; JA-193 ¶65; JA-195 ¶¶70-71; JA-197 ¶¶78, 80; JA-198-99 ¶84; JA-201 ¶¶89, 92; JA-202 ¶95; JA-203 ¶99; JA-204 ¶103; JA-205 ¶106. These witnesses uniformly stated that Defendants tracked data reflecting the number of deliveries across the country using NetSuite, Manhattan Scale, and Tableau. JA-210 ¶¶124-26. The CWs also reported that demand data and trends were conveyed to management in the Looker Reports (JA-185 ¶34; JA-186 ¶¶37-38; JA-187 ¶40; JA-188 ¶45; JA-192-93 ¶¶61-63; JA-208-09 ¶¶117-121; JA-213-14 ¶134), and monthly delivery summaries, which management accessed via NetSuite, Scale, and Salesforce (JA-226 ¶162(ii); JA-232 ¶174(ii), JA-235 ¶183(ii); JA-242 ¶195(ii); JA-243 ¶197(ii); JA-245 ¶199(ii)).

The sheer number of CWs (31) reporting the same facts and events supports the credibility of the CW accounts. This Court recently found that these type of CW

32

accounts are sufficient to state a 10(b) claim. *See Teladoc*, 2024 WL 4274362, at *4. As the Court noted in *Teladoc*, inconsistencies between Defendants' statements about inventory and demand on the one hand and confidential witness statements and supporting documents on the other "cannot be resolved 'at this stage of the litigation, when we must accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiffs' favor.'" 2024 WL 4274362, at *4 (holding that the district court erred in dismissing allegedly false and misleading statements of a company's progress in reducing inventory in light of allegations from "a cadre of confidential informants" contradicting the company's statements). The District Court attempted to distinguish *Teladoc* on the basis that "none of the confidential witnesses here had any involvement in or responsibility for assessing Peloton's overall demand or the preparation of Peloton's sales guidance." SPA-22. First mistake: as discussed *supra*, this case does ***not*** challenge Defendants' sales guidance. Second, with respect to the issue of demand and inventory, the CW statements and the evidence provided by the CWs here are largely analogous to those found to be sufficient to state a claim in *Teladoc*.

In *Teladoc*, the Court held that statements pled as false or misleading were directly contradicted by accounts of eleven former employees who "worked for [the company] in the relevant timeframe and who provided details as to the lack of integration in the sales teams at the time [defendant's] statements regarding full

integration were made." *Id.* at *4. The Court held that these allegations satisfied the specificity requirement for confidential witness statements. *Id.* For example, the *Teladoc* plaintiffs alleged as false the following statement made by Teladoc's CEO during the company's February 2021 earnings call: "our commercial organization is now fully integrated, and our teams responsible for cross-selling have been collaborating for months." *Id.* In assessing whether Plaintiffs had adequately alleged falsity as to this statement, the Court was compelled by the testimony of a former Teladoc growth acquisition manager who had personally observed in the fall of 2021 that many business segments of the merged entities were still "siloed," i.e., the integration was not complete. *Id.* This CW's observation demonstrated that the February 2021 statement concerning a "full integration" was misleading. *Id.* The Court further credited the account of a former Teladoc employee who had observed that the sales teams of the merged entities were not fully integrated by the time she left Teladoc in June 2021. *Id.* Because these CW statements "present[ed] inconsistencies with [executive's] definitive statements," the *Teladoc* Court found that the district court had erred in declining to find the February 2021 statement— and other statements—materially false or misleading. *Id.*

Similarly, here the SAC alleges facts attributed to a "cadre of confidential informants" who worked at Peloton during the relevant timeframe and had observed, contemporaneous with Defendants' public statements indicating otherwise, that

34

inventory levels had ballooned and demand had declined. *Id.* These **thirty-one detailed CW accounts**, versus the eleven in *Teladoc*, are at least as particularized as those in *Teladoc.* For example, CW7, an inventory specialist responsible for assessing physical inventory counts and managing inventory flow, observed that Peloton management knew the Company had excess inventory by early 2021. JA-189 ¶¶47-48. CW8, an operations supervisor who worked at Peloton's Carteret, New Jersey warehouse, observed that by early summer 2021, inventory of Peloton's exercise equipment had outpaced demand, and as a result, the warehouse's yard was saturated with containers full of equipment. JA-190 ¶¶52-53; JA-191 ¶55. CW20, a sales manager who received comprehensive monthly reports of all Peloton memberships and sales, stated that sales of Peloton's exercise equipment slowed drastically in early 2021. JA-199 ¶¶85-86. These accounts—and others—are analogous to those in *Teladoc*: they are detailed observations by former employees during the relevant time period about a particular company trend or occurrence that contradict Defendants' public statements.

### 4. Eight Dismissed Statements Are Not Forward-Looking and Were Not Accompanied by Meaningful Cautionary Language

The District Court incorrectly found Statements 1, 2, 3, 10, 11, 14, and 19 to be forward looking. SPA-15-18. A forward-looking statement is one that concerns a projection or a "statement of future economic performance." *See Vivendi*, 838

F.3d at 246. Each of these challenged statements speaks in the **present** tense about demand and inventory, and does not fit this definition. Nevertheless, the District Court incorrectly concluded that because Statements 2 and 10 stated that "robust" demand was reflected in Peloton's sales guidance, they were necessarily forward-looking. SPA-16. In particular, the District Court plucked out language from each of these statements that Plaintiffs did not challenge (Plaintiffs' SAC demarcated the challenged portion of each statement in bold) to support its faulty conclusion that both were inactionable forward-looking statements. *See* SPA-15-16. As a result, the District Court ignored the portions of these statements that Plaintiffs did challenge as false and misleading, i.e., "we're still seeing very strong organic demand across all geographies across all products," (Statement 2, SPA-6; JA-223 ¶155) and "we still see a ton of demand," (Statement 10, SPA-7; JA-233 ¶177).

The Court then erroneously accepted Defendants' argument that Statements 3, 14 and 19 "all refer to Peloton's future operations and plans." SPA-16. But these statements all concerned then-existing business practices, not future ones. Statement 3 – "we haven't seen any softening of demand" – was not a reference to Peloton's future operation and plans as the Court held (SPA-6), but rather demand trends that Peloton had already or presently was observing (*see* JA-223 ¶156). Statement 14 – ". . . The price drop with B1 was absolutely offensive as we think about the competitive landscape and we think about democratizing the access to great fitness,

36

which has, as you know, always been in our playbook," was Foley's response to an analyst's question about why Peloton had reduced the price of its Bike and thus concerned Peloton's then-current attempt to offload the excessive inventory that the Company had accumulated (*see* JA-237 ¶187) not a reference to the future. And Statement 19, Defendant Foley's statement in November 2021 that "our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period" was Foley's representation of then-current, measurable inventory levels (*see* JA-246 ¶205), not Peloton's "future opportunities and plans"[10] (SPA-15-16).

Despite that the foregoing statements have no forward-looking component, the District Court concluded that the challenged statements "clearly describe future economic performance" and are "paradigmatic forward-looking statements." SPA-16. As described above, this is wrong. But even if these statements do contain a forward-looking component, the non-forward-looking part is still actionable and not

---

[10] The District Court gave no further thought to Statements 1, 11, and 13 beyond what was provided in its first opinion. The District Court stated that "Plaintiffs have not put forth any additional facts or *evidence* for the Court to determine otherwise." SPA-15. Plaintiffs are not required to put forth "evidence" at the pleading stage. *See In re McKesson HBOC Inc. Sec. Litig.*, 126 F. Supp 2d 1248, 1272 (N.D. Cal. 2000). With respect to facts, the only fact that matters is that these three statements are not forward looking. *E.g.*, Statement 1 ("We **are not seeing** a softening in demand. That is absolutely **not what's happening here**. We **are seein**g incredibly strong organic demand even in the light phase of marketing…. But **it's absolutely not** a softening of demand that **now we're seeing**, **we're seeing** robust demand.") (emphasis added). These statements do not "describe future economic performance."

protected by the PSLRA's safe harbor. *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 556 (S.D.N.Y. 2010) ("[W]hen an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply."). The District Court was required to parse the statements and determine if the non-forward-looking component satisfied the 10(b) pleading requirements, which it failed to do. *See Vivendi*, 838 F.3d at 246 (noting that the "forward-looking elements" of a mixed present/future statement may be "severable" from the "non-forward-looking" elements" and that the part of the statement that refers to the present is not protected by the safe harbor); *see also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1328 (11th Cir. 2019) ("courts should afford safe harbor protection to the forward-looking portion (if applicable) and then evaluate the present-tense statement on its own) (internal citation and quotations omitted).

Separately, the District Court was wrong that Defendants' statements were accompanied by "meaningful cautionary language." SPA-16. The "cautionary" language the Court cited did not specifically address "the allegedly undisclosed risk," and was thus not meaningful. *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 515 (S.D.N.Y. 2016). Further, hypothetical warnings of future adverse events do not insulate statements when the events warned of have **already materialize**. *See Set Cap. LLC v. Credit Suisse Grp. AG,* 996 F.3d 64, 85 (2d Cir.

2021). Thus, boilerplate warnings about the effect COVID might have on Peloton's future do not negate statements of present fact known to be false due to an already-materialized decline in demand and excess inventory levels. Defendants' purported cautionary language does not "insulate from liability the failure to disclose that the risk ha[d] transpired." *In re Facebook, Inc., IPO Secs. & Deriv. Litig.*, 986 F. Supp. 2d 487, 515 (S.D.N.Y. 2013); *see also Panther Partners Inc. v. Jianpu Tech. Inc.*, 18 Civ. 9848 (PGG), 2020 WL 5757628, at *12 (S.D.N.Y. Sept. 27, 2020) (warnings are insufficient if "framed as mere hypotheticals" which "imply that the risk" is "theoretical," when it "has already materialized").

The District Court went even further by finding sufficient the type of generic, boilerplate cautionary language such as "actual results may differ materially from those contained in or implied by these forward-looking statements…" that is recited at the beginning of virtually every earnings call for every company. SPA-16. Such generic language is inadequate. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) (boilerplate language did not qualify as meaningful cautionary language); *Bishins v. CleanSpark, Inc.*, No. 21 CV 511 (LAP), 2023 WL 112558, at *9 (S.D.N.Y. Jan. 5, 2023) ("Cautionary language must expressly warn of or directly relate to the risk that brought about Plaintiffs' loss… it must convey substantive information, and it must not be boilerplate).

This issue was squarely addressed in 2023 by the Northern District of California in *DocuSign*, 669 F. Supp. 3d 849. *DocuSign* is instructive because both cases concern the impact of the COVID-19 pandemic on demand for each company's flagship products, and the state of demand post-pandemic. In *DocuSign*, the defendants argued that certain of the forward-looking statements were accompanied by repeated disclosures regarding the impact of the pandemic on DocuSign's sales and that these disclosures constituted "meaningful cautionary" language sufficient to insulate those statements from liability. *Id.* at 877. In particular, the *DocuSign* defendants claimed that the following disclaimers afforded certain statements protection under the safe-harbor's cautionary language provision: (i) the pandemic "had accelerated adoption of DocuSign eSignature;" and (ii) "[g]rowth rates would decline from peak pandemic levels." *Id.* While the *DocuSign* court noted that other courts have recognized similar language as sufficiently cautionary, it nevertheless found these disclaimers inadequate. *Id.* The court held that although the risk disclaimers expressly discussed the uncertain impact of the pandemic on DocuSign's business—and thus directly addressed the misrepresentations made by defendants—they failed to inform the reader that some of the risks *had already materialized*. *Id.* at 879. As such, disclaimers that the pandemic "could" or "may" impact DocuSign's business were inadequate because these risks had already come to fruition. *Id.* Thus, the *DocuSign* defendants'

40

disclosures regarding the pandemic-related risks were misleading. *Id*. Like in *DocuSign*, the risks that Defendants cautioned investors about here had already materialized at the time they were issued, *i.e.*, Peloton had already experienced excess inventory levels when Defendants issued the warning statements, and Defendants knew it. JA-250-51 ¶¶214-18. *See also Teladoc*, 2024 WL 4274362, at *5 (reversing dismissal of claims premised on risk warnings regarding integration where risks were no longer potential, but had "already materialized and resulted in significant disruption" to the corporate defendants).

### 5. Peloton's Risk Warnings Were Misleading

In Statement 20, which encompasses the risk disclosures made in Peloton's SEC filings made on May 6, 2021; August 26, 2021 and November 4, 2021, Defendants said: "If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale." JA-250-51 ¶214. This risk disclosure was materially misleading because the purported "risk" already had materialized. Indeed, Peloton had already experienced excess inventory levels by early 2021. JA-211-221 ¶¶130-52. By May 6, 2021, and certainly by August 26, 2021, Peloton "had experienced" excessive inventory (e.g., overflowing warehouses and enormous storage fees for Bikes and Treads stuck in containers in ports). *See* JA-216-17 ¶¶137-143. By November 4, 2021, Peloton's excess inventory had spiraled so far out of control that 91% of its inventory was

41

unsold. *Id.* As CEO McCarthy said, Peloton was "drowning in inventory." JA-178 ¶2; JA-257-58 ¶240.

The District Court ignored these facts when it held that Statement 20 (the "risk disclosure") is a non-actionable opinion statement. *See* SPA-24. Instead, the District Court again accepted Defendants' unsupported assertion that inventory was not "excessive" because Peloton had purposefully increased inventory to reduce delivery times. SPA- 22. This is plain error for several reasons. First, the issue of whether inventory was excessive cannot be resolved at the pleadings stage. *See, e.g.*, *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012) ("delicate, fact-intensive assessments . . . are more properly left to the jury"). Second, the facts alleged in the SAC belie any possible explanation that inventory was purposefully being increased. Third, Plaintiffs have alleged facts showing that Defendants knew, well before, that Peloton's inventory levels far exceeded demand. JA-212 ¶32; JA-216-18 ¶¶138-43. Indeed, Defendants' claim that inventory was not "excessive" is directly contradicted by statements from Peloton's own CEO who later explained that this excess "inventory has consumed an enormous amount of cash," which was a "primary driver of [Peloton's] underperformance." JA-258 ¶241. These dangerously high levels of inventory were also reflected in internal company documents published by *Business Insider* in January of 2022, which confirmed that

rising inventory levels had necessitated pauses in production of nearly all products. JA-256 ¶233.

The District Court, again with no analysis, rejected that the risks warned of had already materialized despite the SAC's particularized allegations, including: (1) twenty-two CWS stating that demand had cratered in early 2021 (JA-211-14 ¶¶130-35); (2) reports that inventory levels far outpaced demand (JA-212 ¶32; JA-216-18 ¶¶138-43); (3) sales people missing quotas due to lack of demand (JA-200 ¶¶87-88; JA-204 ¶102; JA-211-22 ¶130; JA-213-14 ¶¶134-35); and (4) internal reports showing inventory levels rising (JA-185-86 ¶¶36-38; JA-189 ¶¶47-51; JA-190-91 ¶¶52-55; JA-210-11 ¶¶124-29; JA-212-13 ¶¶132-33; JA-216-17 ¶¶140-43).

