# 24-2803

## United States Court of Appeals
## for the Second Circuit

---

CITY OF HIALEAH EMPLOYEES' RETIREMENT SYSTEM, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, ROBECO CAPITAL GROWTH FUNDS SICAV—ROBECO GLOBAL CONSUMER TRENDS,
*Plaintiffs-Appellants*,

v.

PELOTON INTERACTIVE, INC., THOMAS CORTESE, JOHN FOLEY, WILLIAM LYNCH, JILL WOODWORTH, MARIANA GARAVAGLIA, HISAO KUSHI,
*Defendants-Appellees*.

---

On Appeal from the United States District Court for the Southern District of New York
No. 1:21-cv-9582 (Hon. Andrew L. Carter)

---

## BRIEF OF DEFENDANTS-APPELLEES

---

Melissa Arbus Sherry
Andrew B. Clubok
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

Michele D. Johnson
LATHAM & WATKINS LLP
650 Town Center Drive
20th Floor
Costa Mesa, CA 92626

January 28, 2025

*Counsel for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant Peloton Interactive, Inc. ("Peloton"), by and through its undersigned counsel, certifies that it is a publicly traded company that has no parent corporation and that, upon information and belief, Morgan Stanley, a publicly-held corporation, owns more than 10% of Peloton's Class A common stock.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

STATEMENT OF THE CASE................................................................3

    A.    Factual Background....................................................................3

          1.    March-September 2020: COVID Causes Demand Surge ..........4

          2.    February 2021: Peloton Exceeds Q2 Guidance and Provides Q3 Forecast ................................................................4

          3.    May 2021: Peloton Exceeds Q3 Guidance and Provides Q4 Forecast ................................................................7

          4.    August 2021: Peloton Exceeds Q4 and FY21 Guidance and Provides Q1 and FY22 Forecast .........................................9

          5.    November 2021: Peloton Exceeds Q1 Guidance and Provides Q2 Forecast ................................................................11

          6.    January-February 2022: Peloton Meets Q2 Guidance.............12

    B.    Procedural Background .......................................................13

          1.    The District Court Dismisses the First Amended Complaint................................................................13

          2.    The District Court Dismisses the Second Amended Complaint................................................................14

SUMMARY OF ARGUMENT ..............................................................15

ARGUMENT .........................................................................................17

I.    THE DISTRICT COURT CORRECTLY HELD PLAINTIFFS FAILED TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION ...................................................................................17

    A.    The District Court Correctly Held that None of the Eight Challenged Statements Were False......................................18

          1.    Peloton's Revenue Guidance Reinforces Each Statement........19

**Page**

2.    None of the Statements Were False or Misleading ..................23

3.    The CW Allegations Do Not Contradict the Challenged Statements ...................................................................................32

B.    Six Statements Are Nonactionable "Puffery" .....................................41

C.    The Same Six Statements Are Nonactionable Forward-Looking Statements ...................................................................................43

1.    The Statements Are Forward-Looking .....................................43

2.    The Forward-Looking Statements Fall Under the PSLRA Safe Harbor ...............................................................................45

D.    Three Statements Are Also Nonactionable Opinions .........................48

II.    IN THE ALTERNATIVE, PLAINTIFFS HAVE FAILED TO PLEAD A STRONG INFERENCE OF SCIENTER ...................................................49

A.    Plaintiffs Fail to Allege Motive and Opportunity ..............................50

B.    Plaintiffs Fail to Plead Strong Circumstantial Evidence of Fraud......52

III.    THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' OTHER CLAIMS .............................................................................................57

CONCLUSION .......................................................................................................58

iii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arkansas Public Employees Retirement System v. Bristol-Myers
Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .......................................................22, 50, 51, 52, 57

*Avon Pension Fund v. GlaxoSmithKline PLC*,
343 F. App'x 671 (2d Cir. 2009) ...........................................................................52

*Bay Harbour Management LLC v. Carothers*,
282 F. App'x 71 (2d Cir. 2008) ............................................................................22

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
850 F.3d 58 (2d Cir. 2017) ...................................................................................49

*City of Monroe Employees Retirement System v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ................................................................................42

*Cox v. Blackberry Ltd.*,
660 F. App'x 23 (2d Cir. 2016) ............................................................................56

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan
Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ...........................................................................41, 50

*Employees' Retirement System of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ...........................................................................37, 38

*In re Finisar Corp. Securities Litigation*,
646 F. App'x 506 (9th Cir. 2016) ...................................................................39, 42

*Freedman v. Value Health, Inc.*,
34 F. App'x 408 (2d Cir. 2002) ............................................................................43

*Furher v. Ericsson LM Telephone Co.*,
363 F. App'x 763 (2d Cir. 2009) ..........................................................................22

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019) ...........................................................................17, 18

iv

**Page(s)**

*Halperin v. eBanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002) ................................................................47

*Hassan v. Boston Beer Co.*,
  No. 23-8, 2023 WL 8110940 (2d Cir. Nov. 22, 2023) ..............23, 40, 41, 44, 54

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v.*
  *Royal Bank of Scotland Group, PLC*,
  783 F.3d 383 (2d Cir. 2015) ................................................................43

*IWA Forest Industry Pension Plan v. Textron Inc.*,
  14 F.4th 141 (2d Cir. 2001) ................................................................38

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ................................................................57

*Jones v. Perez*,
  550 F. App'x 24 (2d Cir. 2013) ................................................................53

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
  412 F.3d 418 (2d Cir. 2005) ........................................................18, 58

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ................................................................50

*Kleinman v. Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013) ........................................................29, 40

*Leadersel Innotech ESG v. Teladoc Health, Inc.*,
  No. 23-cv-1112, 2024 WL 4274362 (2d Cir. Sept. 24, 2024)..............31, 34, 43

*In re Liberty Tax, Inc. Securities Litigation*,
  828 F. App'x 747 (2d Cir. 2020) ................................................................22

*Local No. 38 International Brotherhood of Electrical Workers*
  *Pension Fund v. American Express Co.*,
  430 F. App'x 63 (2d Cir. 2011) ................................................................54

*Lucas v. Icahn*,
  616 F. App'x 448 (2d Cir. 2015) ................................................................19

**Page(s)**

*In re Lululemon Securities Litigation*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ...............................................................................40, 51

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*,
709 F.3d 109 (2d Cir. 2013) ...............................................36

*New Orleans Employees Retirement System v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) ..........................................38

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018) ................................51

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ...............................................39

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...........................................39

*Oklahoma Firefighters Pension & Retirement System v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Public Employees Retirement System v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)....................................................23, 42

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015).......................................................48, 49

*In re Philip Morris International Inc. Securities Litigation*,
89 F.4th 408 (2d Cir. 2023) .......................................42, 44, 45

*In re Renewable Energy Group Securities Litigation*,
No. 22-335, 2022 WL 14206678 (2d Cir. Oct. 25, 2022) ..........................55, 57

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ...........................17, 18, 32, 41, 48

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996) ....................................43, 51, 52

vi

**Page(s)**

*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
  No. 9-cv-2083, 2018 WL 1587457 (D. Conn. Mar. 31, 2018)..........................39

*Shemian v. Research in Motion Ltd.*,
  570 F. App'x 32 (2d Cir. 2014) .........................................................................53

*Simon v. American Power Conversion Corp.*,
  945 F. Supp. 416 (D.R.I. 1996) ........................................................................39

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ................................................................................22

*Slayton v. American Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ..................................................................45, 47, 56

*In re Smith & Wesson Holding Corp. Securities Litigation*,
  836 F. Supp. 2d 1 (D. Mass. 2011), *aff'd*, 669 F.3d 68 (1st Cir.
  2012) ..................................................................................................................35

*In re SolarEdge Technologies, Inc. Securities Litigation*,
  No. 23-cv-9748, 2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024)..........................36

*South Cherry Street, LLC v. Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009) ................................................................................52

*Steamfitters Local 449 Pension Plan v. AT&T Inc.*,
  No. 21-2698, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) ........................41, 42

*Swanson v. Danimer Scientific, Inc.*,
  No. 23-7674, 2024 WL 4315109 (2d Cir. Sept. 27, 2024)................................57

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...........................................................................................49

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ........................................................................48, 49

*In re UiPath, Inc. Securities Litigation*,
  -- F. Supp. 3d --, 2024 WL 4667269 (S.D.N.Y. Nov. 4, 2024)........................32

*Weston v. DocuSign, Inc.*,
  669 F. Supp. 3d 849 (N.D. Cal. 2023)...............................................................39

**Page(s)**

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ....................................................45, 54

## STATUTES AND REGULATIONS

15 U.S.C. § 78j(b) ..........................................................................3

15 U.S.C. § 78t(a) ..........................................................................3

15 U.S.C. § 78t-1 ...........................................................................3

15 U.S.C. § 78u-4(b)(1) .................................................................17

15 U.S.C. § 78u-4(b)(2)(a) ............................................................49

15 U.S.C. § 78u-5(c) ......................................................................43

15 U.S.C. § 78u-5(c)(1)(A)-(B) .....................................................43

15 U.S.C. § 78u-5(i)(1)(A)-(D)......................................................43

17 C.F.R. § 240.10b-5.....................................................................3

17 C.F.R. § 240.10b5-1(c)(1)........................................................50

## OTHER AUTHORITIES

Jason Fernando, *Compound Annual Growth Rate (CAGR) Formula
   and Calculation*, Investopedia,
   https://www.investopedia.com/terms/c/cagr.asp (updated Nov. 12,
   2024) ...........................................................................................8

## INTRODUCTION

This case is about a company's good faith efforts to navigate the COVID-19 pandemic ("COVID"), not securities fraud. COVID left businesses around the globe navigating an unprecedented situation and vulnerable to the whims of broken supply chains, disrupted manufacturing, closed physical stores, and uncertain consumer spending. For Peloton Interactive, Inc. ("Peloton"), COVID triggered unexpected, record-breaking demand. Before COVID, Peloton's business followed the seasons—with higher demand in the winter than the summer. But the first year of COVID departed from this usual pattern. And Peloton's inventory could not keep up, with customer order-to-delivery times ballooning from 1-3 weeks to 8-10 weeks. Peloton invested significant resources in developing manufacturing capacity and increasing inventory—a plan it disclosed to the market in real-time.

At the same time, Peloton repeatedly warned that the impacts of COVID on its business were difficult to predict, and that COVID-level demand was not expected to last. By the start of 2021, Peloton predicted a return to pre-COVID seasonal trends and that demand in some quarters would be less than prior quarters. But Peloton also predicted demand would still remain strong relative to the prior year and especially two years prior. These predictions were reflected and quantified in Peloton's quarterly revenue guidance. And they proved correct: Peloton met or

1

exceeded its guidance, which Plaintiffs do not challenge, and achieved year-over-year ("YoY") growth during the entire Class Period.

Plaintiffs seek to transform Peloton's transparency into a story of deliberate deception. They allege Defendants continued to promise COVID-level demand and failed to disclose that inventory was allegedly "excess" relative to demand. But Plaintiffs plead no particularized facts to support their narrative and no reasonable investor would be misled into thinking that the COVID peaks would continue indefinitely. Nor could they: Defendants told the market in real-time that unprecedented COVID levels would not continue and quantified its growing inventory, in dollar amount, in SEC forms. The documents incorporated by reference into the Second Amended Complaint ("SAC") confirm exactly that. And the allegations of confidential witnesses ("CW")—mostly low-level employees who had no direct contact with Defendants and no visibility into company-wide metrics—do not conflict with those disclosures.