By warning that Peloton **may** experience excess inventory levels, Peloton led investors to believe that Peloton had not **already** experienced excess inventory levels due to declining demand. This Court has held that "cautionary words about future risk cannot insulate an issuer's failure to disclose that the risk has, in fact, materialized." *Set Cap LLC*, 996 F.3d at 85; *see also Teladoc*, 2024 WL 4274362, at *5 (reversing dismissal of claims premised on risk warnings where risk had already materialized); *In re Facebook Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk had already materialized."); *Plumbers & Pipefitters Nat'l Pension Fund v.*

*Tableau Software, Inc.*, No. 17-CV-5753, 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) (defendants' disclosure that revenue may decline was misleading because the warned-of risks had already come to fruition); *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 228-29 (S.D.N.Y. Mar. 16, 2023) (liability for risk disclosure adequately pled where disclosure omitted that the risk had transpired).

### 6.    Statements 9 and 19 Are Not Puffery or Opinions

The District Court dismissed two statements as "expressions of puffery and corporate optimism." SPA-23-24.   With respect to Statement 9, Defendants represented that inventory level were being "ramped up" to meet the "current increased demand." JA-228 ¶168.  This is not puffery or corporate optimism.  With respect to Statement 19 (quoted but not labeled by the District Court at SPA-23), Defendant Foley represented stated that "inventories are healthy," when Plaintiffs have alleged specific facts creating a strong inference that, by November 2021, inventory levels were far from healthy.[11]   Again, this was not puffery, but a representation designed to allay very specific concerns of investors about the state of Peloton's inventory.  These statements were not the vague, positive expressions like those deemed insufficient in *Teladoc*. *See* 2024 WL 4274362 at *3 (dismissing

---

[11] Statement 19 was made on a November 4, 2021 1Q22 earnings call, not a November 9, 2021 call, as the District Court incorrectly states at SPA-23.  Statement 19 appears at ¶204 of the SAC, not at ¶205, as the District Court incorrectly states at SPA-23.

as puffery statements which included phrases like "going really great," "continues to progress," "well on [the] way," and "on track").

Statements 9 and 19, the only ones that the District Court dismissed as corporate optimism or puffery,[12] are actionable because statements about Peloton's inventory and demand were verifiable facts existing at the time that Defendants Foley, Lynch and Woodworth made the statements. JA-228 ¶168; JA-246 ¶205. Moreover, the District Court failed to consider these statements in context. Defendants Foley, Lynch and Woodworth made their statements to alleviate investor concerns about Peloton's rising inventory levels. "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 392 (S.D.N.Y. 2022) (reasonable investor could rely on statements made repeatedly to reassure investors about the Company's integrity); *Novak*, 216 F.3d at 315 (statements about inventory were not puffery); *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023)

---

[12] The District Court vaguely stated that "the above-listed statements are inactionable as a matter of law," but it is unclear which list the court is referring to. SPA-24. If the court is referring to the words it quotes in the preceding parenthetical, the words cherrypicked by the Court are not the statements that Plaintiffs allege are false and misleading. For example, with respect to Statement 10, the Court picked the language "Bike+ exceeding our expectations," which Woodworth said at the May 25, 2021 analyst conference, but ignored the subsequent language of the statement that "we've lapped COVID now" and "we still see a ton of demand." JA-233 ¶177.

(statements that sales were healthy went beyond mere optimism because they "provid[ed] a concrete description of the past and present state of the pipeline."); *Quality Sys.*, 865 F.3d at 1143 (statements regarding sales pipeline were not puffery because they addressed "specific aspects of company's operation that defendants knew to be performing poorly.").

After dismissing Statements 9 and 19 as puffery, the District Court deemed Statement 20 to be a non-actionable statement of opinion. SPA-24. As an initial matter, Statement 20, cited *supra* at Section I(A)(5), is actionable because the risk warned of had already materialized at the time the statement was issued. *See Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, No. 23 CIV. 2138 (JPC), 2024 WL 4354809, at *12 (S.D.N.Y. Sept. 30, 2024) (risk disclosure found actionable where it concealed the extent of the risk the company was facing). Nevertheless, the District Court erroneously relied on *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 575 (S.D.N.Y. 2018), to posit that because Statement 20 contained the words "if" and "may," it is similar to the "evaluative" statements that were dismissed in *Xerox.* SPA-24. *Xerox* is inapposite. There, the statements at issue—e.g., "I don't think revenue will be down" and "in my view, we're making visible progress here" —were "quintessential statements of opinion" because they were qualitative statements concerning the success of implementing a new business venture, *i.e.*, management's statements that they thought the new

venture was "going well." *Xerox*, 300 F. Supp. 3d at 575. Conversely, the statement at issue here, *i.e.*, disclosing a "risk" that Peloton could experience excess inventory levels due to a failure to accurately forecast demand, did not concern management's subjective opinion about Peloton's inventory, but rather a tangible impact to the Company's business that had, in fact, already transpired.

Moreover, even if any of Defendants' statements could be viewed as opinions, they remain actionable under *Omnicare*, which holds that opinion statements are actionable where, as here, the speaker either: (i) "did not hold the belief [] professed;" or (ii) omitted information that made the statement misleading. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). And qualifiers such as "we think" and "we believe" do not "operate as a magic shield against liability," particularly since the challenged opinion did not "fairly align[] with the information in the issuer's possession at the time." *In re Wells Fargo & Co. Sec. Litig.*, No. 1:20-CV-04494 (GHW), 2021 WL 4482102, at *13-14 (S.D.N.Y. Sept. 30, 2021) (statements actionable where omitted facts conflicted with statements); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) (opinion statements are actionable if they "contradict facts that are known to a defendant"); *Blanford*, 794 F.3d at 306 (same). Here, Defendants' statements omitted conflicting material facts about Peloton's demand and inventory levels.

## II.   ISSUES NOT REACHED BY THE DISTRICT COURT

Because the District Court found that Plaintiffs did not plead any actionable statements, it did not address whether Plaintiffs adequately pled scienter or claims under 20A and 20(a) of the Exchange Act.  SPA-24-25.  If this Court decides to exercise its "authority to decide issues that were argued before but not reached by the district court," *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir. 2004), Plaintiffs submit that the SAC adequately pleads scienter, insider trading, and control person liability.

### A.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

The SAC alleges a strong inference of scienter.  *See Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).  The inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences;'" instead, the inquiry is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id*. at 326.  *See also In re Salix Pharms., Ltd.*, 14-CV-8925 (KMW), 2016 WL 1629341, at *13 (S.D.N.Y. April 22, 2016) (a tie "goes to the plaintiff").  A strong inference of scienter may be established through facts showing either (a) "strong circumstantial evidence of conscious misbehavior or recklessness" or (b) "motive and opportunity to commit fraud."  *Novak*, 216 F.3d at 307.

48

### 1. Defendants Had Actual Knowledge That Sales Were Declining, Quotas Were Missed, and Inventory Was Building

Through internal reporting software showing sales metrics and inventory movement in real-time (JA-208-09 ¶¶120-21; JA-209 ¶123; JA-211-12 ¶130), Defendants knew that sales targets were missed repeatedly even after quotas were lowered due to decreasing demand; that sales had declined and were continuing to decline due to decreasing demand; and that inventory levels had ballooned as a result. JA-235-36 ¶183; JA-242 ¶195; JA-249-50 ¶211; JA-263-64 ¶267-68; JA-264-65 ¶¶269-70; JA-265-66 ¶271-75. These facts created a strong inference that Defendants knew their statements about demand for Peloton's products and explanations for increasing inventory were false. *See Quality Sys.*, 865 F.3d at 1145-46 (CW statements that management had access to sales forecasts generated through Salesforce supported an inference of scienter); *Docusign*, 669 F. Supp. 3d at 884 (CW statements that Defendants had access to and used Salesforce data to track demand supported an inference of scienter); *Forescout*, 63 F.4th at 768 (allegations that management had access to the status of deals through internal reports supported inference of scienter).

The specific facts supporting these allegations come from **thirty-one former Peloton employees**, whose accounts confirm downward trends in demand, overflowing inventory in warehouses and at shipping ports, and management's

regular access to and knowledge of this information. The CW statements "describe with sufficient particularity" facts "to support the probability that a person in the position occupied by the source[s] would possess the information alleged." *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020) (citation omitted) (CW accounts supported a strong inference of scienter where each CW, by virtue of her job position, was provided with "direct, contemporaneous information" about the fraudulent activity). *See also Celestica*, 455 F. App'x at 15 (CW allegations that defendants were informed about inventory buildup on monthly calls were sufficient to demonstrate scienter where inventory levels were critical to the company's financial performance). Confidential witness testimony must be "taken collectively" with other alleged evidence of scienter. *Moshell*, 481 F. Supp. 3d at 290.

For example, CW1 explained that beginning in February 2021, Woodworth and Lynch: (i) were informed that demand was expected to decline and did in fact decline in March of 2021 (JA-183 ¶27); (ii) attended monthly supply chain meetings where internal presentations showed that demand continued to decline between February and November of 2021 (JA-183-84 ¶¶27-29); and (iii) were copied on emails after each supply chain meeting which contained action items (JA-183-84 ¶29). Further, CW1 told Lynch directly that they were concerned about Peloton's growing inventory levels and that current levels of demand did not warrant increased production. JA-184 ¶¶30-31. Similar allegations have been found to support an

inference of scienter. *See, e.g.*, *Quality Sys.*, 865 F.3d at 1145 (CW's personal knowledge of Defendants' real-time access to Salesforce reports forecasting quarterly sales supported an inference of scienter); *Docusign*, 669 F. Supp. 3d at 879-80 (same).

Moreover, Plaintiffs' allegations regarding Defendants' knowledge do not rest on the account of CW1 alone. Other CWs described in the SAC also confirm that Defendants closely tracked and regularly discussed declining demand and excess inventory:

- CW8 and CW9 said that Defendants would have known by August 2021 that Peloton was paying for shipping containers to sit at ports of entry, because warehouses were at capacity. JA-191-92 ¶¶55, 58.

- CW10 stated that Foley and Lynch were on an email distribution list for the Looker Reports which showed real-time sales results daily. JA-193, ¶62; JA-209 ¶121. CW10 further explained that Foley sent internal emails when sales milestones were attained, and would discuss sales figures during company-wide meetings. JA-192 ¶61; JA-213 ¶133.

CWs also confirmed that Defendants Foley, Lynch and Woodworth knew that actual sales were well below sales forecasts. JA-212 ¶¶131-32. According to CW1, CW3, CW7, CW11, and CW12, by August 2021, Peloton had three months of excess inventory on hand (JA-238 ¶189); had incurred substantial demurrage fees (JA-191 ¶¶55, 58); and had opened additional warehouse facilities to store excess inventory (JA-193-94 ¶66.). CW10 stated further that Foley and Lynch attended weekly meetings with Peloton's Chief Sales Officer and discussed the decline of sales, sales

51

forecasts, and sales quotas.  JA-192-93 ¶¶60-64.[13]  These detailed allegations are more than sufficient to create an inference of scienter at the pleading stage.[14]

### 2.  Inventory and Demand Were Core Matters at Peloton

Core operations allegations "can provide supplemental support for … scienter." *Celestica*, 455 F. App'x at 14 n.3.  Demand and inventory were part of Peloton's "core operations."  Allegations regarding core operations must be considered holistically with other evidence of scienter.  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017) ("[T]he doctrine can provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently.").  Defendants Foley, Lynch, and Woodworth, co-founders of Peloton and its highest-level executives, were surely aware of demand for and inventory levels of Peloton's fitness equipment which accounted for 72% of the Company's annual revenue.  *See, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec.*

---

[13] Courts have credited CW statements attesting to defendants' attendance at meetings involving the subject of their false statements (i.e., regular meetings regarding sales, manufacturing capacity, and inventory) and held that such statements support scienter.  *See Speakes v. Taro Pharm. Indus., Ltd.*, No. 16-CV-08318 (ALC), 2018 WL 4572987, at *8 (S.D.N.Y. Sept. 24, 2018) (CW statements that defendants regularly attended meetings to discuss drug pricing decisions supported an inference of scienter).

[14] The accounts of these CWs can be credited because the facts alleged "'support the probability that a person in the position occupied by the source would possess the information alleged.'" *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l, N.V.*, 89 F. Supp. 3d. 602, 615-16 (S.D.N.Y. 2015) (internal quotation omitted).

*Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004) (scienter was well-pled in the absence of facts alleging *actual* knowledge of the fraud, because a high-level officer has a "duty to familiarize himself with the facts relevant to the core operations of the company…"); *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *13 (S.D.N.Y. Mar. 28, 2018) (outsized importance of the EpiPen to Mylan's bottom line bolstered inference of scienter).

### 3. Internal Documents Support Defendants' Scienter

The SAC cites internal company documents published in *Business Insider* and U.S. import data, which corroborate the CWs' statements that management knew that Peloton's inventory levels were excessive due to declining demand. JA-218-21 ¶¶144-52. That the CWs' accounts are corroborated by internal documents and public data further strengthens the inference of scienter. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (internal company documents corroborated by former employees' accounts established a strong inference of scienter).

### 4. Defendants' Insider Trades

The District Court did not address Plaintiffs' insider trading allegations. Defendants Foley, Woodworth, and Lynch, in particular, realized tremendous profits on sales of their Peloton stock during the Class Period: $80.1 million (Foley); $16.8 million (Woodworth); and $103.5 million (Lynch). JA-259 ¶244. "[I]nsider trading

represents a classic example of a 'concrete and personal' benefit that suffices to plead motive to commit securities fraud." *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011) (citation omitted). For stock sales to evidence scienter, they must be unusual in timing or amount, so as to "suggest[] that the seller is maximizing personal benefit from inside information." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020).

When determining whether insider trading activity is unusual, courts consider: (i) the amount of profit realized from the sales; (ii) the percentage of stockholdings sold; and (iii) the number of insiders selling. *Scholastic*, 252 F.3d at 74-75. Here, Foley, Lynch and Woodworth together realized profits of approximately $200 million from their CP stock sales. JA-272-73 ¶¶296-99. Insiders' trades have been found to be suspicious where the profits were far less.[15]

The timing of the sales also was suspicious, in many cases following spikes in Peloton's stock price after false statements were disseminated. *See In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001) (insider sales suspicious where they occurred shortly after false statement); *City of Warren Police & Fire Ret. Sys. v. World Wrestling*, 477 F. Supp. 3d 123, 137 (S.D.N.Y.