Understanding all this, the district court correctly dismissed the SAC for several, independent reasons. Most fundamentally, each statement was true when made—that alone is reason to affirm. Most also fail as puffery, forward-looking statements, opinion, or all three. And although the district court did not—and this Court need not—address scienter, Plaintiffs' allegations do not give rise to a strong inference that Defendants intentionally misled investors. This Court should affirm.

## STATEMENT OF THE CASE

This is a putative class action asserting claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants Peloton Interactive, Inc.; John Foley, William Lynch, and Jill Woodworth (collectively, "Speaker Defendants"); and Thomas Cortese, Mariana Garavaglia, and Hisao Kushi (collectively, "Non-Speaker Defendants"), on behalf of an investor class that acquired Peloton common stock between February 5, 2021 and January 19, 2022 (the "Class Period"). JA179 ¶¶ 9-10; JA277 ¶ 316. On September 30, 2024, the district court dismissed the SAC with prejudice. SPA1-26. This appeal followed.

### A.    Factual Background

Founded in 2012, Peloton sells, among other things, stationary bikes with touch screens that provide access to live and on-demand fitness content. JA405-06. During the Class Period, customers could purchase these products three ways: online (comprising a majority of sales), via an "inside sales" team member, or at a Peloton showroom. JA408, 424. Peloton's revenue was generated primarily from these sales. JA405.

Peloton's "business is affected by seasonality," meaning demand is typically higher during the winter season—due to the holidays, New Year's resolutions, and cold weather—than the warmer months. JA375. Because Peloton's fiscal year runs

from July 1 to June 30, the lower-demand months generally fall during Q1 (July 1-September 30) and Q4 (April 1-June 30), and the higher-demand months fall during Q2 (October 1-December 31) and Q3 (January 1-March 31). *Id.*

### 1. *March-September 2020: COVID Causes Demand Surge*

In March 2020, COVID was declared a pandemic. Despite the uncertainties caused by COVID, JA415-16, Peloton demand surged, JA206 ¶ 110, and departed from "traditional seasonal patterns," JA410, having benefited from lockdown orders and gym closures. Peloton's revenue for April-June 2020 (4Q20), which ordinarily would have been lower than January-March 2020 (3Q20), was higher. JA593. At the same time, COVID severely disrupted global supply chains, hindering the import of products. For Peloton, this resulted in low inventory and heightened order-to-delivery times, *see* JA673, which risked hurting customer satisfaction in a highly competitive market and increasing "rates of post-purchase order cancellation," JA415-16. In November 2020, Peloton told investors it would be "operating under supply constraints for the foreseeable future." JA631.

### 2. *February 2021: Peloton Exceeds Q2 Guidance and Provides Q3 Forecast*

On February 4, 2021, Peloton announced its October-December 2020 (2Q21) results. Peloton's $1.065 billion in quarterly revenue "exceed[ed] expectations across all geographies," and represented 128% YoY growth. JA676.

During an earnings call the same day, then-CEO Foley explained this "strong demand," paired with "COVID-related delivery challenges," resulted in "elevated" "delivery wait times." JA673. To combat this "supply and demand imbalance," Peloton was "focused on significantly growing [its] manufacturing capabilities." JA672, 677. These efforts, then-CFO Woodworth shared, were starting to pay off: "current manufacturing capacity exceeds demand[,] a trend that will accelerate as we move through the back half of the fiscal year." JA677. But more near-term work was needed, so Peloton announced plans to spend over $100 million in "expedited shipping" to ensure "certainty for customers on the delivery dates we offer." JA673.

An analyst asked whether Woodworth's prediction about manufacturing capacity exceeding demand was "because [Peloton] ramped capacity," or whether it was "seeing any change to demand due to extended [order-to-delivery] times." JA680. Foley responded: "*We are not seeing a softening of demand. That is absolutely not what's happening here. We are seeing incredibly strong organic demand, even in the face of light marketing.*" *Id.* (Statement 1); *see* Addendum (table of statements).[1] He added: "*[I]t's absolutely not a softening of demand. That's no[t]*

---

[1] The italics used for the statements here and in the addendum reflect the emphasis added in the SAC and Plaintiffs' brief. This brief refers to the statements by the number used in the district court's order dismissing the SAC. SPA5-9. Because Plaintiffs have dropped challenges to various statements, the numbering includes gaps. Only eight statements remain at issue: 1-2, 9-11, 14, 19-20.

*what we're seeing. We're seeing robust demand.*" JA680. Woodworth "highlight[ed], obviously," that Foley's assertions of "strong" demand were "reflected in the revised revenue guidance that we've given for Q3 and Q4." *Id.* "[I]n Q3, . . . *we're still seeing very strong organic demand across all geographies across all products*." *Id.* (Statement 2).

Consistent with these statements, Peloton's January-March 2021 (3Q21) guidance predicted $1.1 billion in quarterly revenue—more than double its revenue from the prior year. JA658, 677. But Peloton warned "[a]ctual results may differ materially" and instructed investors to review the "SEC filings" and "shareholder letter" "[f]or a discussion of the material risks and other important factors that could impact our actual results." JA672; *see* JA659 (directing investors to Forms 10-K and 10-Q "Risk Factors"). The referenced SEC filings included specific and extensive disclosures. *See* JA369-94. They warned that the fitness market is highly competitive; Peloton's revenue growth rate was likely to slow as the business matured; and Peloton derived a significant majority of revenue from bike sales, meaning a decrease would have a large impact on revenue. JA369.

Peloton also emphasized the unique risks and uncertainties caused by COVID. JA369 (COVID was "material risk[]"). It acknowledged that COVID-driven demand was "unexpected[ly]" high, resulting in deviations from usual seasonal trends. JA379; *see* JA371, 375, 658. Peloton repeatedly warned that COVID's

"impact [on] consumer demand for our products and services" "remains uncertain," JA370, and "is changing rapidly," JA372; *see* JA333, 370-71, 374, 380, 659. And Peloton made clear it did not believe the unprecedented COVID demand would continue indefinitely: "[o]ver time, we expect the seasonality of our business to return, with pronounced increases in demand during our second and third quarters," as compared to the first and fourth quarters. JA375.

### 3. May 2021: Peloton Exceeds Q3 Guidance and Provides Q4 Forecast

On May 6, 2021, Peloton reported January-March 2021 (3Q21) results, beating its forecast with actual sales of $1.262 billion and achieving 141% YoY growth. JA703. During an earnings call that same day, Woodworth announced that Peloton's efforts "to reduce wait times for [Peloton] products" were paying off. *Id.* Wait times for one bike model, which had been as high as "8-10 weeks" in April 2021, JA193 ¶ 64, were "back to pre-pandemic levels of one to three weeks," JA703. In its 10-Q, Peloton quantified the precise inventory increase, explaining it had "*a $363.7 million increase in inventory levels*" compared to the prior year "*as [it] ramped up supply to meet the current increased demand.*" JA549 (Statement 9).

Woodworth then offered "overall commentary" on Peloton's sales outlook. JA706. She explained that, "[a]s anticipated," bike sales had been "tapering from COVID highs," and Peloton was "expecting a gradual return to historical seasonal sales trends." *Id.* Reflecting this anticipated return to seasonality, Peloton

announced April-June 2021 (4Q21) revenue guidance of $915 million—approximately $300 million lower than its Q3 results. *Id.*

Woodworth contextualized this guidance by comparing it to Peloton's pre-COVID results: "[O]ur unit sales remain significantly higher than pre-COVID levels. We expect [bike] sales in Q4 fiscal '21 to be over 3x higher than they were in Q4 of fiscal '19, two years prior." *Id.*; *see* JA710, 716. When asked, two weeks later, about this guidance and how to "get people comfortable with where bike demand is heading into warmer weather and into strong reopening," Woodworth repeated: "[w]e've lapped COVID now. *But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that [compound annual growth rate ("CAGR")] over a 2-year period, we still see a ton of demand*." JA836 (Statement 10).[2]

As usual, Peloton warned that "[a]ctual results may differ materially," JA699, and provided specific and extensive risk disclosures, *e.g.*, JA515-16, 553-81, 771. Peloton warned, for example, that "[o]ur operating results could be adversely affected if we are unable to accurately forecast consumer demand for our products and services and adequately manage our inventory." JA563. "*If we fail to accurately*

---

[2]  The CAGR is the rate of return assuming that the growth of an investment from its beginning to end balance is smoothed. Jason Fernando, *Compound Annual Growth Rate (CAGR) Formula and Calculation*, Investopedia, https://www.investopedia.com/terms/c/cagr.asp (updated Nov. 12, 2024).

*forecast consumer demand we may experience excess inventory levels or a shortage of products available for sale.* Inventory levels in excess of consumer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer . . . ." JA564 (Statement 20).[3]

### 4. *August 2021: Peloton Exceeds Q4 and FY21 Guidance and Provides Q1 and FY22 Forecast*

On August 26, 2021, Peloton announced its April-June 2021 (4Q21) and full FY21 results. Peloton beat its Q4 guidance with $937 million in revenue, reflecting 54% YoY growth. JA730. For FY21, Peloton announced $4.02 billion in revenue, "up 120% year-on-year and up 340% versus fiscal year 2019." JA727. At the same time, Woodworth reminded investors that FY21 was a "very unusual year," with "both supply and demand shocks [that] impacted our performance." JA733. She warned that demand was expected to "step back in fiscal year 2022," JA736, and "return to normal seasonal patterns," JA733; *see* JA735, 745, 747. And she noted that Peloton was now "lapping [COVID] comparisons," "which makes predicting our year-over-year performance more challenging than normal." JA733. Woodworth then shared Peloton's "best current estimate" for July-September 2021

---

[3] Plaintiffs challenge this same risk warning in Peloton's Form 10-K, filed August 26, 2021, and Form 10-Q, filed November 4, 2021. JA250-51 ¶¶ 214-16.

9

(1Q22) and the full FY22, predicting $800 million in Q1 revenue—a $100 million decrease from the previous quarter—and $5.4 billion for FY22.  JA733-34.

Woodworth further noted that, in the past year, Peloton had "made significant progress on product wait times," with order-to-delivery windows for both bike models "at pre-pandemic levels for the past several weeks."  JA731.  And she announced that "we are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our *expectations of continued strong demand*."  JA734 (Statement 11).

Foley also announced that Peloton was reducing its bike price—the "latest step on [Peloton's] journey to broaden the accessibility of [its] products."  JA729.  This journey began years before COVID and included offering a 0% financing option in 2017 and a no-risk 30-day home trial in 2019, and reducing the bike price in mid-2020, when demand was at its COVID-peak.  JA728.  As Foley explained, "[d]emocratizing access to our platform has always been our goal."  JA729.  An analyst asked how Peloton was "think[ing] about demand for Bike+ currently" and, "given the light [Q1] guide," whether the decrease in bike price was "offensive or defensive."  JA737.  Foley responded: "*we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast.  The price drop with [bike] was absolutely offensive.  As we think about the competitive landscape, we*

10

*think about democratizing access to great fitness, which is, as you know, always been in our playbook.*" JA738 (Statement 14).