---

[15] *See, e.g.*, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y 1999) ($78 million in combined profit was "massive by any measure"); *Blanford*, 794 F.3d at 302-03 ($49 million in combined profit supported scienter).

2020) (insider sales that occur "at the time of the alleged withholding" of negative news may permit an inference of bad faith and scienter") (internal quotation marks and citation omitted). Just four days after the Company's February 4, 2021 earnings call, Lynch sold 500,000 shares (JA-273 ¶298) for proceeds of $72.48 million, and Kushi, one of Peloton's co-founders, sold 160,000 shares for proceeds of $23.2 million (*see* JA-298). On February 16, 2021, while Peloton's stock was trading at $155.50, up about 4.7% from the February 4 earnings call, Foley sold 100,000 shares; Lynch 116,670 shares; and Woodworth 150,000 shares. JA-272-73 ¶¶296-98.

Defendants' 10b5-1 trading plans provide no defense under the circumstances presented here. JA-258-62 ¶¶246-58. "[W]here a 10b5-1 trading plan is entered into—or strategically amended—to take advantage of an inflated stock price or insider information" the trading plan is not a "cognizable defense to scienter allegations on a motion to dismiss." *George v. China Auto. Sys., Inc.*, No. 11 CIV. 7533 KBF, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012); *Kasilingam v. Tilray, Inc.*, No. 20-CV-03459 (PAC), 2022 WL 4537846, at *9 (S.D.N.Y. Sept. 28, 2022) ("[T]he mere presence of a 10b5-1 plan is not a complete defense to scienter."). Further, simply because an insider trades pursuant to a trading plan does not render those stock sales "non-discretionary." *See DocuSign*, 669 F. Supp. 3d at 885 (stock sales transacted under 10b5-1 plans allowed defendants to "conceal[] the negative

information before the sale" and "set[] the sales for certain dates" which "were discretionary choices" sufficient to support an inference of scienter at the pleading stage) (internal quotation marks omitted).

The SAC alleges that Foley established his trading plan in September 2020 (JA-269 ¶285), when Peloton's stock was still trading at historic highs on investor expectations that demand would continue unabated. The plan required stock sales for two years. However, Foley abruptly terminated the plan on August 30, 2021, more than a full year ahead of schedule (JA-267-68 ¶281), at a time when he knew of Peloton's inventory glut, declining demand and what that meant for the business. Specifically, just four days later, Peloton filed a Form 8-K disclosing that the Company had identified "a material weakness" in its "internal controls over financial reporting with respect to identification and valuation of inventory," causing Peloton's stock price to drop 8.5%. JA-272 ¶295. A "valid plan" must "prevent the insider from exerting any subsequent influence over how, when, or whether to effect purchases or sales." *Smilovits v. First Solar, Inc.*, No. CV12-0555-PHX-DGC, 2019 WL 7282026, at *3 (D. Ariz. Dec. 27, 2019). By terminating his plan fourteen months early, Foley avoided selling his Peloton stock at significantly lower prices – creating a plausible inference that he knew his public statements did not reflect Peloton's true internal state of affairs. *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018) (scienter pled as to defendant who avoided a

25% stock price drop by abruptly halting trading under his 10b5-1 plan immediately before company released negative results). As such, Foley's trading plan does not insulate him from liability for insider trading.

Similarly, Woodworth and Lynch abruptly ceased trading pursuant to their trading plans at suspicious times in September 2021. JA-227 ¶164; JA-273 ¶298. Thus, the three most senior Peloton officers terminated their trading plans when demand for Peloton's products had evaporated and inventory had become insurmountably high.

Finally, Foley and Lynch had each pledged 65% and 41%, respectively, of their economic interest in Peloton as collateral for loans. JA-226-27 ¶163; JA-232 ¶175; JA-250 ¶212; JA-268 ¶283. These substantial pledges (the value of which was contingent on the price of Peloton's stock remaining high) would have motivated Foley and Lynch to keep Peloton's stock price inflated so as to avoid a margin call or decrease in credit. JA-258-59 ¶¶241-45. "Where a corporate officer pledges shares of his common stock as collateral for loans, this pledge provides the officer with a financial incentive to conceal problems at the Company in order to avoid a decline in the stock price that could trigger a margin call or a decrease in available credit." *Meyer v. Concordia Int'l Corp.*, No. 16 CIV. 6467 (RMB), 2017 WL 4083603, at *7 (S.D.N.Y. July 28, 2017) (cleaned up).

## B.   THE SAC ADEQUATELY ALLEGES A SECTION 20A CLAIM

To state a claim for insider trading under §20A, a plaintiff must demonstrate: (i) a predicate violation of the Exchange Act; and (ii) facts demonstrating that the defendant traded the security at issue contemporaneously with the plaintiff.  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008).  "[T]he standard for contemporaneity is a reasonable period," *Oxford Health*, 187 F.R.D. at 144, which can extend throughout "the entire period while relevant material non-public information remained undisclosed." *In re Am. Bus. Computers Corp. Sec. Litig.*, MDL No. 913, 1994 WL 848690, at *4 (S.D.N.Y. 1994).  Here, the trading gap between Plaintiffs and insiders ranges from one to eleven days.   JA-260-63 ¶¶251-65.  *In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 176 (S.D.N.Y. 2021); *S.E.C. v. McCaskey*, No. 98 CIV 6153 (SWK) (AJP), 2002 WL 850001, at *11 n.15 (S.D.N.Y. Mar. 26, 2002).

## C.   THE COMPLAINT ADEQUATELY ALLEGES A CONTROL PERSON LIABILITY CLAIM

The SAC also adequately alleged that certain Defendants were "culpable participants" in the fraud, and thus control persons under Section 20(a).  JA-282-83 ¶¶337-43.  *Aegean*, 529 F. Supp. 3d at 149-50.  The District Court erred in dismissing Plaintiffs' 20(a) claim.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court reverse the Judgment of the District Court and remand for further proceedings.

DATED: December 10, 2024

/s/ Daniel L. Berger
Daniel L. Berger
Karin E. Fisch
Cecilia E. Stein
Mica A. Cocco
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
dberger@gelaw.com
kfisch@gelaw.com
cstein@gelaw.com
mcocco@gelaw.com

*Counsel for Lead Plaintiff Robeco
Capital Growth Funds SICAV –
Robeco Global Consumer Trends*

Hannah Ross
Avi Josefson
Jonathan D. Uslaner
Caitlin C. Bozman
**BERNSTEIN LITOWITZ
BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com

avi@blbglaw.com
jonathanU@blbglaw.com
caitlin.bozman@blbglaw.com

*Counsel for Additional Plaintiff City of Hialeah Employees' Retirement System*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with Second Circuit Local Rule 32.1(a)(4), because it has 13,719 words, excluding those parts of the brief exempted by Fed. R. App. P. 32.1(f).

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman font.

<u>/s/ *Karin E. Fisch*</u>
Karin E. Fisch

*Counsel for Lead Plaintiff Robeco*
*Capital Growth Funds SICAV – Robeco*
*Global Consumer Trends*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Page(s)

**Document**

Opinion and Order, dated September 30, 2024 (ECF No. 108) .....................SPA-1

Opinion and Order, dated March 30, 2023 (ECF No. 88) ...........................SPA-27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBECO CAPITAL GROWTH FUNDS
SICAV – ROBECO GLOBAL CONSUMER
TRENDS and CITY OF HIALEAH
EMPLOYEES' RETIREMENT SYSTEM,
*individually and behalf of all others similarly
situated*,

       **Plaintiffs,**

      **-against-**

PELOTON INTERACTIVE, INC., JOHN
FOLEY, WILLIAM LYNCH, JILL
WOODWORTH, THOMAS CORTESE,
MARIANA GARAVAGLIA, and HISAO
KUSHI,

       **Defendants.**

---

**21-cv-9582 (ALC)(OTW)**

**OPINION AND ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

   Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends

("Robeco") along with City of Hialeah Employees' Retirement System ("City of Hialeah"),

together ("Plaintiffs") bring this securities class action against Peloton Interactive, Inc. ("Peloton"

or "the Company"), John Foley ("Foley"), William Lynch ("Lynch"), Jill Woodworth

("Woodworth"), Thomas Cortese ("Cortese"), Mariana Garavaglia ("Garavaglia"), and Hisao

Kushi ("Kushi") (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder

on behalf of itself and a class of all persons who purchased Peloton common stock between

February 5, 2021 and November 4, 2021 (the "Class Period").

   Currently pending before the Court is Defendants' motion to dismiss the Second Amended

Complaint. (ECF No. 93). Drawing all reasonable inferences in Plaintiffs' favor, the Court finds

that Plaintiffs have not articulated sufficient factual allegations to carry their assertions beyond the speculative level: many of Defendants' alleged misstatements are statements of non-actionable corporate optimism or are protected by the PSLRA safe harbor, and Plaintiffs have not asserted sufficient facts demonstrating Defendants' statements were materially false when made. For these reasons, Defendants' motion is **GRANTED**.

## BACKGROUND

### I.    Factual Background[1]

#### A.  The Parties

Lead Plaintiff Robeco Capital Growth Funds SICAV is an "open-ended investment company based in Rotterdam, Netherlands" that purchased common stock at allegedly artificially inflated prices during the Class Period. (SAC, ECF No. 92 ¶ 13).

Plaintiff City of Hialeah Employees' Retirement System is a "benefit pension plan based in Hialeah, Florida" that "provides pension services and benefits to employees, retirees, and beneficiaries of the City of Hialeah." (*Id.* at ¶ 14).

Defendant Peloton Interactive, Inc. ("Peloton") is a fitness company that manufactures and produces stationary bikes and treadmills (referred to as "Connected Fitness products"). (*Id.* ¶ 15.) The Company sells a monthly subscription service that allows users to participate in remote fitness classes using the Company's online fitness platform. (*Id.*)

The "Management Defendants" consist of high-ranking members of Peloton's executive leadership. Defendant Foley is the Executive Chair and co-founder of Peloton. (*Id.* ¶ 16.) He also served as Peloton's Chief Executive Officer and as a member of the Board of Directors. (*Id.*)

---

[1] The following facts are drawn from the Second Amended Complaint ("SAC"), Defendants' Memorandum in Support of their Motion to Dismiss, Plaintiffs' Opposition Brief, and documents relied upon therein.

Defendant Lynch is another co-founder of Peloton and served as the President and a member of the Company's Board of Directors. (*Id.* ¶ 17.) Defendant Woodworth was Peloton's former Chief Financial Officer. (*Id.* ¶ 18.) Plaintiffs allege that the Management Defendants made misleading statements to investors while in possession of material, non-public adverse information about Peloton. (*Id.* ¶¶ 16-18.)

The "Insider Trading Defendants" are alleged to have traded Peloton common stock on the basis of material, nonpublic information. (*Id.* ¶¶ 20–23.) Defendant Kushi is Peloton's Chief Legal Officer and another co-founder. (*Id.* ¶ 20.) Defendant Garavaglia was Peloton's Chief People Officer and Chief Business Officer. (*Id.* ¶ 21.) Defendant Cortese is another of Peloton's co-founders and its Chief Operations Officer until August 2021. (*Id.* ¶ 22.) He was subsequently named as the Company's Chief Product Officer. (*Id.*)

### B. Allegations of Declining Demand for Peloton's Products

In the wake of the business closures enacted in the face of the COVID-19 pandemic, demand for Peloton's products increased exponentially. (*Id.* ¶ 110.) Peloton began to experience supply chain logistic issues and substantial backlogs in delivering its Connected Fitness products to its customers. (*Id.* ¶¶ 27-32.) In response, Plaintiffs allege that Peloton significantly ramped up its production capacity and told investors that it would be making investments into its supply chain in order to keep up with the soaring demand. (*Id.* ¶ 115.) By early 2021, however, Plaintiffs allege that this surge in demand had begun to wane as COVID-19 vaccines became more widely accessible and brick and mortar gyms began reopening. (*Id.* ¶ 204.) Plaintiffs allege that Defendants hid the true nature of the declining demand to investors and publicly stressed that its investment into its supply chain was necessary and appropriate given the sustained demand for its products. (*Id.* ¶ 248.)

3

As analysts and investors began to question whether Peloton's explosive success could be maintained after the peak of the COVID-19 pandemic, Defendants allegedly continued to assure the public that demand for Peloton's products remained strong.  (*Id.* ¶¶ 165, 167, 185, 190, 202, 205, 268.)  However, Plaintiffs allege that by early 2021, Peloton and its management knew that the demand for its products had begun to decline.  Specifically, Plaintiffs allege that Defendants received regular reports from sales management software such as Looker, Salesforce, Slack, and Callidus, showing that sales had declined.  (*Id.* ¶ 117.)  Plaintiffs allege that sales personnel were regularly missing their sales quotas (even after they had been reduced), which was reported to Defendants.  (*Id.* ¶¶ 34, 135, 183).  Plaintiffs also cite Peloton's rising inventory levels as indication that demand for its products was decreasing.  (*Id.* ¶¶ 191. 193, 233-244.)  Plaintiffs also note that Peloton was forced to reduce the price of its bikes in order to increase sales.  (*Id.* ¶¶ 31, 189, 192-93, 199, 201.)

Plaintiffs substantiate these allegations by relying on the statements of several confidential witnesses ("CWs"), consisting of 32 former Peloton employees.  (*Id.* ¶¶ 25–108.)

In the SAC, Plaintiffs allege the following:[2]

First, at least 11 additional CWs confirm that demand had cratered in early 2021. (*Id.* ¶ 132.) These new CWs verify that Defendants regularly received reports generated by sophisticated sales software that tracked sales metrics and analytics in real time. (*Id.* ¶¶45, 60-61, 86, 117-22.) These reports revealed that sales were declining throughout 2021. (*Id.* ¶¶33-35, 45-46, 60-62, 130-32.) According to one CW, the former Senior Director of Operations and Supply Chain Program Management, Defendants were warned that inventory levels far outpaced demand. (*Id.* ¶¶ 27-32.) Second, new CWs confirm that sales personnel regularly missed their quotas, even when lowered,

---

[2] *See* Pl. Opp. at 3-4 (ECF No. 98).

4

information that was tracked by and reported to Defendants. (*Id.* ¶¶87-88, 102, 130, 134-35.) The new CWs state that quotas were missed because the demand for products wasn't there. Third, Peloton's inventory levels rose rapidly as sales declined. (*Id.* ¶¶ 98-105.) The CWs stated that the Management Defendants received software generated reports that tracked company-wide inventory and sales data in real time, which showed that "less inventory was moving." (*Id.* ¶¶36-38, 47-51, 52-55, 124-29, 132-33, 140-43.) Shipments of bikes from Peloton's largest warehouses across the country had declined by almost 50% by April of 2021. (*Id.* ¶¶37-38, 81, 132.) As a result, warehouses struggled to find space to store inventory, and Peloton left inventory sitting outside in warehouse yards and paid hefty demurrage fees to let containers of equipment sit at international 4 and domestic ports for months on end. (*Id.* ¶¶31, 52-58, 108, 141).