As always, Peloton emphasized the "great debate about the growth prospects of [the connected fitness] industry post-COVID," JA727; warned that "[a]ctual results may differ materially," JA726; and pointed to specific and extensive risk disclosures, *e.g.*, JA402-03, 414-42, 771. And Peloton further confirmed that, "[a]s the pandemic receded in recent months, we experienced a return to pre-pandemic seasonal trends." JA410.

### 5. *November 2021: Peloton Exceeds Q1 Guidance and Provides Q2 Forecast*

On November 4, 2021, Peloton shared its July-September 2021 (1Q22) results. Peloton's $805 million in revenue beat its guidance and reflected YoY (6%) and two-year (88% CAGR) growth. JA787.

Peloton reminded investors that it "always expected the engagement to come down slightly coming out of COVID" and that "those crazy elevated COVID engagement numbers" would not last "forever." JA799. And Peloton disclosed that "[m]igrating from quarterly sequential growth during COVID back to our pre-COVID seasonality has proven challenging." JA791. During fall 2021, Peloton's website and showroom traffic did not increase as much as expected, "add[ing] increased near-term uncertainty into our forecast." JA784. Peloton accordingly

11

reduced its FY22 forecast, from $5.4 billion to $4.4-4.8 billion—which still represented growth (14% YoY, 59% CAGR). JA790.

For October-December 2021 (2Q22), Peloton predicted $1.1-1.2 billion in revenue, reflecting its expectations of a strong holiday quarter. *Id.* Foley explained that while the Q1 "summer months have traditionally seen lower engagement levels," "[l]ooking ahead [to Q2], we're about to enter our busiest time of the year. *Our inventories are healthy and our logistics teams are well equipped for the seasonally strong sales period.*" JA786-87 (Statement 19). He added: "[w]e have low expected [order-to-delivery times] across our portfolio as we know delivery is greatly appreciated during the holiday and New Year's resolution periods." JA787.

Again, Peloton warned that "[a]ctual results may differ materially," JA783, and issued specific and extensive risk disclosures, *e.g.*, JA784, 789-93. But the next day, Peloton's stock dropped 35%. JA253 ¶ 225.

### 6. *January-February 2022: Peloton Meets Q2 Guidance*

Peloton announced its October-December 2021 (2Q22) preliminary results on January 20, 2022, JA808, and its final results on February 8, 2022, JA817. With revenue of $1.13 billion, Peloton's results fell squarely within its guidance range, and represented YoY (6%) and two-year (56% CAGR) growth. JA817. But because "assessing demand coming out of COVID" continued to be a "significant challenge," JA825, Peloton further lowered its future guidance, JA818.

12

**B.**     **Procedural Background**

    **1.**     *The District Court Dismisses the First Amended Complaint*

On November 18, 2021, Plaintiff Hialeah Employees' Retirement System filed a putative class action complaint. JA7. On June 25, 2022, Plaintiff Robeco Capital Growth Funds-SICAV Robeco Global Consumer Trends filed an amended consolidated complaint ("FAC"), alleging Defendants made eighteen statements about Peloton's demand and inventory that were knowingly false and misleading because Defendants knew COVID-level demand had declined. JA21-144.

The district court dismissed for failure to plead a material misstatement or omission—but granted leave to amend. SPA44-52. The court concluded that every challenged statement was true. Specifically, Peloton's characterization of its sales was consistent with its financial results because Peloton "exceeded" its revenue guidance throughout the Class Period. SPA48-51. So "Plaintiff's allegations that Defendants were concealing an actual decrease in overall demand" were "not borne out by the totality of the facts alleged." SPA50. "[M]ost importantly," the court explained, Peloton "explicitly told the public that demand for Peloton's products would be returning to pre-COVID levels after the surge in demand it had seen during COVID." *Id.* Because the FAC was "premised on the nondisclosure of information that was actually disclosed," Plaintiff had failed to state a claim. SPA51 (citation omitted).

13

The district court also found many of the statements nonactionable for additional reasons. Eight were forward-looking statements protected under the Private Securities Litigation Reform Act ("PSLRA") safe harbor because they were accompanied by "extensive" and "meaningful cautionary language." SPA44-47. Five were nonactionable puffery, lacking "specific metric[s] on which the investing public would reasonably rely." SPA47-48.

Because Plaintiff failed to plead any actionable misstatement or omission, the district court did not address scienter. SPA51-52. Finding no violation of Section 10(b), the district court dismissed Plaintiff's remaining claims. SPA52.

### 2. *The District Court Dismisses the Second Amended Complaint*

Plaintiffs then filed a consolidated SAC, JA171-307, dropping their challenge to ten statements and bringing challenges to two new statements, JA987-91 (listing statements). Because Plaintiffs had "failed to cure the [FAC's] deficiencies," the district court dismissed Plaintiffs' claims with prejudice. SPA15.

The district court again held that every statement was true, SPA18-22, and that each was nonactionable on alternative grounds: nine were protected by the PSLRA safe harbor, SPA15-18; five were puffery, SPA23-24; and one was an opinion, SPA24. The court did not address whether Plaintiffs adequately pleaded scienter. SPA24-25. And having found no Section 10(b) violation, it dismissed the remaining claims. SPA25.

14

## SUMMARY OF ARGUMENT

The SAC challenged ten statements. The district court held that none were materially false or misleading for multiple, independent reasons. On appeal, Plaintiffs expressly abandon Statement 13—the only statement made by Lynch. Pls.' Opening Br. ("OB") 8 n.4. They also implicitly abandon Statement 3 by failing to address it in the falsity section of their opening brief. And they do not challenge the dismissal of claims against any Non-Speaker Defendant. Plaintiffs' arguments about the remaining eight statements and two Speaker Defendants are without merit. *See* Addendum (table of statements). This Court should affirm.

*First*, the district court correctly held that none of the challenged statements were false or misleading when made. Plaintiffs' claims are premised on Peloton's purported failure to disclose that demand would decrease from "COVID-level[s]," OB23, and that inventory accumulated as a result of this allegedly undisclosed demand decrease, OB27. But Plaintiffs ignore what Defendants *actually said* and the relevant context, which contradict their claims of falsity. Peloton expressly and repeatedly acknowledged COVID-level demand was anomalous, disclosed its expectations of a return to seasonality, and said it was deliberately building inventory. Peloton provided revenue guidance reinforcing these disclosures and quantifying its expectations of a return to pre-COVID seasonality. And Peloton met

or exceeded that guidance throughout the Class Period, with both YoY and two-year growth. Plaintiffs' failure to allege any false statement is reason alone to affirm.

*Second*, most of the statements are nonactionable for additional reasons. Six are puffery (Statements 1-2, 10-11, 14, 19). Statements about "strong" or "robust" demand and "healthy" inventory, without more, are too vague for a reasonable investor to rely upon. The same six statements also reflect future expectations, performance, or plans and are protected by the PSLRA safe harbor. Plaintiffs contend the accompanying cautionary language is insufficient, but the safe harbor is written in the disjunctive and Plaintiffs do not argue the statements were made with actual knowledge of falsity. Regardless, each statement *was* accompanied by extensive cautions about COVID's impact on Peloton's demand and inventory. And three of the statements, reflecting Foley and Woodworth's "expect[ations]" and "feel[ings]," are also nonactionable opinion (Statements 10-11, 14).

*Third*, Plaintiffs failed to plead facts establishing a strong inference of scienter. The district court did not address, and did not need to address, scienter because Plaintiffs failed to allege falsity. But if this Court considers scienter, Plaintiffs' claims fail on that ground too. Plaintiffs point to Foley and Woodworth's stock sales—but those sales were made under pre-arranged trading plans entered before the Class Period. The CWs do not adequately allege Foley or Woodworth

had any information contradicting their public statements. And statements made after the Class Period say nothing about what they knew during the Class Period.

*Finally*, because Plaintiffs' Section 20(a) and 20A claims are derivative of their Section 10(b) claim, the district court properly dismissed those claims as well.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD PLAINTIFFS FAILED TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION

To "protect [a defendant] against strike suits," the PSLRA and Rule 9(b) impose stringent pleading requirements on private securities fraud actions. *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462-63 (2d Cir. 2019) (citation omitted). Under Rule 9(b), plaintiffs must state "the circumstances of a fraud" with particularity. *Id.* The PSLRA imposes the additional requirement to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief," to "state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1). Under these heightened standards, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

To determine "whether a statement is materially misleading under Section 10(b)," a court asks "'whether the defendants' representations, taken together and in

context, would have misled a reasonable investor.'" *Id.* at 172 n.7 (citation omitted). When evaluating these claims, a court "considers, in addition to the complaint, and written instruments attached, statements incorporated by reference, and public disclosure documents filed with the SEC." *Gamm*, 944 F.3d at 462.

The district court correctly held Plaintiffs failed to plead any material misstatement or omission for many, independent reasons. This Court should affirm.

### A. The District Court Correctly Held that None of the Eight Challenged Statements Were False

Plaintiffs failed to allege particularized facts showing that any of the eight challenged statements were false or misleading when made.[4] According to Plaintiffs, Defendants assured investors that COVID-level demand "was not impacted by the relaxation of COVID restrictions." OB7-8. But as the district court concluded, Defendants never made any such promise. SPA20, 50. To the contrary, Defendants repeatedly said COVID-level demand was anomalous; expressly warned demand would return to pre-COVID seasonal trends; and released revenue guidance reflecting that assumption. As to inventory, Plaintiffs concede Peloton disclosed its

---

[4] Plaintiffs forfeit any challenge to Statement 3 by failing to make any argument that the statement was false or misleading. OB21-35; *see also* OB8, 11 (not identifying Statement 3); *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief."). Plaintiffs briefly say Statement 3 is not forward-looking (OB36), but that does not matter if it is not false or misleading. Regardless, the arguments for Statement 1 apply equally to Statement 3.

accumulating inventory to investors. OB14, 27. They nonetheless argue Peloton misled investors by hiding *why* there was "excess inventory," *i.e.*, that "inventory accumulated because demand had declined." OB11, 13, 27, 29. But Plaintiffs fail to explain what it means for inventory to have been in "excess" or to identify with particularity when such "excess" accumulated. And Peloton told the market it was building inventory to ensure short order-to-delivery times for expected future demand—expectations reflected in Peloton's revenue guidance, which it met or exceeded every Class Period quarter. Peloton's disclosures are "flatly inconsistent with an intent to mislead." *Lucas v. Icahn*, 616 F. App'x 448, 450 (2d Cir. 2015).

### 1. *Peloton's Revenue Guidance Reinforces Each Statement*

One point is critical to understand at the outset: demand for Peloton's products is reflected in its sales, and Peloton's revenue guidance is a proxy for expected demand. Plaintiffs do not dispute that Peloton's guidance was true when issued. OB6. So understood, the challenged statements cannot be false or misleading. Plaintiffs cannot claim to have been misled about demand, when the guidance disclosed that demand would not increase indefinitely quarter-over-quarter but would, instead, return to pre-COVID seasonal trends—predictions that proved true.

During earnings calls, Peloton made clear that its revenue guidance reflects its demand expectations. For instance, when announcing Q3 guidance, Woodworth expressly stated that Peloton's expectations of strong demand were "reflected in the

19

revised revenue guidance that we've given for Q3." JA680. Then when announcing Peloton's FY22 guidance, Woodworth explained that this "guidance reflects our expectation of continued strong demand." JA734 (Statement 11). She further explained that the guidance's prediction of YoY growth was based on Peloton's expectations of "strong demand" and higher "sales" "than in fiscal 2021." JA733. Then, when later reducing this guidance, Peloton explained the revision was necessary because of "reduction[s]" to Peloton's "demand outlook" and "demand forecast." JA790-91. And Peloton's investors understood all this. For example, when Peloton issued July-September 2021 guidance that was lower than the previous quarter's revenue, an analyst commented that this guidance "obviously . . . implies sequential decline" in the "*trend in demand*." JA745 (emphasis added).