### The Alleged Misstatements[3]

Plaintiffs allege that Defendants made the following materially false and misleading statements from February 5, 2021 until November 4, 2021 during the Class Period:

- **Feb. 4, 2021 2Q21 Earnings Call[4]**

  Analyst: "Jill, you mentioned that manufacturing capacity exceeds demand. I just want to clarify that strictly because you ramped capacity, **or are you seeing any change to demand due to extended order to delivery times**? [...]

  Foley: "Thanks Doug. We're going to do a switcher I'm going to take the first one, and then I think William and I can talk about Precor. **We are not seeing a softening in demand. That is absolutely not what's happening here. We are seeing incredibly strong organic demand even in the phase of light marketing.** As you know, the successes that we're seeing in getting the order to delivery down and getting our backlog down are 100% based on incredible upgrades, and our manufacturing capacity up to over six times -- 6x increase in just the last 12 months in our capacity of them know - - we're now making more Bikes on a monthly basis than we did in all of fiscal 2018. So it's a Herculean effort based on our in-house manufacturing teams and our third-party partners.

---

[3] The statement numbers correspond to those designated by the Court in its March 30, 2023 Opinion and Order with respect to the First Amended Complaint (ECF No. 88). Plaintiffs no longer challenge ten of the Statements from that Complaint, i.e., those that the Court labeled Statements 4, 5, 6, 7, 8, 12, 15, 16, 17, and 18. (See ECF No. 88, pp. 5-11.)

[4] All italicized and bolded texts are as filed in the Amended Complaint.

And so yeah, I hope that answers your question. **But it's absolutely not a softening of demand that now we're seeing, we're seeing robust demand."** (*Id.* ¶ 154 ("Statement 1").)

- **Feb. 4, 2021 2Q21 Earnings Call**

   Woodworth: "And I would just highlight obviously, that's reflected in the revised revenue guidance that we've given for Q3 and Q4. Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products**." (*Id.* ¶ 155 ("Statement 2").)

- **Feb. 4, 2021 2Q21 Earnings Call**

   Analyst: "[J]ust thinking about the opening next year, some of the e-commerce companies had a showdown in September and October, and then reaccelerated due to lockdown. Did you see anything in the fall and how are you thinking about that."

   Foley: "When the vaccine was announced in the fall, you saw a reaction to the stock, we did not see any reaction to our sales or demand. We still have not seen any softening since that vaccine was announced and since the vaccine has been rolling out. So other than investors getting nervous, the consumers are still feeling like they want to work out at home The experience to William's point is the best in the world and it's getting better as we launch more software features, more content types, more access on more different platforms. And I think what you're seeing is everyone's starting to realize that working out at home is a better place. It's a better value. And so, we're very bullish on our sales opportunities on the other side of the opening to your point. So we remain very, very bullish on our opportunity. And like Jill did say, we're excited to get on the offensive and start marketing because the story is incredible, the products and the experiences are incredible, and they're getting better by the month. So we've remained very, very bullish on our opportunity. **We haven't seen any softening of demand.**" (*Id.* ¶ 156 ("Statement 3").)

- **May 7, 2021 Form 10-Q**

   Peloton: "The increase in net operating assets and liabilities was primarily due to a $442 million increase in accounts payable and **accrued expenses related to increased inventory** and other expenditures to promote general business growth, as well as the timing of payments, partially offset by a **363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.**" (*Id.* ¶ 168 ("Statement 9").)

- **May 25, 2021 Analyst Conference**

   Analyst: "how do you get people comfortable with where Bike demand is heading into warmer weather and into strong reopening[?]"

Woodworth: "Well, first, I would say, and I think we said this after the launch of Bike+ is that truly the technology and the innovation that we've brought with the Bike+ has been incredibly well received. And so I think we continue to see Bike+ exceeding our expectations on mix. And so with that said, the comments that I made around bike demand in Q4 is that we all know that COVID was a little bit of an anomaly last year in terms of sales. And so when you look at Q4 of last year, and everybody -- I mean, I was the most bikes or treads that we had ever sold in such a short period of time, it's a tough comparable for us, right? And at this juncture, it's not relevant. So what I was trying to do was, okay, well, let's look back to where we were in Q4 of '19 and where we expect to be in terms of bike in Q4 of this year. **And I was trying to make the point that, yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand.** And what's so interesting about our company today, versus 2 years ago, is that we now have the portfolio of products, right? We have the lower price bike at $49 a month. We have Bike+ which I've said is doing very well. We also are back marketing, again, which is something we haven't done and we were purely organic for so many months because we didn't want to exacerbate the OTD situation." (*Id.* ¶ 177 ("Statement 10").)

- **Aug. 26, 2021 4Q21 Earnings Call**

  Woodworth: "For fiscal [year] 2022 we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR."

  **"We are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of continued strong demand."** (*Id.* ¶ 174 ("Statement 11").)

- **Aug. 26, 2021 4Q21 Earnings Call**

  Analyst: "…**And the second question on the supply chain, we can see the inventory numbers up pretty dramatically quarter to quarter on the balance sheet**. Outside of the cost headwinds that you talked about for supply chain, are you worried at all about actually getting product to the consumer over the next -- basically through the holiday season?"

  Lynch: "Well, I can take the second question first. This is William. In terms of the guidance that Jill provided, we feel like we've built -- and the investments that John and Jill talked about, we built the infrastructure to support our holiday plans. As Jill noted, we feel like fiscal year '22 is going to be a return to more **seasonality. So a large part of our business is in Q2, Q3. And certainly, that's true of deliveries. And so everything in the supply chain from inventory that you're noting, the accumulation up on the balance sheet to warehousing and how we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that we're staging for what will be our biggest holiday ever.** We're very excited both in terms of the Bike growth that Jill noted and then the launch of Tread, which we expect to be very large over time. And

7

so there's -- a lot of companies aren't in that position or reading in automotive, some of the shortages on chips and semis. So we're very proud of our team. We think our partners, TI, others who have helped us get in that position. So inventory is up. We are building inventory. As you know, the lead times with ocean freight and freight, in general, have extended. And so we've been diligent about learning from the past and feel like we're in a really good position to execute this plan this year." (*Id.* ¶ 186 ("Statement 13").)

- **Aug. 26, 2021 4Q21 Earnings Call**

Analyst: "One for John and one for Jill. John, we know there's seasonality. But just given the light 1Q guide, is the price -- is the Bike price gotten offensive or defensive? And how do you think about demand for Bike+ currently? And then, Jill, hoping you can walk through a little bit more detail around the Tread gross margin structure perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you."

Foley: "**Thank you, Doug. So as Jill said in her opening remarks, we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast. The price drop with B1 was absolutely offensive as we think about the competitive landscape and we think about democratizing the access to great fitness, which has, as you know, always been in our playbook.** This is actually the first year since we founded the company that we had the opportunity to do this, and we're super excited that the investments we've made in our supply chain certainly over the last few years, but definitely in the last 12 months, are bearing enough fruit that we have the capacity to make what will become -- what will look like close to 2 million fitness units of hardware this year, which is just incredible considering, when we founded the company, we approached the biggest contract manufacturer we could find, and they said that they were confident that they could make up to 10,000 Bikes a year. That was only eight years ago. So the scale of which we've seen and put in place and invested in across our entire supply chain with Bikes. And now, obviously, it includes Treads. And the lower priced Tread as well allowed us to consider lowering the price of B1, and we think it's the right thing for our business, obviously, solving for net new sub adds, which was kind of our True North of getting more people into the tent and thinking about the LTV of those users, not just, Doug -- interestingly, not just as a subscriber for the $39 for a new Bike sub, which has always been kind of our True North and the golden goose of our business model, but think about selling those same people, the same households, future Treads, and future products, apparel and all the other stuff that becomes a much broader LTV picture over time." (*Id.* ¶ 187 ("Statement 14").)

- **Nov. 4, 2021 1Q22 Earnings Call**
  Foley: "Looking ahead, we're about to enter our busiest time of the year. **Our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period.**" (*Id.* ¶ 205 ("Statement 19").)

- **May 6, 2021 Form 10-Q' August 26, 2021 Form 10-K; November 4, 2021 Form 10-Q**

"*If* we fail to accurately forecast consumer demand, we *may* experience excess inventory levels or a shortage of products available for sale . . ." ((*Id.* ¶ 214 ("Statement 20").)

## C. Peloton Reveals Decline in Demand to the Public

In Peloton's annual report for the fourth quarter of fiscal year 2021, the Company informed the market about a "material weakness" in the Company's internal controls related to inventory reporting. (*Id.* ¶ 286.)

Subsequently, on November 4, 2021, Peloton announced its financial result for the fiscal year 2022 and disclosed that it had revised its full-year revenue guidance to a range of $4.4 billion to $4.8 billion, down from $5.4 billion. (*Id.* ¶ 219.) The Company also announced that 91% of its inventory on hand remained unsold. (*Id.* ¶ 223.) Plaintiffs allege that this decline in demand was because Peloton's customers "were increasingly free to exercise outside the home." (*Id.*)

In the 1Q22 Earnings Call, Foley explained to the public:

> "As you all well know, stay-at-home and work-from home orders, coupled with commercial gym closures drove massive awareness gains for Connected Fitness, accelerating an adoption curve that was already well underway. Given the unprecedented circumstances presented by the global pandemic, we said last quarter that modelling the exit from COVID and the massive growth we saw in fiscal 2021 would be a challenging task, and that has certainly proven to be true.
>
> We reduced backlogs, our visibility into our future performance has become more limited. From forecasting consumer demand to accurately predicting logistics costs, our teams have never seen a more complex operating environment in which to guide our expected results this year.
>
> As noted in our shareholder letter, we are reducing our guidance for fiscal year 2022. We have returned to presenting ranges given the uncertainty. The swift timing of these changes since giving our initial guidance in August is not lost on us.
>
> As we prepared our previous guidance, we had to make assumptions about consumer behavior coming out of COVID, the impact of our

original Bike price reduction and the cost structure within our Connected Fitness segment, all against the backdrop of a global supply chain crisis [….]

While we continue to see a nearly 100% two-year growth CAGR in both traffic and unit sales in Q1 and into Q2, we've seen a greater-than-anticipated taper of our website traffic levels over the past two months and a slower-than-expected pickup in retail showroom traffic, both of which are important inputs into our forward-looking demand model. This reduction in traffic has added increased near-term uncertainty into our forecast.

As expected, our original Bike price reduction created a step shift in demand, helping to broaden our demographic mix and expand our market opportunity. The price move did significantly improve our e-commerce conversion rate, in fact, greater than we expected, but not enough to offset the year-over-year declines we have seen in overall traffic.

We saw a positive and sustained reception to the price moves in our international markets. This was anticipated as our international consumers have proven to be more price sensitive. To maintain a premium end-to-end member experience, we made significant investments over the past year to scale manufacturing, logistics and operations. Overall, we believe we met the challenge, but there's no doubt that in some cases, we overcorrected. That combined with the reduction to our demand picture and higher than expected costs across product, transportation and delivery are causing a near-term compression of our hardware margins.

[…]

We track our estimated market share closely. And while sales are currently not meeting our previous forecast, third-party data suggests that we continue to build on our leading share of the Connected Fitness market. We firmly believe at-home fitness customers will want one subscription for a comprehensive home fitness platform and we are determined to be that one subscription."

(Engel Decl., Ex. 11, ECF No. 68 at 3–5.)

Plaintiffs allege that this disclosure directly contradicted Defendants' representations from the prior few months and that this information shocked the market. (*Id.* ¶¶ 223-27.) Peloton's stock price dropped by 35%, declining from a price of $86.06 per share to a closing price of $55.64

per share. (*Id.* ¶ 225) On a February 8, 2022 earnings call, Peloton announced that Foley would be stepping down as CEO and instead serve as executive chair of the Company's board of directors. (*Id.* ¶ 237.) The Company also announced that Lynch would be stepping down from the board of directors. (*Id.*) As of September 12, 2022, Foley had resigned from the board of directors. (Pl.'s Mem., ECF No. 69 at 7 n.3.)

### D. Scienter Allegations

Plaintiffs allege that when Defendants learned that demand for their products was declining, the Management Defendants and Insider Trading Defendants sold their shares of Peloton stock at inflated prices. (*Id.* ¶¶ 245-45.) In particular, Plaintiffs allege that the Management Defendants and Insider Trading Defendants either suspiciously deviated from their 10b5-1 trading plans or engaged in "highly erratic and irregular trading behavior", suggesting that they had sold Peloton shares during the class period on the basis of material nonpublic information before the truth emerged that demand for Peloton's products was declining. (*Id.* ¶ 291.) Plaintiffs also allege that because the Management and Insider Trading Defendants had pledged a "substantial percentage" of their shares during the Class Period, they were motivated to keep Peloton's stock price artificially high. (*Id.* ¶¶ 282.)

### II. Procedural Background

The Complaint was filed on November 18, 2021. (ECF No. 1.) On May 2, 2021, Robeco was appointed as Lead Plaintiff and this action was consolidated with 21-cv-10266 (ALC)(OTW) *Deulina v. Peloton Interactive, Inc. et al*. (ECF No. 42.) Thereafter Plaintiff filed an Amended Complaint on June 25, 2022. (FAC, ECF No. 51.) Defendants filed a motion to dismiss on August 22, 2022, ECF No. 66), which the Court granted on March 30, 2023 (ECF No. 88, "Ord."). Plaintiff Plaintiff Robeco, together with a new Plaintiff City of Hialeah, filed their Second Amended

SPA-11

Complaint on May 6, 2023 (ECF No. 92), and Defendants filed their Motion to Dismiss the Second

Amended Complaint on June 16, 2023. Plaintiffs filed their Opposition on July 21, 2023 (ECF No.

98). Defendants filed their Reply on August 18, 2023. This Motion is fully briefed. Oral argument

was denied on April 2, 2024. (ECF No. 103).

## LEGAL STANDARDS

### I.  Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

Court must "accept as true all factual statements alleged in the complaint and draw all reasonable

inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d

184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be

dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement

for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows

the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the

plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has

acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges

facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The

Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a

trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v.

Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In deciding a motion to dismiss a securities action, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns*, 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

## II.    Section 10(b) and Rule 10b-5

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading'. . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). This is an objective test that looks to the understanding of an "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Importantly, "literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192. "However, Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 397 (S.D.N.Y. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Thus, issuers have a duty of

disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).