While Peloton never promised to meet the revenue guidance, it did for every quarter during the Class Period—each time representing YoY growth:

| Period | Revenue Guidance | Actual Revenue | Guidance Met? | YoY Growth? |
|---|---|---|---|---|
| Jan-Mar 2021 3Q21 | $1.1 billion | $1.262 billion | ✓ | ✓ |
| Apr-June 2021 4Q21 | $915 million | $937 million | ✓ | ✓ |
| July-Sept 2021 1Q22 | $800 million | $805 million | ✓ | ✓ |
| Oct-Dec 2021 2Q22 | $1.1-1.2 billion | $1.13 billion | ✓ | ✓ |

JA677, 703, 706, 730, 734, 787, 790, 817.

Faced with a quantification of expected and actual demand that directly contravenes their preferred narrative, Plaintiffs ask the Court to ignore these metrics. Plaintiffs claim the guidance cannot be considered because it comes from "documents Defendants provided which were not referenced in the SAC." OB25. That is specious. Five of the eight challenged statements were made during earnings calls, where the guidance was provided. JA677 (Statements 1-2); JA734 (Statements 11, 14); JA789-90 (Statement 19).[5] The district court correctly concluded that the

---

[5]    Of the three remaining statements, two were in SEC forms filed the same day and incorporated by reference in the earnings calls, JA549 (Statement 9); JA379, 424, 563-64 (Statement 20), and one was made at a conference in reference to a comment Woodworth had made during an earnings call, JA836 (Statement 10).

full earnings calls—including the portions discussing revenue guidance—were incorporated by reference. SPA13, 28 n.1, 49; *see Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022) ("A document that is integral to the complaint and partially quoted therein may be incorporated by reference in full" and may be considered for "the truth of their contents."); *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 750 & n.2 (2d Cir. 2020) (considering full earnings call and Form 10-Ks when evaluating whether specific statement made during call was actionable).

Plaintiffs also say that because they are "*not* challeng[ing]" the guidance as "false," OB25, 33, the district court erred by looking beyond the cherrypicked words they do challenge, OB26, 36. Plaintiffs are wrong. It is well-settled that, to state a Section 10(b) claim, a statement must "be 'mislead[ing],' evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (alteration in original) (citation omitted). And this Court routinely rejects invitations to read statements in isolation and out of context. *E.g.*, *Furher v. Ericsson LM Tel. Co.*, 363 F. App'x 763, 765 (2d Cir. 2009); *Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 75-76 (2d Cir. 2008).

---

Plaintiffs do not dispute that the SEC forms and conference transcript were properly incorporated by reference.

Read in context, Peloton explained how it expected demand to translate into revenue. And with the truth of that revenue guidance unchallenged, Peloton's statements could not have misled investors. *See Hassan v. Boston Beer Co.*, No. 23-8, 2023 WL 8110940, at *3 (2d Cir. Nov. 22, 2023) (statement that product was "'growing in the high double digits'" not actionable when "true and grounded in publicly available data" (citation omitted)); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 580 (S.D.N.Y. 2018) (statement that "profitability is improving" not misleading when defendant "gave a detailed summary" of company's results and "data" showed revenue increase (citation omitted)), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ("substantially for the [same] reasons").

### 2. *None of the Statements Were False or Misleading*

Reading each statement in context and time (something Plaintiffs fail to do), none were false or misleading when made.

**Statements 1-2: Foley and Woodworth's February 4, 2021 Statements.** Woodworth and Foley's statements about "strong," "robust," and not "softening" demand were not false or misleading because there are no particularized allegations that, by February 2021, demand had slowed. To the contrary, demand remained strong as evidenced by Q2 results and Q3 guidance.

During the February 4, 2021 earnings call, Woodworth announced Peloton's October-December 2020 (2Q21) results of $1.065 billion, exceeding expectations and eclipsing the previous quarter ($757.9 million). JA648, 676. She then announced that Peloton's "current manufacturing capacity exceeds demand." JA677. An analyst sought "to clarify" whether this was "because [Peloton] ramped capacity" or whether it was "seeing any change to demand due to extended [order-to-delivery] times." JA680. Foley responded: "*We are not seeing a softening of demand. That is absolutely not what's happening here. We are seeing incredibly strong organic demand, even in the face of light marketing.*" *Id.* (Statement 1). He continued: "*[I]t's absolutely not a softening of demand. That's no[t] what we're seeing. We're seeing robust demand.*" *Id.* And Woodworth "highlight[ed], obviously," that Foley's comment was "reflected in the revised revenue guidance that we've given for Q3." *Id.* "[I]n Q3 . . . *we're still seeing very strong organic demand across all geographies across all products*." *Id.* (Statement 2).

As Woodworth expressly stated, these demand statements were "reflected" in Peloton's Q3 guidance. And that guidance predicted $1.1 billion in quarterly revenue, reflecting Peloton's expectations of *further* growth, both quarter-over-quarter and year-over-year.[6] JA676.

---

[6]   Peloton's statements about "strong" and "robust" demand are best understood in context as reflected in the unchallenged revenue guidance. If viewed instead as

Plaintiffs claim the CWs collectively allege demand "had dropped by the start of the Class Period" (*i.e.*, February 5, 2021). OB4. That is false. The CWs do not even agree on when demand allegedly began to decline. *E.g.*, JA186 ¶ 37 (CW3, "downturn in sales" started "by April 2021"); JA195 ¶ 70 (CW12, sales "slowed down by June 2021"); JA198-99 ¶ 84 (CW19, "deliveries slowed" "in July 2021"); JA202 ¶ 94 (CW24, "orders were slowing" "in August or September 2021"). Only *one* CW (CW2), a low-level employee who is not alleged to have insight into companywide demand, consistently and definitively alleged demand decreased *before* February 2021. JA185 ¶ 34. But the other allegations in the SAC *contradict* that assertion, pointing to February 2021 as the *earliest* demand declined. JA211 ¶ 130 (summarizing CW accounts as allegedly "reveal[ing]" demand declines "*as early as February 2021*"); JA212-13 ¶ 132 (cataloguing CWs stating demand decreased in February or March 2021); JA213 ¶ 132 (CW28, "in December 2020, Peloton was still pretty busy"); JA203 ¶ 100 (CW27, describing consistent sales from January-June 2021). And timing matters: the absence of particularized allegations that demand dropped substantially *before* February 2021 (and actual financial results to the contrary) is fatal to any argument that Statements 1-2 were false or misleading when made.

---

statements about demand in the abstract, they are unquantified and too vague to be actionable. *See infra* Section I.B (puffery).

**Statement 9: Peloton's May 7, 2021 Statement.** Peloton's statement about an "increase in inventory levels" to meet "current increased demand" was not false or misleading because both demand and inventory undisputedly increased during the referenced time period and were disclosed in real-time.

In Peloton's Form 10-Q, Peloton explained that, in July 2020-March 2021 (the first three quarters of FY21), as compared to July 2019-March 2020 (the first three quarters of FY20), Peloton had "*a $363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.*" JA549. Except for a few weeks, the first three quarters of FY20 occurred *prior* to COVID shutdowns. Plaintiffs do not (and cannot) dispute that, from July 2020-March 2021 as compared to *pre*-COVID, Peloton experienced "increased demand" and had to "ramp[] up supply to meet" this demand. This "increased demand" is reflected in Peloton's actual revenue for the first three quarters of FY21: $757.9 million in Q1, $1.065 billion in Q2, and $1.26 billion in Q3. And it is further reinforced by Peloton's Q3 results, which reflected 141% YoY growth. Statement 9 was indisputably true for the period to which the statement refers.

**Statement 10: Woodworth's May 25, 2021 Statement.** Woodworth's statement about "a ton of demand" was not false or misleading because it compared demand to two years prior.

26

In reference to Woodworth's comment during the May 6 earnings call "that demand is up 3x from where it was 2 years ago," an analyst asked, "where bike demand is heading into warmer weather and into strong reopening." JA836. Woodworth emphasized, "we all know that COVID was a little bit of an anomaly last year in terms of sales." *Id.* She explained that April-June 2020 (4Q20) is thus not the "relevant" comparator; what matters is "Q4 of [FY]19." *Id.* Comparing "where we were in Q4 of [FY]19 [to where we expect to be in terms of bike in Q4 of this year," "*bike sales or bike demand is still over 3x where it was a couple years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand*." *Id.* It is undisputed that in May 2021, as compared to May 2019, there was "a ton of demand." *See* JA706.

Peloton's revenue guidance further confirms that Woodworth's demand statement used a pre-COVID comparator. During the earnings call sparking the analyst's question, Woodworth disclosed that "sales have been tapering from COVID level highs, and we're expecting a gradual return to historical seasonal sales trends." JA706. Woodworth reiterated the business is "going to be seasonal" now, JA836, and Peloton announced a Q4 forecast *less* than its actual Q3 revenue— acknowledging demand would *not* increase quarterly and would instead reflect seasonality, with lower sales in warmer months. With this context, it is clear Woodworth did not promise COVID-level demand would continue in perpetuity.

**Statements 11 and 14: Woodworth and Foley's August 26, 2021 Statements**.  Woodworth and Foley's statements about "strong" and "robust" demand, a "normalized backlog," and a decrease in bike price were not false or misleading because demand expectations were explicitly tied to guidance accurately quantifying demand, and none speak to levels of inventory buildup at all.

During Peloton's earnings call for FY21 Q4, Woodworth announced that order-to-delivery times, which had been heightened due to supply chain issues, were back "at pre-pandemic levels."  JA731.  As a result, Peloton "enter[s] fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our *expectations of continued strong demand*."  JA734 (Statement 11).  An analyst asked how Peloton is "think[ing] about demand for Bike+ currently" and, "given the light [Q1] guide," whether the decrease in Bike price was "offensive or defensive."  JA737.  Foley responded: "*we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast.  The price drop with [bike] was absolutely offensive.  As we think about the competitive landscape, we think about democratizing access to great fitness, which is, as you know, always been in our playbook.*"  JA738 (Statement 14).

Starting with demand, both Woodworth and Foley tethered their assertions to the "guidance" or "guide."  JA734, 737-38.  That Q1 guidance ($800 million) was *lower* than the previous quarter's results ($937 million), while reflecting YoY (6%)

and two-year (87%) growth. JA734. Woodworth and Foley could not have been trying "to assuage the market's fears that COVID-level demand would not continue" (OB23) when they *disclosed* an expected sequential decrease in demand. Woodworth further reminded investors that "fiscal 2021 was a very unusual year," JA733, and warned that "profitability will step back in fiscal 2022," JA736. Statements 11 and 14 could not have misled inventors into believing that quarter-over-quarter demand increases would continue.

As for inventory, Woodworth's statement about Peloton's "normalized backlog" referred to her announcement that the delays plaguing delivery had been addressed, and order-to-delivery times were back at "pre-pandemic levels." JA731, 734; *see* OB26 (not challenging this portion of statement). Statement 11 thus has nothing to do with inventory buildup. Statement 14 similarly says nothing about inventory buildup, much less attribute any buildup to increased demand. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 155 (2d Cir. 2013) (defendant "not obligated to disclose" fact when a statement, read in context, did not suggest "the contrary").