### III.     Fed. R. Civ. P. 9(b) and the PSLRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake."  To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)).  Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### DISCUSSION

### I.     Plaintiffs Have Failed to Cure Deficiencies and Have Not Pleaded an Actionable Misstatement or Omission

### A.  Safe Harbor for Forward-Looking Statements

Plaintiffs' second amended complaint has still failed to cure the deficiencies the Court has specified in its dismissal of the first amended complaint, namely that the challenged statements are non-actionable, forward-looking statements that fall within the PSLRA's statutory safe harbor.

A "forward-looking statement" is (1) "a statement containing a projection of revenues, income. . . or other financial items," (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," or (3) "a statement of future economic performance."  15 U.S.C. § 78u-5(i)(1)(A)-(C); *see also In re Vivendi*, 838 F.3d at 246.  These statements are subject to the PSLRA's safe harbor which provides, in relevant part, that: "[A] defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading. Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *Id.* at 245–46 (citation omitted).  To qualify as "meaningful," cautionary language must "convey[] substantive information" and cannot be "boilerplate" or "vague." *Id.* at 247 (citation omitted).  However, "[t]he cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (citing *Slayton v. American Exp. Co.*, 604 F.3d 758, 768–69 (2d Cir. 2010)).

In its previous order, the Court found that Statements 1, 11, and 13 were forward-looking. Plaintiffs have not put forth any additional facts or evidence for the Court to determine otherwise. Defendants also identify five other statements allegedly protected by the PSLRA safe harbor:

Statements 2-3, 10, 14, and 19. They argue that these Statements related to Defendants' projections regarding the future. Statements 2 and 10 explained that "robust" demand was reflected in Peloton's sales guidance. SAC ¶ 155 (demand is "reflected in the revised revenue guidance that we've given"); id. ¶ 177 (discussing "where we expect to be in terms of bike in Q4 of this year"). And Statements 3, 14, and 19 all refer to Peloton's future opportunities and plans. Id. ¶ 187 (in response to question about "1Q guide," explaining supply-chain had "capacity to make what will become—what will look like close to 2 million fitness units"); id. ¶ 156 ("we're very bullish on our sales opportunities on the other side of the opening"); id. ¶ 205 ("Looking ahead, we're about to enter our busiest time of the year. Our inventories are healthy and our logistics teams are well-equipped"). Statement 20 is also arguably forward-looking and cautionary. ("*If* we fail to accurately forecast consumer demand, we *may* experience excess inventory levels or a shortage of products available for sale . . ." id. ¶ 214. Plaintiffs assert that these Statements are not in fact forward-looking, but statements of then-existing fact. This argument fails. These statements clearly describe future economic performance and are "paradigmatic forward-looking statements protected by the safe harbor." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020), aff'd, 847 F. App'x 35 (2d Cir. 2021); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *23-25 (S.D.N.Y. Sept. 2, 2022).

Moreover, these forward-looking statements are accompanied by meaningful cautionary language. Statements 1-3, 10-11, 13-14, 19-20 were accompanied by extensive company-specific warnings that actual results may differ materially from those contained in or implied by these forward-looking statements due to risks and uncertainties associated. While it is true that "cautionary words about future risk cannot insulate from liability an insurer's failure to disclose the risk that has, in fact, materialized in the past and is virtually certain to materialize again," *Set*

*Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021), such is not the case here. As this Court has already determined, Peloton warned of the very risks alleged to have later occurred, including "a change in consumer spending preferences" due to "the COVID-19 pandemic," and the "uncertain[ty of] how the COVID-19 pandemic will impact Subscriber renewal rates in the long-term." Ord. at 20 (citing Ex. 1 at 40, 50).[5] Peloton also warned that "our revenue growth rate is likely to slow down as our business matures," particularly if "the market for our products . . . does not continue to grow" or "grows more slowly than we expect," and cautioned that "past financial results may not be indicative of our future performance" due to its "limited operating history." *Id.* 19-20 (citing Ex. 1 at 40-41). These extensive warnings about the risk and uncertainty of future subscriber growth were specified in Peloton's Form 10-q, issued on February 4, 2021, the same day of the 2Q21 Earnings Call (where Statements 1-3 took place). Moreover, the 2Q21 Earnings Call began with cautionary language. Peter Stabler, Head of Investor Relations, beginning 2Q21 Earnings Call noting:

> Our comments and responses to your questions reflect management's views as of today only and will include statements related to our business that are forward-looking statements under federal securities law. Actual results may differ materially from those contained in or implied by these forward-looking statements due to risks and uncertainties associated with our business. For a discussion of the material risks and other important factors that could impact our actual results, please refer to our SEC filings and today's shareholder letter, both of which can be found on our Investor Relations website. (*See* Ex. 7., ECF No. 96-7).

And, these very detailed warnings were substantively repeated in Peloton's SEC filings throughout the Class Period. (*See, e.g., id.*, Ex. 2, ECF No. 68-2 at 17 ("The full extent of the impact of COVID-19 on our business and financial results will depend largely on future developments, including upon the removal of lockdowns may cause, consumers to go back to

---

[5] The Court "may take judicial notice of the full contents of the SEC's filings relating to this enforcement action because plaintiffs rely upon portions of them in their pleadings." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 354-55 n.5 (2d Cir. 2010).

their pre-COVID routines…"); *id.* Ex. 3, ECF No. 68-3 at 45 (same)) Peloton's "substantive

company-specific warnings" are the precise type of "extensive and specific" factors that courts

find meaningfully cautionary. *See, e.g.*, *Gray*, 454 F. Supp. 3d at 392 (dismissing where

company had specific risk warnings).

The Court finds that this language is sufficiently specific to shield Defendants from

liability for their forward-looking statements. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d

518, 534 (S.D.N.Y. 2021); *See Rombach*, 355 F.3d at 173-74 (affirming dismissal of claims

based on "[c]autionary words about future risk" where plaintiffs' "allegations do not support an

inference that the company was in trouble" and are "consistent with unremarkable circumstances

short of financial peril or instability"); *see, e.g.*, *In re Delcath Sys. Sec. Litig.*, 36 F. Supp. 3d

320, 333 (S.D.N.Y., 2014) (FDA approval statements made on conference calls and in press

releases not actionable under PSLRA safe harbor because of publicly filed docs that contradicted

plaintiff's allegations).

### B. Falsity

Once again, Plaintiffs have failed to adequately plead falsity as to any of the Challenged

Statements, including the newly Challenged Statements 19-20, because none of the Challenged

Statements was false.

A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur

unless an alleged material misstatement was false at the time it was made. *See San Leandro*

*Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d

Cir. 1996). A statement believed to be true when made, but later shown to be false, is insufficient.

*Id.* (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked

a reasonable basis for their optimistic, but qualified, predictions as to the company's future

performance"); *see also Novak v. Kasaks*, 216 F.3d at 309 ("refus[ing] to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") (internal citations omitted), *cert. denied*, 531 U.S. 1012 (2000).

As the Second Circuit has recently specified in *Leadersel Innotech ESG v. Teladoc Health, Inc.*, "[a] material misrepresentation or omission must be both (1) false or misleading, and (2) material. *See Singh v. Cigna Corp.*, 918 F.3d 57, 62-63 (2d Cir. 2019). Whether a statement is false or misleading is 'evaluated not only by literal truth, but by context and manner of presentation.' *Id.* at 63 (internal quotation marks and citation omitted). For a statement to be misleading, a plaintiff must plead that the speaker omitted facts whose omission makes the statement misleading to a reasonable investor. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187-89, 135 S. Ct. 1318, 191 L. Ed. 2d 253 (2015). 'An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.' *Singh*, 918 F.3d at 63 (internal quotation marks and citation omitted). Similarly, for an alleged statement to be "material" under Section 10(b), we have held that it 'must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome[.]' *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) *Leadersel Innotech ESG v. Teladoc Health, Inc.*, 2024 U.S. App. LEXIS 24196, *4-5 (2d. Cir., Sept. 24, 2024). Plaintiffs must do more than simply assert that a statement is false—"they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174. "The key question in considering the misleading nature of a statement is 'whether defendants' representations, taken

together and in context, would have misle[d] a reasonable investor[.]'" *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (internal citations omitted).

This Court has already recognized, "Peloton's performance exceeded its sales guidance throughout the Class Period," meaning the "challenged statements were entirely consistent with Peloton's actual financial results." Ord. at 23. Throughout the Class Period (1) Peloton explained that demand expectations were "reflected in" its "revenue guidance," see SAC ¶¶ 155, 185; (2) Peloton achieved that guidance each quarter; and (3) those results reflected YoY growth. Exs. 1-3, 6-11, 13; Ord. 23-24. Rather than promising that the unprecedented demand that Peloton had seen during COVID closures would remain at the same level," Defendants told investors "that the rapid increase in demand for Peloton's products could not be sustained at COVID levels". Ord. at 24-25 (emphasis added); see also SAC ¶ 177 (COVID was "an anomaly last year in terms of sales").

First, Plaintiffs challenge a statement from November 4, 2021 (Statement 19), where Foley said that "[l]ooking ahead" Peloton had "healthy" inventories and was "well-equipped for the seasonally strong sales period" in 2Q22. SAC ¶ 205; App. A at 19. Plaintiffs claim the statement was misleading because "sales were declining," and there was "no sign of sales rebounding at any time through November 2021." See SAC ¶ 207. But, Peloton achieved its 2Q22 sales guidance, which reflected year over year growth (2Q22 revenue guidance listing $1.1-1.2 billion, actual revenue achieved $1.134). See Exs. 1-3, 6-13. Moreover, Plaintiffs claim that nearly every Challenged Statement was false and misleading because according to CWs some Inside Sales staff missed their sales quotas. See SAC ¶¶ 158, 170, 179, 189 (discussing allegations by CW2, CW6, and CW10). Plaintiffs allege only that some employees in one channel (Inside Sales, which comprised a minority of total sales) missed quotas, although Peloton had three sales channels. See

Ex. 2 at 24. Because Plaintiffs' anecdotal allegations thus say nothing about Peloton's performance "as a whole, they do not support an inference of falsity. *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp*., 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018); *see also Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *12 (S.D.N.Y Mar. 29, 2021) (no falsity where no dispute defendants reported "results accurately").

Second, Plaintiffs claim that Statement 20 is materially false and misleading because the purported "risk" had already materialized. In Peloton's SEC filings made on May 6, 2021; August 26, 2021 and November 4, 2021 (SAC ¶ 214), Defendants stated: "If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale." But Peloton's inventory growth does not prove falsity. The SAC claims, based on allegations from low-level CWs, that the Challenged Statements were false because there was not "strong" demand for Peloton products, as evidenced by "excessive" inventories. See SAC ¶¶ 170, 179, 189, 207. But the CW allegations conflict with Plaintiffs' own allegations. See Ord. at 24. Several CWs allege there was "excess inventory" at "Christmastime in 2020" or "early 2021," SAC ¶¶ 38, 48, 71—when even Plaintiffs admit Peloton experienced "unprecedented" demand and was "supply constrained." Id. ¶¶ 1, 165; Ord. at 24 (CW allegations "need not be credited" where inconsistent with "totality of the facts"). Peloton has sufficiently alleged that its Class Period inventory was not "excessive"—Peloton purposefully built inventory to improve delivery times and Peloton warned not of "excessive" inventory generally, but that excessive inventory "may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices," which would negatively impact Peloton's financials. Ex. 3 at 52. *See Hou Liu v. Intercept Pharms*., Inc., 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) ("no [] allegations" that risk materialized); *see also Williams*, 869 F.3d at 243 ("adverse effects at issue" had not yet been

realized. To avoid a repeat of long order to delivery times during the busy holiday season in 2020, Defendants built "ample inventory" to ensure quick delivery "during the holiday and New Year's resolution periods." Ex. 11 at 6; SAC ¶ 170. Peloton was "abundantly transparent" about its inventory plan, and Plaintiffs ignore that Peloton "met its guidance" throughout the Class Period. *See Insperity, Inc*., 2022 WL 784017, at \*8.

In balance, no reasonable investor could have been misled by these purportedly false statements, because they were in fact, true. Peloton told investors what it expected demand to be through its quarterly sales guidance, how it planned to build inventory to meet demand, and then met or exceeded that guidance throughout the Class Period. In *Teladoc*, the Second Circuit found that certain statements made from multiple former employees responsible for integrating the two companies' sales forces were directly contradicted by confidential witnesses and supporting documents. Following an $18.5 billion merger between two large telehealth companies, the *Teladoc* defendants told investors that the companies had "fully integrated" their "commercial organization" and "sales team[s]" although the companies were not fully integrated when defendants made these statements. 2024 WL 4274362, at \*1, 4-5. This is not the case here. Plaintiffs' SAC alleges no specific facts contradicting any of Defendants' statements, and none of the confidential witnesses here had any involvement in or responsibility for assessing Peloton's overall demand or the preparation of Peloton's sales guidance.

And as this Court notes again, the "challenged statements were entirely consistent with Peloton's actual financial results." Ord. at 23. Plaintiffs have failed to adequately plead that any of the Challenged Statements were false or materially misleading.

## C.  Statements of Corporate Optimism

"[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable."). As the Second Circuuit has explained, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."). *See Leadersel Innotech ESG v. Teladoc Health, Inc*., 2024 U.S. App. LEXIS 24196, *5-6 (setting forth corporate optimism standards).

The Court has already found that Statement 9 constitutes inactionable corporate puffery. Ord. at 22. Certainly, Foley's Statement during the November 9, 2021 1Q22 Earnings Call (SAC ¶ 205), "Looking ahead, we're about to enter our busiest time of the year. Our inventories are healthy, and our logistics teams are well-equipped for the seasonally strong sales period" is precisely the type of vague expressions of optimism that courts in this district have dismissed. *See, e.g.*, *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018); *see also Gregory v. ProNai Therapeutics Inc.*, 297 F. Supp. 3d 372, 398-99 (S.D.N.Y. 2018) (statements about the company's "competitive advantage" were mere puffery); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) (statements suggesting "Xerox's confidence in its competitiveness" and "vaguely and

enthusiastically describ[ing] Xerox's performance, [and] expectations of business success" were non-actionable puffery); *compare, e.g.*, *Teladoc*, 2024 WL 4274362, at *3 (integration is "going really great," "continues to progress," "well on [the] way," and "on track") with SAC ¶¶ 177, 185-186, App. A at 10-11, 13 (Peloton expects "continued strong demand"; "Bike+ exceeding our expectations"; "we're in a really good position" and are "staging for what will be our biggest holiday ever").

Accordingly, the Court finds that the above-listed statements are inactionable as a matter of law.