**Statement 19: Foley's November 4, 2021 Statement.** Foley's statement about "healthy" inventory was not false or misleading because it indicated only that there was *enough* inventory heading into the holiday season to avoid delivery issues experienced in prior periods.

During an earnings call, Peloton announced its July-September 2021 results ($805 million), which reflected the "lower engagement levels" expected during the Q1 "summer months," like in "every non-COVID year in [Peloton's] history." JA786-87. "Looking ahead" to Q2, Foley announced: "we're about to enter our busiest time of the year. *Our inventories are healthy and our logistics teams are well equipped for the seasonally strong sales period.*" JA787. Foley explained that having "healthy" inventory and being "well equipped" meant having "low expected [order-to-delivery times] across our portfolio" because "delivery is greatly appreciated during the holiday and New Year's resolution periods." *Id.* Reinforcing Foley's prediction of a "seasonally strong sales period," Peloton issued guidance predicting $1.1-1.2 billion in Q2 revenue. JA790. In describing inventory as "healthy," Foley was responding to a concern that Peloton might not have *enough* inventory to meet this "seasonally strong" demand—the precise issue Peloton faced the prior holiday season. *See* JA673 (supply chain issues in December 2020 "forced [Peloton] to reschedule many deliveries"). Foley's statement does not imply anything about Peloton having too much inventory.

**Statement 20: Peloton's Risk Disclosure**. The risk disclosure was not false or misleading because Plaintiffs do not allege with any particularity that the warned-of risk materialized.

In its 2021 Forms 10-Q and 10-K, Peloton warned: "Our operating results could be adversely affected if we are unable to accurately forecast consumer demand for our products and services and adequately manage our inventory." JA379, 424, 563. Specifically, it cautioned: "*If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale.* Inventory levels in excess of consumer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer . . . ." JA564. The warned-of risk was two-fold: (i) Peloton could fail to accurately forecast demand; and (ii) if so, Peloton might have "excess inventory" leading to write-downs and other consequences. *Id.* Plaintiffs cannot allege that Peloton failed to accurately forecast demand, having conceded they do not challenge the revenue guidance. OB6. They argue only that Peloton characterized "excess inventory" as a purely hypothetical risk when, in fact, that risk had allegedly already materialized. OB42.

But Peloton did not warn of "excess" inventory in the abstract—it warned of the specific potential financial consequences of "excess" inventory: write-downs, write-offs, sale at discounted prices, and a decrease in gross margins. And Plaintiffs do not allege (much less with particularity) that any of *those* consequences materialized during the Class Period. *See, e.g.*, *Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23-cv-1112, 2024 WL 4274362, at *3 (2d Cir. Sept. 24, 2024)

(dismissing fraud claims based on risk disclosures where complaint failed to adequately allege that risk materialized); *Rombach*, 355 F.3d at 173-74 (same).

At the outset, Plaintiffs do not explain what it means for inventory to be in "excess." In any event, Peloton disclosed its precise inventory in dollar amounts, as well as Peloton's precise financial condition. *E.g.*, JA335 ($244.5 million in net inventory in June 2020; $552.8 million in December 2020); JA517 ($614.2 million in net inventory in March 2021). These "fulsome disclosures" permitted investors "to track, quarter by quarter, whether revenue was adversely impacted" by the warned-of risk. *In re UiPath, Inc. Sec. Litig.*, -- F. Supp. 3d --, 2024 WL 4667269, at *11 (S.D.N.Y. Nov. 4, 2024) (warnings about adverse conditions that could affect business's results not misleading where defendant made "robust disclosures" about financial condition). Statement 20 was not misleading.

### 3. *The CW Allegations Do Not Contradict the Challenged Statements*

Plaintiffs do not take the required statement-by-statement approach and entirely ignore the district court's "most important[]" holding: that "Defendants explicitly told the public that demand for Peloton's products would be returning to pre-COVID levels after the surge in demand it had seen during COVID." SPA50; *see* SPA20. They do not dispute that Peloton's demand during the Class Period was strong compared to pre-COVID and cannot dispute that Peloton disclosed that demand would return to pre-COVID seasonal trends, as further reinforced by

Peloton's revenue guidance. *E.g.*, JA704, 706, 733, 736, 745, 747, 801, 836. And they concede Peloton disclosed its inventory growth. Plaintiffs' limited counterarguments focus on the CWs, which they say the district court "discount[ed]." OB6. But the CWs do not contradict the challenged statements.

**Allegations of Sale and Delivery Slowdowns.** According to Plaintiffs, the CWs alleged "a drastic slowdown in sales beginning in early 2021," as well as "fewer deliveries." OB9. By using "sales" as a proxy for demand, Plaintiffs *concede* demand is inextricably linked with revenue and thus the unchallenged revenue guidance. In any case, the CWs (1-3, 7-8, 10-12, 14-24, 27-30) describe sales or deliveries decreasing from COVID highs; none compare demand during the Class Period to pre-COVID seasonal demand, the focus of the challenged statements. *See* JA183-84 ¶ 29; JA185 ¶ 35; JA186 ¶ 37; JA189 ¶ 49; JA190 ¶ 52; JA192 ¶ 60; JA194 ¶ 67; JA195 ¶ 70; JA196 ¶ 75; JA197 ¶¶ 78; JA198-99 ¶¶ 82-84, 86; JA200 ¶¶ 87-88; JA201 ¶ 90; JA202 ¶¶ 94, 96; JA203-04 ¶¶ 100, 102; JA205 ¶¶ 104-05.[7]

---

[7] Contrary to Plaintiffs' assertion that CW3 compared demand to "p[re]-COVID levels," OB14, CW3 alleged a "downturn in sales," as compared to "throughout 2020," beginning April 2021, JA186 ¶ 37. Defendants disclosed this expected decreased demand in April 2021, issuing revenue guidance for April-June 2021 that was $300 million *less* than its previous quarter's results. CW3's limited visibility into demand is evident by CW3's allegation that, "based on the number of deliveries going out from [a small sampling of] warehouses," "it was obvious that Peloton was not going to surpass its 2020 sales." *Id.* This allegation is contradicted by Peloton's actual FY21 results, reflecting 120% YoY growth.

Such allegations are entirely consistent with Peloton's disclosures and guidance, which predicted quarter-over-quarter decreases in demand heading into the summer, due to a return to seasonality, from January-March 2021 ($1.1 million), to April-June 2021 ($915 million), to July-September 2021 ($800 million). *See supra* at 21.

Relying on *Teladoc*, Plaintiffs argue that the "number" of CWs is sufficient. OB32-35. That is not what *Teladoc* says: the CWs must allege particularized facts that contradict the challenged statements. There, contrary to defendants' representations that the organization was "'fully integrated,'" CWs "provided details" and "specific examples" that those statements were not true, and their allegations were consistent with each other, "emails[,] and other documentation." 2024 WL 4274362, at *4 (citation omitted). Here, none of the CWs contradicted the challenged statements. That should be the end of the matter. Moreover, unlike in *Teladoc*, where the CWs were responsible for overseeing the very conduct defendants allegedly misrepresented (integration), none of the CWs here had any involvement in assessing Peloton's overall demand. And they offer inconsistent allegations about demand during the Class Period. *Supra* at 25 (CW allegations inconsistent regarding when slowdowns began).

**Allegations of Missed Sales Quotas.** Plaintiffs rely heavily on "missed sales quotas" (OB9-10, 30-31), but again, the CW allegations are inconsistent—and none contradict the challenged statements. The CWs do not even agree that sales quotas

34

*were* missed. *E.g.*, JA205 ¶ 105 (CW30, salespeople were "making their goals," albeit "barely"). They also disagree on the timing of any missed quotas and whether the quotas had to accordingly be adjusted. *Compare* JA185 ¶ 34 (CW2, employees started "missing sales goals" in "December 2020"), *with* JA192 ¶ 60 (CW10, sales "dropped off" "by the summer of 2021"); *compare* JA200 ¶ 87 (CW21, "sales quotas did not decrease" from COVID highs), *with* JA200 ¶ 88 (CW22, quotas *did* decrease). These inconsistencies highlight the CWs' limited visibility into the demand of the *entire* company. As CW20 explained, sales managers (who reported to location managers, then regional managers, then management) received monthly reports used to "set goals for the upcoming months" for "their location"—not the company as a whole. JA199 ¶ 86; *see also* JA185 ¶ 35 (CW2, each account executive received reports about own sales).

And regardless, sales quotas are not metrics on demand performance but are internal, aspirational "targets" typically "set high" to "encourage growth." *In re Smith & Wesson Holding Corp. Sec. Litig.*, 836 F. Supp. 2d 1, 10 (D. Mass. 2011), *aff'd*, 669 F.3d 68 (1st Cir. 2012). Even around the 2020 holiday season, when Plaintiffs claim the "pandemic was a boon for Peloton," JA206 ¶ 110, employees were achieving only 80-85% of their sales goal, according to CW10, JA192 ¶ 60. Plus, the CWs are all from the inside sales or showroom teams, JA408; none are alleged to have visibility into online sales, which, during the Class Period, was

responsible for "a majority of [Peloton's] units sold," JA424.[8]  That some individual employees were missing different sales goals at different times—in certain of Peloton's sales channels and in certain locations—does not give rise to an inference that the statements about company-wide demand were false or misleading.

Plaintiffs argue that CWs can, in certain circumstances, establish company-wide practices (OB31-32), but their cases are readily distinguishable.  In *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, a Securities Act case subject to the lower Rule 8 standard, CWs directly involved in applying defendant's underwriting guidelines uniformly and consistently described "company-wide" pressure to ignore the published guidelines that were alleged to be misleading.  709 F.3d 109, 121 n.5, 124 (2d Cir. 2013).  In *In re SolarEdge Technologies, Inc. Securities Litigation*, the CW allegations "all corroborate[d] one another[]" and were "sufficient to infer a company-wide practice of channel staffing" because the high-level CWs, such as the Senior Director of National Sales and Director of Customer Support, "interacted directly" with defendants and had "'broader knowledge' of the company's practices."  No. 23-cv-9748, 2024 WL 4979296, at *8-9 (S.D.N.Y. Dec. 4, 2024) (citation omitted).  The low-level CWs'

---

[8]    Plaintiffs allege that "Inside Sales and Outside Sales were [Peloton's] *primary* sales channels," OB10 n.5, but this assertion is contradicted by Peloton's SEC Forms, reporting that online sales were the "majority of [Peloton's] units sold," JA424, which Plaintiffs do not allege were false.

inconsistent allegations here undermine any suggestion their experiences were company-wide rather than unique to their individual location or sales channel.

**Allegations of Increasing Inventory.** Plaintiffs cite CWs to say that Peloton was building inventory at a rate that "far outpaced demand," OB12-13, but as Plaintiffs concede, Peloton disclosed its plans to build inventory, OB14, 17; JA29 ¶ 9; JA64 ¶ 129 (admitting Defendants disclosed that purpose was to decrease order-to-delivery times). The CW allegations are thus not inconsistent with the challenged statements. *Compare* OB12-13 (CWs 13, 11, 8, 1 alleging that inventory accumulated in "Christmastime in 2020," "April or May of 2021," "June of 2021," and "August 2021," respectively), *with* JA677 (announcing, in February 2021, that "current manufacturing capacity exceeds demand, a trend that will accelerate"); JA517 (disclosing inventory increase in May 2021); JA734-35 (similar in August 2021). And, again, the CWs do not agree on when inventory allegedly became "excessive"—offering testimony ranging from "Christmastime in 2020," JA195 ¶ 71, to "summer of 2021," JA202 ¶ 94.