### D.  Non-actionable Opinion Statements

Although Statement 20 is arguably forward-looking, the Court certainly finds that it is a non-actionable opinion statement. Statements of opinions are actionable "if either 'the speaker did not hold the belief [he] professed' or 'the supporting facts [he] supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc.*, 575 U.S. at 186); *see also Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) ("Subjective statements can be actionable only if the defendant's opinions were both false and not honestly believed when they were made." (internal quotation marks and citation omitted). Plaintiffs argue that Statement 20 is a misleading statement by omission. But the cautionary ("if") and qualifying ("may") language accompanying the Statement is strikingly similar to the kinds of "evaluative assessments" dismissed as nonactionable statements of opinion. *Xerox*, 300 F. Supp. 3d at 575.

### II.  Scienter

Because Plaintiffs have failed to plead any actionable misstatement or omission, the Court need not reach the question of whether Plaintiffs have adequately pleaded scienter.  *See Singh v.*

*Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *see also Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020).

### III.    Section 20(a) and Section 20A Claims

As Plaintiffs have failed to adequately allege their § 10(b) claim, the claims under § 20(a) also fail as a matter of law.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).  Likewise, Plaintiffs' insider trading allegations necessarily fail because they has failed to plead an adequate predicate § 10(b) claim.  *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364 (S.D.N.Y. 2005).

### IV.    Denial of Leave to Amend

A district court is not required to grant leave to amend when it grants a motion to dismiss based on pleading deficiencies. *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 Fed. Appx. 289, 296 (2d. Cir. 2021) (internal citation omitted). And Plaintiffs had ample opportunity to amend their complaint to cure deficiencies. It is thus "unlikely that the deficiencies . . . were unforeseen." *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 188. Given that Plaintiffs have yet to cure these deficiencies, even when the Court granted leave to file a 133-page Second Amended Complaint, the Court denies leave to amend the SAC. Further amendment will not cure these deficiencies given Plaintiffs' failure to show falsity in light of the cautionary language accompanying non-actionable forward-looking statements.

## **CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss pursuant to Fed. R. Civ. Pro.

12(b)(6) is **GRANTED**. Accordingly, this case is dismissed with prejudice. The Clerk of Court is

respectfully requested to terminate the pending motion at ECF Nos. 93 and to close this case.

Dated:  September 30, 2024
   New York, New York

_____
    **ANDREW L. CARTER, JR.**
    **United States District Judge**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ROBECO CAPITAL GROWTH FUNDS SICAV – ROBECO GLOBAL CONSUMER TRENDS,** *individually and behalf of all others similarly situated,* | |
| **Plaintiff,** | |
| -against- | 21-CV-9582 (ALC)(OTW) |
| **PELOTON INTERACTIVE, INC., JOHN FOLEY, WILLIAM LYNCH, JILL WOODWORTH, THOMAS CORTESE, MARIANA GARAVAGLIA, and HISAO KUSHI,** | <u>OPINION AND ORDER</u> |
| **Defendants.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff Robeco Capital Growth Funds SICAV – Robeco Global Consumer Trends ("Robeco" or "Plaintiff") brings this securities class action against Peloton Interactive, Inc. ("Peloton" or "the Company"), John Foley ("Foley"), William Lynch ("Lynch"), Jill Woodworth ("Woodworth"), Thomas Cortese ("Cortese"), Mariana Garavaglia ("Garavaglia"), and Hisao Kushi ("Kushi") (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of itself and a class of all persons who purchased Peloton common stock between February 5, 2021 and November 4, 2021 (the "Class Period").

Currently pending before the Court is Defendants' motion to dismiss the Amended Complaint. (Mot., ECF No. 65.) Drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has not articulated sufficient factual allegations to carry their assertions beyond the speculative level: many of Defendants' alleged misstatements are statements of non-actionable

corporate optimism or are protected by the PSLRA safe harbor, and Plaintiff has not asserted sufficient facts demonstrating Defendants' statements were false when made.   For these reasons, Defendants' motion is **GRANTED**.

<u>**BACKGROUND**</u>

### I.     Factual Background[1]

A.   <u>The Parties</u>

Robeco is an "open-ended investment company based in Rotterdam, Netherlands" that purchased common stock at allegedly artificially inflated prices during the Class Period.  (Am. Compl., ECF No. 51 ¶¶ 34–35.)

Defendant Peloton is a fitness company that manufactures and produces stationary bikes and treadmills (referred to as "Connected Fitness products").  (*Id.* ¶ 36.)  The Company sells a monthly subscription service that allows users to participate in remote fitness classes using the Company's online fitness platform.  (*Id.*)

The "Management Defendants" consist of high-ranking members of Peloton's executive leadership.  Defendant Foley is the Executive Chair and co-founder of Peloton.  (*Id.* ¶ 37.)  He also served as Peloton's Chief Executive Officer and as a member of the Board of Directors.  (*Id.*)  Defendant Lynch is another co-founder of Peloton and served as the President and a member of the Company's Board of Directors.  (*Id.* ¶ 38.)  Defendant Woodworth was Peloton's former Chief Financial Officer.  (*Id.* ¶ 39.)  Plaintiff alleges that the Management Defendants were provided with copies of the Company's reports and press releases alleged in the Amended Complaint to be

---

[1] The following facts are drawn from the Amended Complaint and documents relied upon therein, including documents attached to the Declaration of Susan Engel which are incorporated by reference into the Amended Complaint.

misleading and thus had the ability and opportunity to prevent their issuance or to cause them to be corrected.  (*Id.* ¶ 40.)

The "Insider Trading Defendants" are alleged to have traded Peloton common stock on the basis of material, nonpublic information.  (*Id.* ¶¶ 41–44.)  Defendant Kushi is Peloton's Chief Legal Officer and another co-founder.  (*Id.* ¶ 41.)  Defendant Garavaglia was Peloton's Chief People Officer and Chief Business Officer.  (*Id.* ¶ 42.)  Defendant Cortese is another of Peloton's co-founders and its Chief Operations Officer until August 2021.  (*Id.* ¶ 43.)  He was subsequently named as the Company's Chief Product Officer.  (*Id.*)

### B.  Allegations of Declining Demand for Peloton's Products

In the wake of the business closures enacted in the face of the COVID-19 pandemic, demand for Peloton's products increased exponentially.  (*Id.* ¶¶ 4, 5, 60.)  Peloton began to experience supply chain logistic issues and substantial backlogs in delivering its Connected Fitness products to its customers.  (*Id.* ¶ 106.)  In response, Plaintiff alleges that Peloton significantly ramped up its production capacity and told investors that it would be making investments into its supply chain in order to keep up with the soaring demand.  (*Id.* ¶ 115.)  By early 2021, however, Plaintiff alleges that this surge in demand had begun to wane as COVID-19 vaccines became more widely accessible and brick and mortar gyms began reopening.  (*Id.* ¶ 9.)  Plaintiff alleges that Defendants hid the true nature of the declining demand to investors and publicly stressed that its investment into its supply chain was necessary and appropriate given the sustained demand for its products.  (*Id.* ¶¶ 146, 165, 174–175, 178.)

As analysts and investors began to question whether Peloton's explosive success could be maintained after the peak of the COVID-19 pandemic, Defendants allegedly continued to assure the public that demand for Peloton's products remained strong.  (*Id.* ¶¶ 64–65, 143–144, 149, 151,

158–159, 167, 180, 186.)    However, Plaintiff alleges that by early 2021, Peloton and its
management knew that the demand for its products had begun to decline.  Specifically, Plaintiff
alleges that Defendants received regular reports from sales management software such as Looker,
Salesforce and Callidus, showing that sales had declined.  (*Id.* ¶¶ 73, 8—81, 85, 110, 114, 120–
125.)  Plaintiff alleges that sales personnel were regularly missing their sales quotas (even after
they had been reduced), which was reported to Defendants.  (*Id.* ¶ 78.)  Plaintiffs also cite Peloton's
rising inventory levels as indication that demand for its products was decreasing.  (*Id.* ¶ 97–105.)
Plaintiffs also note that Peloton was forced to reduce the price of its bikes in order to increase
sales.  (*Id.* ¶ 178.)

Plaintiff substantiates these allegations by relying on the statements of several confidential
witnesses ("CWs"), consisting of former Peloton employees.  (*Id.* ¶¶ 45–54.)  CW1—Peloton's
former Senior Director of Operations and Supply Chain Program Management—states that as of
February 2021, Woodward and Lynch had learned that demand for Peloton's products would
decline from 7% to 20% beginning in March 2021.  (*Id.* ¶ 125.)  CW1 also states that the inventory
backlog was so significant, that Peloton had to start letting its inventory sit at ports and was forced
to pay "substantial demurrage fees."  (*Id.* ¶ 137.)  CW1 maintains that he attended regular meetings
with Woodworth and Lynch.  (*Id.*)

CW2 is a former account executive in Peloton's sales division who states that sales had
begun to decline as early as December 2020 when members of the sales team had been missing its
sales goals.  (*Id.* 46.)

CW3—a regional operations manager—indicated that this precipitous decline in demand
was known to regional managers and warehouse staff in early 2021.  (*Id.* 126.)  CW3 also notes
that when he left the Company in April 2021, the facilities he managed were only delivering half

the number of bikes that it had been delivering during 2020. (*Id.* ¶ 126.) He states that he frequently discussed the decline in sales with other regional operations managers in early 2021 and that Foley Lynch and Woodworth "misrepresented the outlook for Peloton and misled investors that the 2020 growth trajectory was repeatable." (*Id.* ¶ 49.)

CW 4—a senior analyst for Peloton's supply chain logistics team—is alleged by Plaintiff to have been "intimately familiar with Peloton's various supply chain and logistic software platforms." (*Id.* ¶ 51.) He states that he attended a meeting with Foley and Lynch in August 2021, where data showing that actual sales were 22% below what had been forecast was presented. (*Id.* ¶ 132.)

The CWs also include a few junior members of Peloton's sales and inventory teams. CW5 was a temporary account executive on Peloton's sales team who explained that the Company's sales data and reporting were easily accessible. (*Id.* ¶ 85.) CW6 states that he believed that sales goals were set with input from Lynch. (*Id.* ¶ 53.) CW7 worked in a Peloton warehouse in Minnesota as an inventory specialist. (*Id.* ¶ 54.) CW7 maintains that it was clear to him that sales were declining. (*Id.*) He also asserts that by early 2021, Peloton management knew that there were problems with inventory. (*Id.* ¶ 130.)

### C.   The Alleged Misstatements

Plaintiffs allege that Defendants made the following materially false and misleading statements from February 5, 2021 and November 4, 2021 during the Class Period:

- Feb. 4, 2021 2Q21 Earnings Call[2]

    Analyst: "Jill, you mentioned that manufacturing capacity exceeds demand. I just want to clarify that strictly because you ramped capacity, **or are you seeing any change to demand due to extended order to delivery times**? [...]

---

[2] All italicized and bolded texts are as filed in the Amended Complaint.

Foley: "Thanks Doug. We're going to do a switcher I'm going to take the first one, and then I think William and I can talk about Precor. **We are not seeing a softening in demand. That is absolutely not what's happening here. We are seeing incredibly strong organic demand even in the phase of light marketing.** As you know, the successes that we're seeing in getting the order to delivery down and getting our backlog down are 100% based on incredible upgrades, and our manufacturing capacity up to over six times -- 6x increase in just the last 12 months in our capacity of them know - - we're now making more Bikes on a monthly basis than we did in all of fiscal 2018. So it's a Herculean effort based on our in-house manufacturing teams and our third-party partners. And so yeah, I hope that answers your question. **But it's absolutely not a softening of demand that now we're seeing, we're seeing robust demand."** (*Id.* ¶ 146 ("Statement 1").)

- Feb. 4, 2021 2Q21 Earnings Call

Woodworth: "And I would just highlight obviously, that's reflected in the revised revenue guidance that we've given for Q3 and Q4. Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products.**" (*Id.* ¶ 146("Statement 2").)

- Feb. 4, 2021 2Q21 Earnings Call

Analyst: "[J]ust thinking about the opening next year, some of the e-commerce companies had a showdown in September and October, and then reaccelerated due to lockdown. Did you see anything in the fall and how are you thinking about that."

Foley: "When the vaccine was announced in the fall, you saw a reaction to the stock, we did not see any reaction to our sales or demand. We still have not seen any softening since that vaccine was announced and since the vaccine has been rolling out. So other than investors getting nervous, the consumers are still feeling like they want to work out at home The experience to William's point is the best in the world and it's getting better as we launch more software features, more content types, more access on more different platforms. And I think what you're seeing is everyone's starting to realize that working out at home is a better place. It's a better value. And so, we're very bullish on our sales opportunities on the other side of the opening to your point. So we remain very, very bullish on our opportunity. And like Jill did say, we're excited to get on the offensive and start marketing because the story is incredible, the products and the experiences are incredible, and they're getting better by the month. So we've remained very, very bullish on our opportunity. **We haven't seen any softening of demand.**" (*Id.* ¶ 149 ("Statement 3").)

- Feb. 4, 2021 2Q21 Earnings Call

Analyst: "And then just a question, on brand, with the pandemic, we see the shift in behavior to working out at home aside from incredible demand, you're seeing for the hardware and digital subscriptions, just any way to frame the impact on the brand . . ."

6

Lynch: "We do research on consumer perceptions around home fitness and going back to the gym, et cetera. . . . we study the consumer and we have quarterly tracking, and we do bespoke research. **And what's clear is the shift into the home is not a COVID-led phenomenon.** It has accelerated it. But we see, if anything, as we emerge to whatever the new normal is that the norms haven't changed. There is a secular shift into fitness in the home. As John [Foley] has said before, it's a better experience and a better place at a better value. And consumers are all seeing that. And so, everything we've seen in the data, I think Jill [Woodworth] has talked in the past about some of the bespoke research we've done on going back to gyms and consumer perception on that vis-à-vis home workout suggests that certainly, COVID has been a tailwind for our demand. . . **. in the home, we see continued momentum in foreseeable future**." (*Id.* ¶ 151 ("Statement 4").)

- Feb. 4, 2021 2Q21 Earnings Call

Lynch "further claimed that the Company was able to accurately forecast demand 'on a more mature product line like on the Bike product line.'" (*Id.* ¶ 151 ("Statement 5").)

- Feb. 11, 2021 Analyst Conference

Analyst: asking "'about what the other side of this pandemic looks like' and 'what reopening does to demand for Peloton.'"

Foley: "I know there's chatter of, we are a stay-at-home stock and we go back to normal and Peloton dies or whatever the anxiety would be. **We obviously are taking the other side of that.** And I'll tell people, I'll tell everyone on the call that for 20 years, 25 years, every year in the US, there's been 5 million treadmills sold, 5 million treadmills sold in the US every year pre-COVID. So it's not like working out at home was a COVID thing. It has always been a thing. It's just the products have been dopey and not connected." (*Id.* ¶ 158 ("Statement 6").)

- March 1, 2021 Analyst Conference

Investor: "How do you answer people who say the vaccine will hurt Peloton?"