Plaintiffs' reliance on *Employees' Retirement System of the Virgin Islands v. Blanford*, 794 F.3d 297 (2d Cir. 2015), is thus inapposite. There, statements that defendants were "'not building any excess inventory'" were directly contradicted by the consistent allegations of CWs, including several who reported directly to defendants, that inventory was frequently "throw[n] away," "stored in [employees']

work spaces," and smuggled "onto trucks or hidden behind black plastic in roped off areas during the quarterly auditor visits." *Id.* at 306-07. Peloton disclosed its expectations that demand would return to seasonal trends, reinforced by revenue guidance that was met every quarter. And it disclosed its plans to build inventory to reduce order-to-delivery times from the beginning of the Class Period through August 2021 and to prepare for a busy 2021 holiday season from August 2021 through the end of the Class Period. It also quantified its precise inventory increase, in dollar amount, in its SEC forms. Such disclosures are the antithesis of fraud.

\* \* \*

In sum, none of the challenged statements were false or misleading because they are not contradicted by concrete and particularized allegations, as required by the PSLRA. In a series of string cites, Plaintiffs invoke cases where demand or inventory statements were deemed actionable. *See* OB5, 24, 27-28, 31-33. But, in each, defendants' statements *were* contradicted by concrete and particularized allegations and so stand in marked contrast to the challenged statements here. *E.g.*, *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146-47 (2d Cir. 2001) (statements that defendants had "'clear[ed] older inventory'" actionable in reference to non-disclosed 2017 inventory buildup, but not actionable in reference to 2016 inventory, which defendants had disclosed (emphasis and citation omitted)); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13-15 (2d Cir. 2011)

(defendants stated "any inventory problems were aberrations" and omitted inventory as a contributor to company cost, when they were "directly" and "specifically informed" that "opposite was true"); *Novak v. Kasaks*, 216 F.3d 300, 304 (2d Cir. 2000) (defendants stated "no major or unusual markdowns were anticipated" when they deliberately ignored own policy of marking down obsolete and worthless inventory, resulting in overstated financials); *In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) ("CEO denied having knowledge of inventory build-up" disclosed to him during annual contract negotiations).[9]

This Court (and others) routinely affirm dismissals when, as here, challenged statements are not contradicted by concrete and particularized factual allegations. For example, in *Hassan v. Boston Beer Co.*, a case concerning post-COVID demand for hard seltzer, this Court concluded that defendants' April 2021 statement that the

---

[9] The plethora of nonbinding district court cases cited are unpersuasive for the same reason. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 866-67, 879 (N.D. Cal. 2023) (statements guaranteeing that demand "will persist" misleading when demand "waned," as illustrated by missed sales guidance); *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, No. 9-cv-2083, 2018 WL 1587457, at *7 (D. Conn. Mar. 31, 2018) (financial statements misleading, having been "inflated by the use of improper accounting methods"); *Simon v. Am. Power Conversion Corp.*, 945 F. Supp. 416, 429 (D.R.I. 1996) (failure to report product malfunction misleading, resulting in product returns, suspension, and buildup). And Plaintiffs mischaracterize *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, where the question was not whether a statement about "robust demand" was actionable, OB24, but whether an analyst's characterization of defendant's demand was fairly attributable to defendant, 380 F.3d 1226, 1234 (9th Cir. 2004).

hard seltzer industry will "now start to reaccelerate" was not misleading. 2023 WL 8110940, at *3. The Court rejected plaintiff's argument that the use of "now" meant "immediate reacceleration" because the statement was in response to a question about "*full year* growth." *Id.* at *2 (citation omitted). And it dismissed plaintiff's reliance on defendants' alleged "'expect[ation] [of] a slowdown in May and June,'" including a CW alleging the same, explaining that any such expectation "d[id] not contradict" the assertion that "the category would reaccelerate over the course of 2021." *Id.* (citation omitted).

Similarly, in *In re Lululemon Securities Litigation*, this Court affirmed the conclusion that statements about defendants' garment "quality" being the "'highest in the industry'" were nonactionable, despite several product recalls, where defendants disclosed that "'sometimes products don't quite turn out the way we imagined.'" 14 F. Supp. 3d 553, 577-79 (S.D.N.Y. 2014) (citations omitted), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (for "substantially" same reasons). Because "the context" of defendants' statements about quality "reveal[ed] their intended limitations," the court rejected plaintiffs' reliance on eleven CWs, who failed to provide allegations contradicting defendants' statements. *Id.* at 579-81, 563 n.2.

And finally, in *Kleinman v. Elan Corp.*, this Court found nonactionable a press release stating, "Encouraging Top-line Results," where the full document disclosed that defendants had achieved "statistically significant results" in a subgroup of the

study population, but that "the 'overall study population' did not attain statistically significant results." 706 F.3d at 153. "[G]iven the context of the statements," the Court explained, "no reasonable investor could have understood the headline to mean anything other than the positive subgroup." *Id.*

So too here. When read in context, each statement was true and grounded in Peloton's revenue guidance. This Court has never found an actionable misstatement on similar facts.

### B. Six Statements Are Nonactionable "Puffery"

Expressions of "puffery" do not give rise to securities violations because they are "too general to cause a reasonable investor to rely upon." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). "'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future'" and "must be permitted to operate with a hopeful outlook." *Rombach*, 355 F.3d at 174 (citation omitted).

Statements 11 and 14 describe, respectively, Woodworth's "expectation" and Foley's "feel[ing]" about future strong demand. Such "positive forward-looking statements" are not actionable. *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853, at *2 (2d Cir. Dec. 13, 2022) ("expect[ations]" about "margin levels" are puffery); *Hassan*, 2023 WL 8110940, at *2-3 (defendant "feel[ing] very optimistic" and "confident" about growth are puffery). Statement

41

19, about inventory being "healthy," is also puffery. It is not specific, measurable, or capable of objective verification; that is, Plaintiffs "cannot point to any objective, black-and-white standards by which to verify" it. *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023).

As for Statements 1, 2, and 10 about demand being "strong" and "robust," "[n]o reasonable investor would place 'substantial reliance'" on these "'generalizations regarding a company's health or the strength of a company's products.'" *Steamfitters*, 2022 WL 17587853, at *2 (citation omitted). Demand, of course, can be quantifiable. The challenged statements here, for example, were accompanied by concrete data about demand—including, most notably, the revenue guidance. Because Plaintiffs do not challenge the revenue guidance as false, demand statements consistent with the revenue guidance cannot be false. *See supra* Section I.A.1-2. But if Plaintiffs insist that their chosen words should be viewed in isolation, they are textbook puffery.

Statements 1-2, 10-11, 14, and 19 are similar to the types of statements that courts routinely deem nonactionable puffery. *See, e.g.*, *Finisar Corp.*, 646 F. App'x at 507 n.1 ("statements about the strength of demand" are puffery); *Xerox Corp.*, 300 F. Supp. 3d at 569 (statements that "vaguely and enthusiastically described [defendant's] performance [and] expectations of business success" are puffery); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005)

("unprecedented market demand"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) ("income growth consistent with its historically superior performance"); *Freedman v. Value Health, Inc.*, 34 F. App'x 408, 411 (2d Cir. 2002) ("thriving" business); *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015) (integration "off to a promising start"); *Teladoc*, 2024 WL 4274362, at *4 (integration "on track").

## C. The Same Six Statements Are Nonactionable Forward-Looking Statements

Statements 1-2, 10-11, 14, 19 are also protected under the PSLRA "safe harbor," which exempts from liability certain "forward-looking statements." 15 U.S.C. § 78u-5(c). A "forward-looking statement" is broadly defined to include statements about "projection of revenues," "future economic performance," "plans and objectives of management for future operations," as well as any "assumptions underlying or relating to any" such statements. *Id.* § 78u-5(i)(1)(A)-(D). Forward-looking statements are not actionable when they are either (1) "accompanied by meaningful cautionary statements," or (2) not made "with actual knowledge" of falsity. *Id.* § 78u-5(c)(1)(A)-(B).

### 1. *The Statements Are Forward-Looking*

Each of Statements 1-2, 10-11, 14, and 19 is a forward-looking statement about future expectations, performance, or plans. Plaintiffs say the use of "present

43

tense" is determinative, OB23, 36, but once again, ignore context, *see Hassan*, 2023 WL 8110940, at *2 (rejecting argument that "use of 'now' meant that [defendant] projected immediate [action] [a]s belied by the broader context of [the] statement").

Statements 1 and 2 should be read together, as collective answers to the same question about the effect heightened order-to-delivery times might have on Peloton's demand.  Foley responded: "[w]e are not seeing a softening of demand."  JA680 (Statement 1).  Woodworth "highlight[ed]" that Foley's statement was "reflected in the revised [Q3 and Q4] revenue guidance," and added that "in Q3," "we're still seeing very strong organic demand," *id.* (Statement 2), reinforcing that these statements about "strong" and "robust" demand were tied to and reflected in their projections about future Q3 and Q4 demand.

Statement 10, Woodworth's response to a question in May 2021 about demand "*heading into warmer weather and into strong reopening*," is also forward-looking.  JA836 (emphasis added).  She answers "we still see a ton of demand," then describes "where we expect to be in terms of bike in Q4 of this year."  *Id.*  Whether this statement about Q4 demand was correct could not "be ascertained until" later, making it forward-looking.  *Philip Morris*, 89 F.4th at 428 (citation omitted).[10]

---

[10]  Plaintiffs' sole reference to Statement 3 occurs in their discussion of forward-looking statements.  OB36.  To the extent preserved, that statement about demand, in response to a question about "next year," is forward-looking for the same reason as Statement 10.

Statements 11, 14, and 19 are also forward-looking future predictions. Statements 11 and 14—made in August 2021, the beginning of Peloton's fiscal year—reflect, respectively, Woodworth's "expectation of continued strong demand" in the upcoming "fiscal [year] 2022," JA734, and Foley's optimism "about the entire year's forecast," JA738. Both refer to predictions about future FY22 demand. *See Philip Morris*, 89 F.4th at 428 ("expected" typically forward-looking). And Statement 19 "[l]ook[s] ahead," on November 4, 2021, to Peloton's peak sales period—"the holiday and New Year's resolution periods"—and confirms that Peloton is "well equipped" for this upcoming "seasonally strong sales period" because its "inventories are healthy." JA787. Each of these statements uses "*quintessentially* forward-looking language." *Philip Morris*, 89 F.4th at 428; *see also Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) ("assumption[]" underlying future projection protected).

### 2. *The Forward-Looking Statements Fall Under the PSLRA Safe Harbor*

Forward-looking statements are nonactionable if they are *either* accompanied by meaningful cautionary language *or* not made with actual knowledge of falsity. *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Plaintiffs do not argue Peloton had "actual knowledge" of falsity, a higher standard than scienter. *Id.* at 773. Because the PSLRA safe harbor is framed in the "disjunctive," *id.* at 766, that

45

failure is dispositive: each forward-looking statement is protected by the safe harbor regardless whether there are sufficient cautionary statements.