Woodworth: "When you look at our engagement data, people have found a way not only to replicate exercising outside the home but enjoy it more and perhaps are doing even more than they were even pre-pandemic. So I feel like this is a trend that's here to stay. COVID just accelerated that trend and I think as you look out with respect to what our growth algorithm looks like in a post-COVID world, it's continuing to further penetrate the markets we're in." (*Id.* ¶ 159 ("Statement 7").)

- May 6, 2021 3Q21 Earnings Call

Woodworth: "obviously, last year was a big comp. It was the first few months of COVID. But that type of growth, over a two-year stack, we're pretty excited about and we believe that that can continue into fiscal 2022." (*Id.* ¶ 162 ("Statement 8").)

- <u>May 7, 2021 Form 10-Q</u>

  Peloton: "The increase in net operating assets and liabilities was primarily due to a $442 million increase in accounts payable and **accrued expenses related to increased inventory** and other expenditures to promote general business growth, as well as the timing of payments, partially offset by a **363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.**" (*Id.* ¶ 165 ("Statement 9").)

- <u>May 25, 2021 Analyst Conference</u>

  Analyst: "how do you get people comfortable with where Bike demand is heading into warmer weather and into strong reopening[?]"

  Woodworth: "Well, first, I would say, and I think we said this after the launch of Bike+ is that truly the technology and the innovation that we've brought with the Bike+ has been incredibly well received. And so I think we continue to see Bike+ exceeding our expectations on mix. And so with that said, the comments that I made around bike demand in Q4 is that we all know that COVID was a little bit of an anomaly last year in terms of sales. And so when you look at Q4 of last year, and everybody -- I mean, I was the most bikes or treads that we had ever sold in such a short period of time, it's a tough comparable for us, right? And at this juncture, it's not relevant. So what I was trying to do was, okay, well, let's look back to where we were in Q4 of '19 and where we expect to be in terms of bike in Q4 of this year. **And I was trying to make the point that, yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand.** And what's so interesting about our company today, versus 2 years ago, is that we now have the portfolio of products, right? We have the lower price bike at $49 a month. We have Bike+ which I've said is doing very well. We also are back marketing, again, which is something we haven't done and we were purely organic for so many months because we didn't want to exacerbate the OTD situation." (*Id.* ¶ 167 ("Statement 10").)

- <u>Aug. 26, 2021 4Q21 Earnings Call</u>

  Woodworth: "For fiscal [year] 2022 we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR."

  "**We are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of continued strong demand.**" (*Id.* ¶ 174 ("Statement 11").)

- <u>Aug. 26, 2021 4Q21 Earnings Call</u>

  Analyst: asking a "question about demand for the Peloton Bike line."

8

Foley: "the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast." (*Id.* ¶ 174 ("Statement 12").)

- Aug. 26, 2021 4Q21 Earnings Call

Analyst: "…**And the second question on the supply chain, we can see the inventory numbers up pretty dramatically quarter to quarter on the balance sheet**. Outside of the cost headwinds that you talked about for supply chain, are you worried at all about actually getting product to the consumer over the next -- basically through the holiday season?"

Lynch: "Well, I can take the second question first. This is William. In terms of the guidance that Jill provided, we feel like we've built -- and the investments that John and Jill talked about, we built the infrastructure to support our holiday plans. As Jill noted, we feel like fiscal year '22 is going to be a return to more **seasonality. So a large part of our business is in Q2, Q3. And certainly, that's true of deliveries. And so everything in the supply chain from inventory that you're noting, the accumulation up on the balance sheet to warehousing and how we've expanded our warehouse footprint to our delivery infrastructures, people, vans, our last-mile facilities, all that we're staging for what will be our biggest holiday ever.** We're very excited both in terms of the Bike growth that Jill noted and then the launch of Tread, which we expect to be very large over time. And so there's -- a lot of companies aren't in that position or reading in automotive, some of the shortages on chips and semis. So we're very proud of our team. We think our partners, TI, others who have helped us get in that position. So inventory is up. We are building inventory. As you know, the lead times with ocean freight and freight, in general, have extended. And so we've been diligent about learning from the past and feel like we're in a really good position to execute this plan this year."  (*Id.* ¶ 176 ("Statement 13").)

- Aug. 26, 2021 4Q21 Earnings Call

Analyst: "One for John and one for Jill. John, we know there's seasonality. But just given the light 1Q guide, is the price -- is the Bike price gotten offensive or defensive? And how do you think about demand for Bike+ currently? And then, Jill, hoping you can walk through a little bit more detail around the Tread gross margin structure perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you perhaps relative to Bike or even Tread+ a couple of years ago when it first came out. Thank you."

Foley: "**Thank you, Doug. So as Jill said in her opening remarks, we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast. The price drop with B1 was absolutely offensive as we think about the competitive landscape and we think about democratizing the access to great fitness, which has, as you know, always been in our playbook.** This is actually the first year since we founded the company that we had the opportunity to do this, and we're super excited that the investments we've made in our supply chain certainly over the last few years, but definitely in the last 12 months, are bearing enough fruit that we have the capacity to make what will become -- what will look like close to 2 million fitness units of

9

hardware this year, which is just incredible considering, when we founded the company, we approached the biggest contract manufacturer we could find, and they said that they were confident that they could make up to 10,000 Bikes a year. That was only eight years ago. So the scale of which we've seen and put in place and invested in across our entire supply chain with Bikes. And now, obviously, it includes Treads. And the lower priced Tread as well allowed us to consider lowering the price of B1, and we think it's that right thing for our business, obviously, solving for net new sub adds, which was kind of our True North of getting more people into the tent and thinking about the LTV of those users, not just, Doug -- interestingly, not just as a subscriber for the $39 for a new Bike sub, which has always been kind of our True North and the golden goose of our business model, but think about selling those same people, the same households, future Treads, and future products, apparel and all the other stuff that becomes a much broader LTV picture over time." (*Id.* ¶ 178 ("Statement 14").)

- Aug. 26, 2021 4Q21 Earnings Call

  Woodworth: "Great. Well, it's a really great call-out. But what I might note is that in fiscal '21, our net adds were boosted a lot by the backlog that we went into. If you remember when COVID hit in March, we went directly red line on manufacturing and went in with a pretty massive backlog going into fiscal '21 given the long OTD. So, I would -- so first, I would say we have much better alignment in sales and delivery time frames in fiscal 2022. **And then -- so from my perspective, yes, we do forecast growth in our Bike portfolio this year on a year-over-year sales basis,** but you have to take into consideration how big the backlog was that we went in. And I think you'll see that that would then imply, even with the 50% of Tread buyers being existing members, that would imply a healthy first year of robust sales of Tread." (*Id.* ¶ 180 ("Statement 15").)

- Aug. 26, 2021 4Q21 Earnings Call

  Analyst: "So, two questions. John, can you maybe speak to the -- just the quarter to the trend in demand you're seeing. Obviously, the guidance implies a sequential decline, but maybe you can parse out the effect of the reopening relative to others like pull back and add spend, etc. And then, Jill, I think you said something to the effect that you expect higher unit sales of bikes in '22 than you did in '21. If you just do a back-of-the-envelope math, it looks like that would imply not a whole lot of sales for the new Tread. So, I was just wondering if you can maybe provide a little more color on that. Thank you."

  Lynch: "And Youssef, we can't comment too much on the quarter-to-date trends, as you can imagine. But I will say, and Jill alluded this in her opening remarks, is that we historically have been a very seasonal business where not only are people out running and riding their bikes in the summertime and getting outside. And this summer, I think, is exceptionally true in that sense coming out of last summer where people are on lockdown. But we obviously don't market aggressively, and I think Jill's opening comments talked about this in the Digital business. We couldn't be more excited about the Digital business. I think I've been one of the biggest champions for -- since day 1 in that business. And we think that it's an incredible lead-gen business, as well as a stand-alone business on its own.

And it's just not smart for us to market it aggressively in the summer vis-a-vis other times of the year. So, when you think about a basket of advertising dollars against your businesses, summer is generally one of the least efficient. So we're trying to run a little bit more disciplined business, certainly on Digital, and you could extrapolate that more broadly. **But I will say, even in the face of light marketing, sales have been robust across our Bike business.** And I guess I'm not supposed to tell you, but how incredibly strong leads have been for our Tread business. **So we are excited about how many leads are in the hopper for people wanting Treads, and we're excited about the demand that we've consistently seen this quarter and, frankly, since COVID hit, as you know.**" (*Id.* ¶ 180 ("Statement 16").)

- Aug. 27, 2021 Form 10-K

    Peloton: "We have identified a material weakness in our internal control over financial reporting, and if our remediation of such material weakness is not effective, or if we fail to develop and maintain an effective system of disclosure controls and internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired. In the course of preparing our financial statements for fiscal 2021, we identified a material weakness in our internal control over financial reporting. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness identified related to reporting involving inventory. We have concluded that this material weakness arose because our controls were not effectively designed, documented and maintained to verify that our physical inventory counts were correctly counted and communicated for reporting in our financial statements." (*Id.* ¶ 171 ("Statement 17").)

- Sept. 22, 2021 Analyst Conference

    Analyst: asking about how Peloton was "positioned as we exit calendar 2021 into calendar 2022." Foley: "we see the opportunity in fitness as so huge in the US and abroad, as you think about the failure of fitness for decades of the gyms didn't really work, the gyms don't feel like they're going to work moving forward, and we can talk about that if you want to, home fitness was never a great category, you had some content and some hardware, but never had an integrated experience that really was engaging and immersive. . . . So, we think that the future of fitness is in the home. . . .we think 2022 is going to be a fantastic year." (*Id.* ¶ 186 ("Statement 18").)

    D.  Peloton Reveals Decline in Demand to the Public

    In Peloton's annual report for the fourth quarter of fiscal year 2021, the Company informed the market about a "material weakness" in the Company's internal controls related to inventory reporting.  (*Id.* ¶ 171.)  Plaintiff alleges that this disclosure "concerned the market", but that

11

Defendants assured investors that the weakness would not impact future sales or revenue and that Peloton "had a strong grasp on its inventory and that inventory was not excessive and was not indicative of waning demand." (*Id.* ¶ 173.) Plaintiff alleges that this "material weakness" was a fabrication, noting that CW 4—a senior analyst for Peloton's supply chain logistics team—reported that he was not aware of any system deficiencies that would have made it difficult for Peloton to accurately track or report its inventory. (*Id.* ¶ 51.)

Subsequently, on November 4, 2021, Peloton announced its financial result for the fiscal year 2022 and disclosed that it had revised its full-year revenue guidance to a range of $4.4 billion to $4.8 billion, down from $5.4 billion. (*Id.* ¶ 206.) The Company also announced that 91% of its inventory on hand remained unsold. (*Id.*) Plaintiff alleges that this decline in demand was because Peloton's customers "were increasingly free to exercise outside the home." (*Id.*)

In the 1Q22 Earnings Call, Foley explained to the public:

> "As you all well know, stay-at-home and work-from home orders, coupled with commercial gym closures drove massive awareness gains for Connected Fitness, accelerating an adoption curve that was already well underway. Given the unprecedented circumstances presented by the global pandemic, we said last quarter that modelling the exit from COVID and the massive growth we saw in fiscal 2021 would be a challenging task, and that has certainly proven to be true.
>
> We reduced backlogs, out visibility into our future performance has become more limited. From forecasting consumer demand to accurately predicting logistics costs, our teams have never seen a more complex operating environment in which to guide our expected results this year.
>
> As noted in our shareholder letter, we are reducing our guidance for fiscal year 2022. We have returned to presenting ranges given the uncertainty. The swift timing of these changes since giving our initial guidance in August is not lost on us.
>
> As we prepared our previous guidance, we had to make assumptions about consumer behavior coming out of COVID, the impact of our

original Bike price reduction and the cost structure within our Connected Fitness segment, all against the backdrop of a global supply chain crisis [….]

While we continue to see a nearly 100% two-year growth CAGR in both traffic and unit sales in Q1 and into Q2, we've seen a greater-than-anticipated taper of our website traffic levels over the past two months and a slower-than-expected pickup in retail showroom traffic, both of which are important inputs into our forward-looking demand model.  This reduction in traffic has added increased near-term uncertainty into our forecast.

As expected, our original Bike price reduction created a step shift in demand, helping to broaden our demographic mix and expand our market opportunity. The price move did significantly improve our e-commerce conversion rate, in fact, greater than we expected, but not enough to offset the year-over-year declines we have seen in overall traffic.

We saw a positive and sustained reception to the price moves in our international markets. This was anticipated as our international consumers have proven to be more price sensitive. To maintain a premium end-to-end member experience, we made significant investments over the past year to scale manufacturing, logistics and operations. Overall, we believe we met the challenge, but there's no doubt that in some cases, we overcorrected. That combined with the reduction to our demand picture and higher than expected costs across product, transportation and delivery are causing a near-term compression of our hardware margins.

[…]

We track our estimated market share closely. And while sales are currently not meeting our previous forecast, third-party data suggests that we continue to build on our leading share of the Connected Fitness market. We firmly believe at-home fitness customers will want one subscription for a comprehensive home fitness platform and we are determined to be that one subscription."

(Engel Decl., Ex. 11, ECF No. 68 at 3–5.)

Plaintiffs allege that this disclosure directly contradicted Defendants' representations from the prior few months and that this information shocked the market.  (*Id.* ¶ 207.)  Peloton's stock price dropped by 35%, declining from a price of $86.06 per share to a closing price of $55.64 per

13

share.  (*Id.*)  On a February 8, 2022 earnings call, Peloton announced that Foley would be stepping

down as CEO and instead serve as executive chair of the Company's board of directors.  (*Id.*

¶ 219.)  The Company also announced that Lynch would be stepping down from the board of

directors.  (*Id.*)  As of September 12, 2022, Foley had resigned from the board of directors.  (Pl.'s

Mem., ECF No. 69 at 7 n.3.)

E.  <u>Scienter Allegations</u>

Plaintiff alleges that when Defendants learned that demand for their products was

declining, the Management Defendants and Insider Trading Defendants sold their shares of

Peloton stock at inflated prices.  (*Id.* ¶¶ 257–277.)  In particular, Plaintiffs allege that the

Management Defendants and Insider Trading Defendants either suspiciously deviated from their

10b5-1 trading plans or engaged in "highly erratic and irregular trading behavior", suggesting that

they had sold Peloton shares during the class period on the basis of material nonpublic information

before the truth emerged that demand for Peloton's products was declining.  (*Id.* ¶ 257.)  Plaintiff

also alleges that because the Management and Insider Trading Defendants had pledged a

"substantial percentage" of their shares during the Class Period, they were motivated to keep

Peloton's stock price artificially high.  (*Id.* ¶¶ 241–245.)