Even so, the forward-looking statements were accompanied by extensive warnings specifically tailored to the risks present in Peloton's business. Each earnings call began with the reminder: "[a]ctual results may differ materially from those contained in or implied by these forward-looking statements due to the risks and uncertainties associated with our business." JA672 (Statements 1-3); JA726-27 (Statements 11, 14); JA783 (Statement 19). And listeners were directed to Peloton's "SEC filings" for "a discussion of the material risks and other important factors that could impact [its] actual results." *Id.*

Peloton's SEC filings, in turn, discussed in detail the principal risks to Peloton's business. *See supra* at 6-12. Most notably, they provided extensive discussion of COVID-specific risks, including the risks Plaintiffs allege materialized. Peloton warned, for example, that "it remains uncertain how the COVID-19 pandemic will impact consumer demand for our products and services." JA415. It recognized that demand "fluctuated based on developments surrounding COVID-19," such as "the duration of the spread of the outbreak (including the potential impact of variants of the virus) and related stay-at-home orders" and "companies' remote work policies." JA416. It further acknowledged that demand had been unusually "high due to government shelter-in-place orders and other stay

46

at home trends," JA425, and expressly cautioned "the removal of lockdowns may cause consumers to go back to their pre-COVID routines," JA416.

Peloton also regularly updated its disclosures as it gained more information, further reinforcing the tailored nature of the cautionary language. *Slayton*, 604 F.3d at 773. For example, in its Forms 10-Q for FY21 Q2 and Q3, Peloton stated that "[o]ver time, we expect the seasonality of our business to return." JA375; JA560. In its Form 10-K for FY21 Q4, Peloton altered this disclosure to state: "[a]s the pandemic receded in recent months, we experienced a return to pre-pandemic seasonal trends." JA410.

And during each earnings call, as well as the May 2021 conference, Defendants repeatedly emphasized that the COVID situation was changing rapidly, was highly uncertain, and could not be predicted. *E.g.*, JA691 (Statements 1-2); JA731 (Statements 11, 14); JA784 (Statement 19); JA836 (Statement 10). Defendants also expressly acknowledged that COVID-level demand was "unusual" and would "step back in fiscal year 2022," JA736, and "return to normal seasonal patterns," JA733 (August 2021 earnings call); *see* JA706 (May 2021 earnings call); JA801 (November 2021 earnings call); JA836 (May 2021 analyst call). Such warnings are more than sufficient, especially since any "reasonable investor" during the Class Period would have understood, and experienced, the unpredictability associated with COVID. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d

Cir. 2002) ("cautionary language [that] addresse[d] the relevant risk directly" was sufficient); *Rombach*, 355 F.3d at 176 (cautionary statements sufficient, even when some were "formulaic").

Plaintiffs respond that Peloton offered only "boilerplate" disclosures. OB38-40. But the detailed disclosures listed above are anything but boilerplate. And Plaintiffs' conclusory assertion that the disclosures are insufficient because they "did not specifically address" the undisclosed risk or that warned-of events "already materialized" (OB38-39) lacks merit for reasons discussed. *See supra* at 30-32.

### D. Three Statements Are Also Nonactionable Opinions

Statements 10, 11, and 14 are each opinions and not "untrue statement[s] of material fact." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (citation omitted). An opinion can be actionable only if "'the speaker did not hold the belief she professed,'" "the supporting facts she supplied were untrue," or "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citation omitted).

Statements 10 and 11 reflect Woodworth's "expect[ations]," or beliefs, about future bike demand; and Statement 14 offers Foley's "feel[ings]" about future bike demand and the FY22 forecast. These statements do not "express[] certainty" and,

48

as such, are statements of opinion. *Omnicare*, 575 U.S. at 183; *see Tongue*, 816 F.3d at 210-11 ("expectation[s]" or feeling "pleased with the results" are opinions).

Plaintiffs do not argue otherwise. They instead assert—in a single conclusory sentence and without reference to any specific statement—that any opinion statement is actionable because Defendants "omitted conflicting material facts about Peloton's demand and inventory levels." OB47. But for an opinion to be actionable, "the omitted facts must 'conflict with what a reasonable investor would take from the statement itself.'" *Tongue*, 816 F.3d at 211 (citation omitted). Plaintiffs identify no such conflict. *See supra* Section I.A.2.

## II. IN THE ALTERNATIVE, PLAINTIFFS HAVE FAILED TO PLEAD A STRONG INFERENCE OF SCIENTER

Because Plaintiffs have failed to allege an actionable misstatement or omission, the question of scienter need not be decided. But Plaintiffs' failure to plead the requisite strong inference offers an alternative ground to affirm. *See CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 78-79 (2d Cir. 2017).

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with," 15 U.S.C. § 78u-4(b)(2)(a), an "intent to deceive, manipulate or defraud," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). A "strong" inference is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. Plaintiffs

bear the burden of alleging facts (a) "to show that defendants had both motive and opportunity to commit fraud," or (b) "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (citation omitted). Plaintiffs fail to sufficiently allege either.

### A. Plaintiffs Fail to Allege Motive and Opportunity

"[T]o raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [Defendants] 'benefitted in some concrete and personal way from the purported fraud.'" *ECA*, 553 F.3d at 198 (citation omitted). Plaintiffs' motive theory is based solely on an allegation that Foley and Woodworth "realized tremendous profits on sales of their Peloton stock during the Class Period." OB53 (citation omitted). But insider stock sales cannot suggest motive unless they are "unusual." *Ark. Pub. Emps.*, 28 F.4th at 355 (citation omitted). Plaintiffs allege nothing unusual here.

As Plaintiffs admit, Foley and Woodworth's stock sales were made pursuant to 10b5-1 trading plans. JA260 ¶ 247; JA272 ¶ 295; JA273 ¶ 297. Such trades "[can]not be timed suspiciously," and do not give rise to scienter, unless the plan was entered into "during the putative class period" *and* the complaint "'allege[s] that the purpose of the plan was to take advantage of an inflated stock price.'" *Ark. Pub. Emps.*, 28 F.4th at 355-56 & n.4 (citation omitted); *cf.* 17 C.F.R. § 240.10b5-1(c)(1). Plaintiffs admit that Foley's trading plan was established in September 2020 (OB56),

and do not dispute that Woodworth's trading plan was likewise entered before the Class Period. Nor do Plaintiffs allege the trading plans were "to take advantage of an inflated stock price." The stock sales thus cannot give rise to the requisite strong inference of scienter.[11] *See Ark. Pub. Emps.*, 28 F.4th at 356 n.4 (failed to allege "plan was not 'given or entered into in good faith' or was 'part of a plan or scheme to evade the prohibitions' of the regulations" (citation omitted)); *Lululemon*, 14 F. Supp. 3d at 585 (no facts alleging trading plan entered "'strategically' so as to capitalize on insider knowledge").

Plaintiffs' arguments to the contrary lack merit. Plaintiffs repeatedly emphasize that the trades were for substantial amounts. OB53-54. But the mere fact that stock sales are "large," without more, is insufficient. *San Leandro*, 75 F.3d at 814.[12] And while Plaintiffs say the "timing" was suspicious, the only sales it identifies were in February 2021 (OB54-55)—at the start of the Class Period and pursuant to pre-arranged Rule 10b5-1 plans.

---

[11] Plaintiffs' reliance on *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472 (S.D.N.Y. 2018), is misplaced. OB56-57. There, the defendants adopted trading plans during the class period and traded in irregular amounts at irregular intervals, allegations not present here.

[12] Plaintiffs refer to $383 million in profit from the stock sales (OB3, 16), but the vast majority of those profits come from sales by the Non-Speaker Defendants and Lynch (OB53; JA259 ¶ 244)—none of whom made any of the statements challenged on appeal.

Plaintiffs also argue that Foley *later* terminated his 10b-5 plan and *later* pledged Peloton shares as collateral for loans, and that Woodworth *later* "halted" sales, to "avoid[] selling [her] Peloton stock." OB56-57. But this Court's decisions—and common sense—make clear that "retain[ing] a large holding in the company" is inconsistent with a motive to defraud. *San Leandro*, 75 F.3d at 814; *see Ark. Pub. Emps.*, 28 F.4th at 356 n.4. Maintaining existing or accumulating shares of stock "signals only confidence in the future of the[] company"— confidence incompatible with fraudulent intent. *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009). In arguing otherwise, Plaintiffs seek to benefit from opposite inferences: that both selling *and* not selling stock during the Class Period are indicative of fraud. Plaintiffs cannot have it both ways.

## B. Plaintiffs Fail to Plead Strong Circumstantial Evidence of Fraud

To establish scienter by demonstrating "conscious misbehavior or recklessness," Plaintiffs must show—as to each defendant—that their conduct represents such an "extreme departure from the standards of ordinary care" as to "*approximat[e] actual intent.*" *S. Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citations omitted). Where, as here, Plaintiffs fail to establish motive, "the circumstantial evidence of conscious misbehavior 'must be correspondingly greater.'" *Ark. Pub. Emps.*, 28 F.4th at 355 (citation omitted).

Plaintiffs rely on the CWs, post-Class Period statements, and the "core operations" theory. Viewed individually and collectively, these allegations are insufficient.

**The CWs.** Plaintiffs repeatedly invoke the "number" of CWs. OB32; *e.g.*, OB4, 8, 35, 49 (bolding "thirty-one"). But alleging a strong inference of scienter is not a counting exercise; the actual substance of the allegations matters. As explained, the CW allegations are entirely consistent with the challenged statements, *and* inconsistent with one another. *See supra* Section I.A.3. For scienter purposes, there is an additional flaw: no CW had any meaningful direct contact with Foley, and only CW1 had direct contact with Woodworth. Since the relevant inquiry is whether "Defendants knew, when speaking, that their statements . . . were false," the other CWs have little bearing. *Shemian v. Rsch. in Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014); *see Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (no scienter where CWs did not "assert direct knowledge that this view was held by defendants").[13]

---

[13] CW5 alleges Peloton hosted company-wide meetings, during which Foley "discuss[ed] sales figures" and "inventory management." JA187 ¶ 42; JA213 ¶ 133. But CW5 provides no details and no time frame for these meetings, and never alleges Foley shared data showing decreased sales or "excess" inventory. Similarly, CW27 reported attending "weekly Zoom calls" with a number of people, including Foley, JA203 ¶ 99, but says nothing about what was discussed during those calls. CW26 asserts "Woodworth was 'aware' of inventory reporting discrepancies," JA203 ¶ 98, but fails to explain what these "discrepancies" were, when they occurred, or how

As to CW1, Plaintiffs assert, at most, that CW1 met with Woodworth once a month "to discuss capacity and demand" and that data presented during these meetings suggested "demand for Peloton's bikes was expected to decline as early as February 2021," and that "demand had declined by "7-20%" "by March 2021." JA183 ¶¶ 27-28. But CW1 does not contend Woodworth "ever accepted" his "views." *Wochos*, 985 F.3d at 1194. Nor should she have: demand was not predicted to—and did not—decrease in February or March 2021. Peloton's $1.262 billion in Q3 revenue (January-March 2021) beat its guidance ($1.1 billion) and exceeded results from the previous quarter ($1.065 billion) and year (141% YoY). JA703.