**II.  Procedural Background**

The Complaint was filed on November 18, 2021.  (ECF No. 1.)  On May 2, 2021, Robeco

was appointed as Lead Plaintiff and this action was consolidated with 21-cv-10266 (ALC)(OTW)

*Deulina v. Peloton Interactive, Inc. et al.*  (ECF No. 42.)  Thereafter, Plaintiff filed an Amended

Complaint on June 25, 2022.  (Am. Compl., ECF No. 51.)

Defendants filed a motion to dismiss on August 22, 2022, arguing that the Amended

Complaint fails to state a claim based on an alleged misstatement or omission because (1) Plaintiff

does not allege falsity because all of the challenged statements were true; (2) the statements are protected by the PSLRA's safe harbor for forward-looking statements; (3) the statements are non-actionable opinions or statements of corporate optimism; (4) Plaintiff does not sufficiently allege scienter; (5) Plaintiff fails to plead loss causation; and (6) Plaintiff fails to state a claim based on alleged insider trading.  (*See generally* Defs.' Mem., ECF No. 66.)  Plaintiff filed its opposition on October 4, 2022.  (Pl.'s Mem., ECF No. 71.)  Defendants filed a reply memorandum on November 3, 2022.  (R., ECF No. 74.)  Both parties also filed motions requesting oral argument. (ECF Nos. 69, 71.)

## LEGAL STANDARDS

### I.     Motions to Dismiss under Rule 12(b)(6)

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679.  A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  The

15

Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In deciding a motion to dismiss a securities action, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns*, 493 F.3d at 98); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

## II.    Section 10(b) and Rule 10b-5

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading'. . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). This is an objective test that looks to the understanding of an "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Importantly, "literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 192. "However, Section 10(b) and

16

Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 397 (S.D.N.Y. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Thus, issuers have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).

### III.     Fed. R. Civ. P. 9(b) and the PSLRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## ANALYSIS

**I.    Plaintiff Has Not Pleaded an Actionable Misstatement or Omission**

### A.  Safe Harbor for Forward-Looking Statements

Defendants argue that the majority of the challenged statements are not actionable because they fall within the PSLRA's statutory safe harbor.  (Defs.' Mem., ECF No. 66 at 13–15.)  Plaintiff argues that the statements are not forward looking and thus are not covered by the safe harbor. (Pl.'s Mem., ECF No. 70 at 12–14.)

A "forward-looking statement" is (1) "a statement containing a projection of revenues, income. . . or other financial items," (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," or (3) "a statement of future economic performance."  15 U.S.C. § 78u-5(i)(1)(A)-(C); *see also In re Vivendi*, 838 F.3d at 246.  These statements are subject to the PSLRA's safe harbor which provides, in relevant part, that:

> [A] defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading. Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies.

*Id.* at 245–46 (citation omitted).  To qualify as "meaningful," cautionary language must "convey[] substantive information" and cannot be "boilerplate" or "vague."  *Id.* at 247 (citation omitted). However, "[t]he cautionary language need not directly precede or follow the forward-looking statement for it to be meaningful."  *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (citing *Slayton v. American Exp. Co.*, 604 F.3d 758, 768–69 (2d Cir. 2010)).

First, the Court finds that Statements 1, 6, 7, 8 11, 13, 15 and 18 constitute forward-looking statements. These statements relate to Defendants' projections regarding the future demand for its products and "fall squarely within the definition of a statement containing a projection of ... income (including income loss), earnings (including earnings loss) per share, ... or other financial items" and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." *Gray*, 454 F. Supp. 3d at 386 (quoting 15 U.S.C. § 78u-5(i)(1)(A) & (C)).

Second, the Court finds that these forward-looking statements were accompanied by meaningful cautionary language. Meaningful cautionary language must include the "important factors that could realistically cause results to differ materially." *Slayton*, 604 F.3d at 773. This language must be both "extensive and specific. . . .and must contain substantive company-specific warnings." *Gray*, 454 F. Supp. 3d at 392 (internal quotations and citations omitted).

Here, the forward-looking statements were prefaced with the warning that "[a]ctual results may differ materially from those contained in or implied by these forward-looking statements due to risks and uncertainties associated with our business." (*See e.g.*, Engel Decl., Ex. 7, ECF No. 68-7 at 2; *id.*, Ex. 8, ECF No. 68-8 at 2; *id.*, Ex. 9, ECF No. 68-9 at 2l; *id.*, Ex. 11, ECF No. 68-11 at 3.) This more general warning was accompanied by disclosures of specific risks made in Peloton's regular filings with the S.E.C. For instance in Peloton's Form 10-Q, issued on February 4, 2021, Peloton issued extensive warnings about the risk and uncertainty of future subscriber growth, explaining that "the market for our products and services is still in the early stages of growth and if it does not continue to grow, grows more slowly than we expect, or fails to grow as large as we expect, our business, financial condition, and operating results may be adversely affected" and warned that "[w]e have a limited operating history and our past financial results may

not be indicative of our future performance. Further, our revenue growth rate is likely to slow as our business matures." (*Id.*, Ex. 1, ECF No. 68-1 at 40.)  Peloton also warned that it "derive[s] a significant majority of our revenue from sales of our Bike. A decline in sales of our Bike would negatively affect our future revenue and operating results." (*Id.*)  An inability to continue to attract subscribers was also identified as a material risk, which Peloton warned could be caused by "deteriorating general economic conditions or a change in consumer spending preferences or buying trends, whether as a result of the COVID-19 pandemic or otherwise." (*Id.* at 41.)  The disclosures even warned of the very risk that was alleged to have occurred here, warning that "while [the Company had] experienced a significant increase in [its] Subscriber base since the outbreak of COVID-19, it remains uncertain how the COVID-19 pandemic will impact Subscriber renewal rates in the long-term." (*Id.* at 51.)

These very detailed warnings were substantively repeated in Peloton's SEC filings throughout the Class Period.  (*See, e.g.*, *id.*, Ex. 2, ECF No. 68-2 at 17 ("The full extent of the impact of COVID-19 on our business and financial results will depend largely on future developments, including upon the removal of lockdowns may cause, consumers to go back to their pre-COVID routines…"); *id.* Ex. 3, ECF No. 68-3 at 45 (same).)  Far from being "boiler-plate", as Plaintiff tries to characterize them, these warnings are both specific and realistic about the precise risks factors faced by Peloton as a company—namely that the relaxation of the COVID protocols closures that had promoted the Company's growth could hamper its future subscriber growth.  These warnings are not "garden variety" and do not relate to "any company's financial well-being".  *C.f. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016) (finding that a "kitchen-sink disclaimer, listing garden-variety business concerns that could affect any company's financial well-being, was not meaningful cautionary language…")  Instead, the warnings

specifically detail how the COVID-19 pandemic could potentially affect Peloton's business, which unlike many other businesses, viewed the lessening of restrictions as a material risk rather than as an opportunity for growth. Moreover, as will be set out more fully below, Plaintiff has not alleged the actual falsity of these forward-looking statements.

Accordingly, the Court finds that this language is sufficiently specific to shield Defendants from liability for their forward-looking statements. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 534 (S.D.N.Y. 2021).

### B. Statements of Corporate Optimism

Defendants further argue that the challenged statements are inactionable because they constitute corporate puffery. (Defs.' Mem., ECF No. 66 at 16–17.) Plaintiff argues that the challenged statements are not puffery because "they were made specifically to alleviate investor concerns about Peloton's rising inventory levels." (Pl.'s Mem., ECF No. 70 at 14–15.)

Statements of puffery are "optimistic statement[s] that [are] so vague, broad, and non-specific that a reasonable investor would not rely on [them]." *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17 (citations omitted). Challenged statements that are properly viewed as "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). "[A]s long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

The Court finds that Statements 4, 6, 7, 8 and 9 are inactionable corporate puffery. Statements by Defendants such as "we think the future of fitness is in the home…we think 2022 is going to be a fantastic year" (Statement 18), "[we] feel like [at home fitness] is a trend that's

here to stay" (Statement 7), and "COVID has been a tailwind for our demand…we see continued momentum in [the] foreseeable future" (Statement 4) reflect Defendants' general optimism in the Company and are "textbook cases" of corporate optimism. *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018); *see also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398-99 (S.D.N.Y. 2018) (statements about the company's "competitive advantage" were mere puffery); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569-70 (S.D.N.Y. 2018) (statements suggesting "Xerox's confidence in its competitiveness" and "vaguely and enthusiastically describ[ing] Xerox's performance, [and] expectations of business success" were non-actionable puffery). Likewise, Foley's statement that Peloton was "obviously taking the other side of that" in a response to a question about what the relaxation of COVID restrictions would mean for demand in Peloton's products is clearly puffery and not a specific metric on which the investing public would reasonably rely. *Schaffer*, 2018 WL 481883, at *9.

Accordingly, the Court finds that the above-listed statements are inactionable as a matter of law.

### C. Falsity

Defendants also argue that Plaintiff has failed to adequately plead falsity as to any of the challenged statements. (Defs.' Mem., ECF No. 66 at 8–13.) Plaintiffs argue that the Amended Complaint adequately pleads falsity because Defendants knew that Peloton's sales team was consistently missing the sales quotas that has been increased in the wake of heightened demand during COVID restrictions, Peloton's sales software was reporting that sales quotas were not being met, there was a significant backlog of unsold inventory after production had been ramped up, Woodward and Lynch were informed in February 2021 that demand would decline by 7% to 20%

22

starting in March 2021, and that presentations were made to the Management Defendants during monthly meetings showing that there was an increasing gap between sales forecasts and actual sales. (Pl.'s Mem., ECF No. 7o at 9–10.)

A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812–13 (2d Cir. 1996). A statement believed to be true when made, but later shown to be false, is insufficient. *Id.* (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance"); *see also Novak v. Kasaks*, 216 F.3d at 309 ("refus[ing] to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.") (internal citations omitted), *cert. denied*, 531 U.S. 1012 (2000). Indeed, the Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—"they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174.

The Court finds that Plaintiff has not pleaded that the challenged statements were actually false. First, Peloton's performance exceeded its sales guidance throughout the Class Period. Plaintiff alleges that Defendants knew that sales were declining in February 2021, but that Defendants continued to characterize Peloton's sales as "strong" or "robust". (Am. Compl. ¶¶ 146, 149). However, the entirety of the public disclosures, incorporated by reference into the Amended Complaint, actually reveal that the challenged statements were entirely consistent with Peloton's actual financial results. For instance, on May 6, 2021, when Peloton announced its 3Q21 results, the Company had actually beaten its forecast of $1.1 billion. (Engel Decl., Ex. 8, ECF No. 68-8

at 6.)  Its subscription membership had increased to 2.08 million users, an 135% increase from the prior year.  (*Id.* at 7.)  The Company also announced that it was seeing record low number is churn. (*Id.*)  Thus, Plaintiff's allegations that Defendants were concealing an actual decrease in overall demand, including that Defendants purportedly had access to a report indicating that demand would decrease by 7 to 20 percent, are not borne out by the totality of the facts alleged and need not be credited.  *See 2002 Lawrence R. Buchalter Alaska Trust v. Philadelphia Financial Life Assur. Co.*, 96 F. Supp. 3d 182, 199 (S.D.N.Y. 2015) ("if the documents contradict the allegations of a plaintiff's complaint, the documents control and the [c]ourt need not accept as true the allegations in the complaint") (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12–CV–847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012)).

Second, and most importantly, Defendants explicitly told the public that demand for Peloton's products would be returning to pre-COVID levels after the surge in demand it had seen during COVID.  Plaintiff's allegations that Defendants knew that "the sales boom of the 2020 was a COVID-phenomenon, and Peloton would be unable to keep sales at that level throughout 2021 and beyond" is reflected in Peloton's disclosures to the market.  In May 2021, Peloton told investors that sales were "tapering from COVID highs" "[a]s anticipated" and that it was "expecting a gradual return to historical seasonal sales trends."  (Engel Decl., Ex. 8, ECF No. 68-8 at 7.)  Peloton also highlighted that a return to seasonality would mean lower demand in the summer months, as people are more able to exercise outside of the home.  (*Id.*)  In this vein, in response to a question about whether vaccines and reopenings would negatively impact demand for Peloton, Woodworth stated that "yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand."  (Am. Compl. ¶ 168.)  In other words, Woodworth

specifically compared demand in Peloton's products with pre-COVID levels, rather than promising that the unprecedented demand that Peloton had seen during COVID closures would remain at the same level.

"The key question in considering the misleading nature of a statement is 'whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor[.]'" *In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) (quoting *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *see also In re Nokia Corp. Sec. Litig.*, No. 19-CV-3509, 2021 WL 1199030, at *19 (S.D.N.Y. Mar. 29, 2021) (citing *S.C. Ret. Sys. Grp. Tr. v. Eaton Corp. PLC*, 791 F. App'x 230, 234 (2d Cir. 2019) (summary order)).  Thus, because Defendants did in fact disclose to the investing public that the Company knew that the rapid increase in demand for Peloton's products could not be sustained at COVID levels, and a full review of Defendants' public disclosures would have given the investing public the information it needed to make an informed decision about Peloton stock, Defendants have not pleaded the actual falsity of Defendants' statements.  Accordingly, the Court finds that Plaintiffs fail to allege sufficient facts to show any actionable misrepresentations or omissions by Defendants.  *See In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."); *see also Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978).

## II.    Scienter

Because Plaintiff has failed to plead any actionable misstatement or omission, the Court need not reach the question of whether Plaintiff has adequately pleaded scienter.  *See Singh v.*

*Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *see also Oklahoma L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 444 F. Supp. 3d 550, 563 (S.D.N.Y. 2020).

**III.     Section 20(a) and Section 20A Claims**

As Plaintiffs have failed to adequately allege their § 10(b) claim, the claims under § 20(a) also fail as a matter of law.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997); *accord Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).  Likewise, Plaintiff's insider trading allegations necessarily fail because it has failed to plead an adequate predicate § 10(b) claim.  *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 364 (S.D.N.Y. 2005).

**IV.     Leave to Amend**

In the event that the Court determines that any part of the Amended Complaint is legally deficient, Plaintiff has requested leave to amend.  (Pl's Mem., ECF No. 70 at 25 n.15.)  Given that the Second Circuit has recognized that "it is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (citation omitted), the Court will grant Plaintiff leave to amend.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendant's motion to dismiss is **GRANTED**.  The motions for oral argument are **DENIED** as moot.  The Clerk of Court is respectfully requested to terminate the pending motions at ECF Nos. 65, 69 and 71.  Plaintiff is granted leave to file a second amended complaint by **April 28, 2023**

Dated:  **March 30, 2023**
   **New York, New York**                                 _____
                                                                              **ANDREW L. CARTER, JR.**
                                                                              **United States District Judge**

26