The timing of CW1's allegations further reinforce they are irrelevant to Defendants' knowledge of falsity. Based on CW1's own allegations, any meeting to discuss slowed demand occurred *after* the February 4, 2021 statements (Statements 1-2). And to state the obvious, CW1's allegations about demand in February and March have no relevance to demand in May, August, and November 2021 (Statements 9-11, 14, 19-20). *See Hassan*, 2023 WL 8110940, at *3 (statements "refer[ring] to growth within the second quarter" do not render misleading statements about "YTD growth").

---

they relate to Plaintiffs' allegations. This is demonstrably insufficient for scienter. *See Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63, 65 (2d Cir. 2011) (no scienter despite twelve CWs because "not one" could "identify a single specific report" contradicting challenged statements).

To the extent Plaintiffs contend that Defendants should have disclosed decreased demand *after* February or March, that is precisely what Defendants did, by issuing Q4 revenue guidance lower than Q3 revenue. JA449. That decrease in demand heading into the warmer weather mirrored traditional seasonal sales trends, which Peloton also disclosed. JA375, 704, 706. Like all of Plaintiffs' allegations, CW1 fails to recognize the seasonal calendar, lacks any comparator, and ignores actual results.

The other CWs do not speak to Defendants' knowledge of any specific contradictory information. OB51-52. Several say nothing about any of the Speaker Defendants and speak (at most) about "management" generally. *E.g.*, JA189 ¶ 48; JA217 ¶ 143. The rest allege generally that the Speaker Defendants had "access" to or had "seen" inventory reports, or that they "should," "would," or must have known something. *E.g.*, JA188 ¶ 46; JA192 ¶ 61; JA195 ¶¶ 68, 70; JA225 ¶ 158; JA242 ¶ 195; JA250 ¶ 211. Such vague allegations of "access" "amount to little more than speculation that documentation or evidence of [contrary facts] must have existed." *In re Renewable Energy Grp. Sec. Litig.*, No. 22-335, 2022 WL 14206678, at *3 (2d Cir. Oct. 25, 2022). And "generalized allegations predicated on what the Defendants must have known '[b]y virtue of their responsibilities and activities as a senior officer,' are precisely the kind of conclusory allegations that fail to satisfy the PSLRA's heightened pleading standard." *Id.* (alteration in original) (citation

omitted); *see Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) (allegations that defendants "monitored the sales and returns" insufficient to establish that "defendants actually possessed information contradicting their public statements").

**Post-Class Period Allegations.**  Ignoring this Court's repeated warnings that "plaintiffs may not plead fraud by hindsight," *Slayton*, 604 F.3d at 776, Plaintiffs invoke two post-Class Period events to show scienter: (i) a *Business Insider* article discussing a January 2022 internal presentation, allegedly showing Peloton had "excess inventory . . . since June 2021," JA219 ¶ 146; OB53; and (ii) Peloton's then-new CEO, Barry McCarthy's September 2022 statement about the status of inventory in February 2022, OB3, 17, 42.  But the first of the five inventory statements (Statement 9) was made on May 7, 2021, before the internal presentation alleged that "excess inventory" had accrued.  And the last (Statement 19) was made on November 4, 2021, months before the internal presentation was made and before McCarthy arrived at Peloton.  These later statements cannot make any of the inventory statements knowingly false at the time they were made.[14]

**Core Operations.**  Plaintiffs also rely on the "core operations" doctrine. OB52-53.  Setting aside "whether, and in what form," the doctrine "survives [the

---

[14]  The temporal disconnect also disposes of the January 2022 *CNBC* article, which reported that Peloton allegedly "stopped producing the Bike+ in December 2021"—after all the challenged statements were made.  OB4.

PSLRA] as a viable theory of scienter," *Renewable Energy Grp.*, 2022 WL 14206678, at *3 n.4 (citation omitted), Plaintiffs state only that "[d]emand and inventory were part of Peloton's 'core operations.'" OB52. "Such a naked assertion, without more, is plainly insufficient." *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (stating only that product was "key product" insufficient); *see Swanson v. Danimer Sci., Inc.*, No. 23-7674, 2024 WL 4315109, at *2 (2d Cir. Sept. 27, 2024) (stating only that "the challenged statements reflect[] 'core information' that was or should have been known by executives" insufficient). Regardless, and as Plaintiffs concede, any "core operations" theory can, at most, "supplement[]" allegations of scienter and "cannot establish scienter independently." OB52 (citation omitted). For the reasons discussed, there are no independent allegations of scienter for the core operations theory to supplement.

## III. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' OTHER CLAIMS

As Plaintiffs admit (OB58), their Section 20(a) and 20A claims rise and fall with their Section 10(b) and Rule 10b-5 claims. *See Ark. Pub. Emps.*, 28 F.4th at 356. Because Plaintiffs failed to allege a predicate violation, the district court correctly dismissed Plaintiffs' Section 20(a) and 20A claims. And because Plaintiffs do not raise any arguments challenging dismissal of their Section 10(b) insider trading claims against the Non-Speaker Defendants in their opening brief, those

claims are not before the Court. *JP Morgan Chase Bank v. Altos Hornos de Mex.,*

*S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

affirmed.

Dated: January 28, 2025                                Respectfully submitted,

                                                              */s/ Melissa Arbus Sherry*
                                                              Melissa Arbus Sherry
                                                              Andrew B. Clubok
                                                              LATHAM & WATKINS LLP
                                                              555 Eleventh Street, NW
                                                              Suite 1000
                                                              Washington, DC 20004
                                                              (202) 637-2200
                                                              melissa.sherry@lw.com

                                                              Michele D. Johnson
                                                              LATHAM & WATKINS LLP
                                                              650 Town Center Drive
                                                              20th Floor
                                                              Costa Mesa, CA 92626

*Counsel for Defendants-Appellees*
*Peloton Interactive, Inc., Thomas Cortese, John Foley, William Lynch,*
*Jill Woodworth, Mariana Garavaglia, and Hisao Kushi*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Second Circuit Rule 32.1(a)(4) because this brief and addendum contain 13,938 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  January 28, 2025                              */s/ Melissa Arbus Sherry*
                                                                 Melissa Arbus Sherry

**ADDENDUM**

| Number | Source | Statement | Reasons Not Actionable |
|---|---|---|---|
| 1 | Feb. 4, 2021 Earnings Call | <u>Analyst</u>: "[Y]ou mentioned that manufacturing capacity exceeds demand. I just want to clarify, is that strictly because you ramped capacity, or are you seeing any change to demand due to extended order delivery times?"<br><br><u>Foley (Statement 1)</u>: "**We are not seeing a softening in demand. That is absolutely not what's happening here. We are seeing incredibly strong organic demand even in the face of light marketing,** as you know. The successes that we're seeing in getting order delivery down and getting a backlog down are 100% based on incredible upgrades in our manufacturing capacity . . . . [B]ut it's absolutely not a softening of demand. That's now what we're seeing. We're seeing robust demand.**" | Not false or misleading<br><br>Puffery<br><br>Forward-looking<br><br>No scienter |
| 2 | | <u>Woodworth (Statement 2)</u>: "And I would just highlight, obviously, that's reflected in the revised revenue guidance that we've given for Q3 and Q4. Obviously, in Q3, we're working through a substantial backlog of orders, **but we're still seeing very strong organic demand across all geographies across all products."**<br><br>JA680. | Not false or misleading<br><br>Puffery<br><br>Forward-looking<br><br>No scienter |

| 3[15] | | <u>Analyst</u>: "[J]ust thinking about the opening next year, . . . how are you thinking about that."<br><br><u>Foley</u>: "[W]e've remained very, very bullish on our opportunity. **We haven't seen any softening of demand.**"<br><br>JA683. | Not false or misleading<br><br>Puffery<br><br>Forward-looking<br><br>No scienter |
| 9 | May 7, 2021<br>Form 10-Q | <u>Peloton</u>: "The increase in net operating assets and liabilities [for the nine months ended March 31, 2021] was primarily due to a $444.2 million increase in accounts payable and accrued expenses related to increased inventory and other expenditures to promote general business growth, as well as the timing of payments, partially offset by a **$363.7 million increase in inventory levels as we ramped up supply to meet the current increased demand.**"<br><br>JA549. | Not false or misleading<br><br>No scienter |
| 10 | May 25, 2021<br>Conference | <u>Analyst</u>: "[H]ow do you get people comfortable with where bike demand is heading into warmer weather and into strong opening[?]"<br><br><u>Woodworth</u>: "[W]e all know that COVID was a bit of an anomaly last year in terms of sales. And so when you look at Q4 of last year, . . . [it] was the most bikes or treads that we had ever sold in such a short period of time, it's a tough comparable for us, right? And at this | Not false or misleading<br><br>Puffery<br><br>Forward-looking |

---

[15] Statement 3, though forfeited (*supra* note 4), is included for the Court's convenience.

| | | | |
|---|---|---|---|
| | | juncture, it's not relevant. So . . . let's look back to where we were in Q4 of '19 and where we expect to be in terms of bike in Q4 of this year. **And I was trying to make the point that, yes, we've lapped COVID now. But bike sales or bike demand is still over 3x where it was a couple of years ago, which when you look at that CAGR over a 2-year period, we still see a ton of demand**. . . . [A]nd then in terms of the warmer weather and getting back, we're always going to be seasonal, right? Now that COVID is behind us and people aren't locked indoors. There's always going to be some summer seasonality to the business." <br><br> JA836. | Opinion <br><br> No scienter |
| 11 | Aug. 26, 2021 Earnings Call | <u>Woodworth</u>: "For fiscal 2022, we expect total revenue of $5.4 billion or 34% year-over-year growth and a 72% two-year CAGR. . . . [W]e are entering fiscal 2022 with a normalized backlog for our Bike portfolio and guidance reflects our expectation of **continued strong demand**." <br><br> JA734. | Not false or misleading <br><br> Puffery <br><br> Forward-looking <br><br> Opinion <br><br> No scienter |
| 14 | | <u>Analyst</u>: "[W]e know there's seasonality, but just given the light 1Q guide, . . . is the bike price offensive or defensive? And how do you think about demand for Bike+ currently?" | Not false or misleading <br><br> Puffery |

| | | | |
|---|---|---|---|
| | | Foley: "**So as Jill said in her opening remarks, we feel like the demand for Bike+ and Bike is robust, and we feel good about the entire year's forecast. The price drop with B1 was absolutely offensive. As we think about the competitive landscape, we think about democratizing access to great fitness, which is, as you know, always been in our playbook.**"<br><br>JA737-38. | Forward-looking<br><br>Opinion<br><br>No scienter |
| 19 | Nov. 4, 2021 Earnings Call | Foley: "Looking ahead, we're about to enter our busiest time of the year. **Our inventories are healthy, and our logistics teams are well equipped for the seasonally strong sales period.** We have low expected OTDs across our portfolio as we know delivery is greatly appreciated during the holiday and New Year's resolution periods."<br><br>JA787. | Not false or misleading<br><br>Puffery<br><br>Forward-looking<br><br>No scienter |
| 20 | May 6, 2021 Form 10-Q; August 26, 2021 Form 10-K; November 4, 2021 Form 10-Q | "Our operating results could be adversely affected if we are unable to accurately forecast consumer demand for our products and services and adequately manage our inventory. . . . **If we fail to accurately forecast consumer demand, we may experience excess inventory levels or a shortage of products available for sale.** Inventory levels in excess of consumer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer . . . ."<br><br>JA379, 424, 563-64. | Not false or misleading<br><br>No scienter |